Exhibit U

# YOWORLD MUSIC COMPANY RECORDING/DEVELOPMENT/MANAGEMENT AGREEMENT

650 WASHINGTON BOULAVARD
BALTIMORE, MARYLAND
301.514.4028

AGREEMENT made and entered into as of _5/21/05_ ,by and between YoWorld Music and Management Company, Inc and Rowdy City Records, Inc., (referred to hereinafter as "Managers" and "Producers") and _Andre Cooper_ and _Randy City / No Walk_, professionally known as "_DREKO / Hannibal_" c/o _____ (individually and collectively referred to hereinafter as "Artist").

WHEREAS, Artist desires to engage Manager to represent Artist and to render services to Artist as Artist's sole and exclusive personal manager, representative and advisor, throughout the world, in all of Artist's affairs in the entertainment industry; and

WHEREAS, Manager desires to act in such capacity and to accept such engagement, and this instant agreement is and shall be for a period of not less than (2) two years in effect and set into force by the signatures at the bottom of this agreement.

NOW, THEREFORE, in consideration of the premises and mutual promises contained herein, and for other good and valuable consideration, the parties hereto agree as follows:

1. (a) Artist hereby engages Manager to be the sole and exclusive personal manager, representative and advisor, throughout the world, of Artist (and any company or corporation formed, owned or controlled, directly or indirectly, by Artist) in all facets of Artist's careers in the entertainment industry. Artist shall immediately advise Manager of all offers of employment and of all inquiries concerning Artist's careers.

(b) Manager hereby accepts such engagement and agrees to advise and counsel Artist regarding Artist's careers in the entertainment industry and to use its reasonable efforts to promote, develop and advance Artist's careers. Manager's services hereunder are not exclusive to Artist and Manager shall be permitted to perform the same or similar services for other artists or persons during the Term. Manager shall also be permitted to devote such time and efforts to other business activities, as Manager may deem necessary or desirable in Manager's sole discretion.

(c) Artist hereby acknowledges that Manager is not licensed under the Labor Code of the State of California as a talent agent or employment agent or otherwise under the Business and Professions Code of the State of California or as a theatrical employment agency or

other employment or booking agency under the General Business Law of the State of New York or as any of the foregoing under the laws of any State; that Manager has not offered or attempted or promised to obtain, seek, or procure employment or engagements for Artist; and that Manager is not authorized, licensed or expected to do so. Therefore, Artist shall not look to Manager to procure or provide engagements or employment; provided, however, that Manager shall select, negotiate with and otherwise represent Artist to such agencies and other third parties that seek and procure employment and engagements for artists.

(d.) All artists under this agreement are deemed to be raw talent that needs the unique services of YoWorld Music Company in order to achieve the excellence required to be a commercial entity or artist. In return for the unique services of YoWorld, all artists are required to be involved with the selling of original CD's regardless of whether or not such artist is on the cd or not. This is a team effort, which helps all artists excel. In this regard, all contract artists with YoWorld must be involved with any street team cd selling/promotions of other YoWorld acts, and maintain an average of (20) twenty cd's sold per week during such street team campaigns, or this agreement is null and void.

2. The initial term ("Initial Term") of this agreement shall be for a period of two (2) years from the date first above written. Manager shall have the right to extend the Initial Term for three (3) consecutive one (1) year option periods ("the Option Periods"). The first Option Period shall commence immediately upon conclusion of the Initial Term and each successive Option Period shall commence immediately upon conclusion of the preceding Option Period unless Manager gives Artist written notice of its intention not to exercise such option prior to the expiration of the Initial Term or the then-current Option Period. The Initial Term and the Option Periods are collectively referred to hereinafter as the "Term".

[Variation: Notwithstanding anything to the contrary contained herein, if the recording agreement between Artist and a Major Record Company (as defined below) shall expire or otherwise terminate during the Term and if Artist thereafter does not have an opportunity to enter into another recording agreement with a Major Record Company (the terms of which provide that Artist shall record and deliver to that Major Record Company one (1) or more Album(s), each with a minimum recording fund of One Hundred Fifty Thousand Dollars ($150,000.00)) prior to the date nine (9) months after the date of that expiration or other termination, Artist shall have the right to notify Manager of Artist's desire that this Agreement be deemed terminated if a replacement recording agreement with a Major Record Company shall not be offered to Artist prior to the date ninety (90) days after Manager's receipt of that written notice. As used herein, the term "Major Record Company" shall refer to BMG, Sony Music, CEMA, Universal, any of the so-called "WEA" record companies, any other record company in the United States which is distributed exclusively by any of the foregoing distributors through normal retail distribution channels in the United States.]

[Variation: Notwithstanding the foregoing, Manager shall not have the option to renew and extend the Term for the Option Period unless all accounting statements rendered to

Artist by a Major Record Company for any accounting period ending prior to the expiration of the Initial Period indicate that aggregate net sales of Albums worldwide during the Initial Period equal or exceed five hundred thousand (500,000) units.]

3. (a) In consideration of Manager's services hereunder, Artist hereby irrevocably assigns to Manager and shall pay Manager or cause Manager to be paid, as and when received by Artist or applied on Artist's behalf, a sum ("Commission") equal to twenty percent (20%) of any and all Gross Compensation.

(b) For the purposes of this Agreement, "Gross Compensation" shall include, without limitation, all forms of income, consideration and compensation relating to Artist's endeavors in the entertainment industry, including, salaries, advances, earnings, fees, royalties, partnership interests, shares of stock, bonuses, shares of profits, shares of receipts, music publishing income, recording funds, tour support received from record companies, gifts, income in kind, and other considerations of any kind or nature whatsoever earned or received directly or indirectly by Artist, individually or as a member of a group or by any party or entity on Artist's behalf or by any party or entity which has furnished Artist's services in the entertainment industry, regardless of by whom procured. Notwithstanding the foregoing, Manager shall not be entitled to Commission with respect to the following:

(i) any actual bona fide recording costs (not including personal advances or wages paid to Artist) paid to Artist or on Artist's behalf pursuant to an agreement for Artist's recording services, up to a maximum of One Hundred Thousand Dollars ($100,000) per album;

(ii) Monies payable to unrelated third party authors, composers and/or co-publishers to the extent that such monies are deducted from monies otherwise payable to Artist;

(iii) all monies paid to Artist as reimbursement for so-called "sound and light" expenses, incurred by Artist in connection with live concert appearances; and

(iv) all monies received by Artist as so-called "tour support" to the extent such monies are recoupable and specifically designated as deficit financing and not used by Artist as a personal advance or for any other purpose.

[Additional Variations:

(v) Royalties, advances or other payments actually made to any producer, mixer or engineer (other than Artist) of master recordings embodying Artist's performances as a featured recording artist payable as a result of the reproduction or other exploitation of those master recordings;

(vi) Monies actually paid by or on behalf of Artist (in connection with personal appearances by Artist) to opening acts, and for sound and light equipment and technicians, and all sums paid to Artist as actual reimbursement by a concert promoter for the cost of sound and light equipment and technicians or similar reimbursement in

connection with a concert appearance by Artist;

(vii) Monies payable to or on behalf of Artist and actually paid for independent promotion and marketing by the Major Record Company with which Artist is a party to a recording or similar agreement, by a person, firm or corporation with which Artist is a party to a co-publishing, administration or similar agreement, or by a third party. [To the extent that Artist has or shall have the right to approve such expenditures, such expenditures shall be subject to Manager's prior approval, which approval shall not be unreasonably withheld by Manager];

(viii) Monies paid by or on behalf of Artist to any third party and actually expended for production costs of a film or video or other filmed performance embodying Artist's performances (other than fees, including union session fees, paid to Artist in connection with the foregoing) including, without limitation, by the Major Record Company with which Artist is party to a recording or similar agreement;

(ix) Performance guarantees (as that term is generally understood in the recording industry) payable to Artist which are less than One Thousand Dollars ($1,000);

(x) So-called "financial investment income" or "passive investment income" earned by Artist which is not otherwise attributable to the results and proceeds of Artist's services in the entertainment field.]

(c) Manager's Commission shall be payable upon all Gross Compensation as and when such Gross Compensation is paid to Artist or to any third party on Artist's behalf, during the Term or after the Term, as a result of and/or pursuant to:

(i) any and all engagements, contracts, commitments and agreements now in existence or entered into or negotiated during the Term;

(ii) any and all engagements, contracts, commitments and agreements negotiated and entered into after the expiration of the Term to the extent such contracts, commitments and agreements pertain to master recordings and/or musical compositions recorded and/or written and composed, in whole or in part, by Artist during the Term;

(iii) any and all extensions, renewals, substitutions, replacements, amendments, additions and modifications of all such contracts, engagements, commitments and agreements referred to in (i) and (ii) above; and

(iv) any and all judgments, awards, settlements, payments, damages and proceeds relating to any suits, claims, actions or proceedings arising out of alleged breach, non-performance or infringement by others of any of the contracts, engagements, etc., referred to in (i), (ii) and (iii), above.

[Variations:

Notwithstanding the foregoing, Manager shall be entitled to receive the Commission set forth in subparagraph (a) above in perpetuity only with respect to property initially exploited during the Term. For purposes hereof, master recordings embodying Artist's featured performances and those musical compositions embodied thereon shall be deemed initially exploited during the Term if recording sessions for those masters shall have commenced prior to the end of the Term. Notwithstanding the foregoing, "property" shall not include master recordings embodying Artist's featured performances which were released prior to the Term

In lieu of the amount set forth in subparagraph 3(a) above, Manager shall be entitled to receive the following percentages of Gross Compensation earned by Artist at any time as a result of the exploitation during the following periods:

(a) Ten percent (10%) for the period commencing upon the last date of the semi-annual accounting period ending immediately after the Term and ending on the date two (2) years after that date ("First Post-Term Period");

(b) Seven and one-half percent (7½%) for the period commencing upon the expiration of the First Post-Term Period and ending on the date two (2) years after that date ("Second Post-Term Period"); and

(c) Two and one-half percent (2½%) for the period commencing upon the expiration of the Second Post-Term Period and ending on the date one (1) year after that date ("Third Post-Term Period");

Notwithstanding anything to the contrary contained herein, no Commission shall be payable to Manager pursuant to this subparagraph on Post-Term property after the expiration of the Third Post-Term Period. For purposes hereof, master recordings embodying Artist's featured performances shall be deemed initially exploited during a particular Post-Term Period if recording sessions have commenced with respect thereto prior to the expiration of that Post-Term Period.]

(d) No expense, cost or disbursement incurred in connection with receipt of Gross Compensation, including, without limitation, salaries, professional fees and booking agency fees shall be deducted therefrom prior to calculation of Commission. In addition to the foregoing, Artist shall reimburse Manager for any and all reasonable bona fide expenditures incurred by Manager on Artist's behalf or in connection with Artist's career or in the performance of Manager's services hereunder within thirty (30) days of such expenses being incurred [variation: provided, however, that Manager shall not incur any single expense in excess of _____ Dollars ($_____) nor aggregate monthly expenses in excess of _____ Dollars ($_____) without Artist's consent.] It is agreed and understood that Artist will be responsible for all booking agency fees and commissions, union dues, publicity and promotion costs, legal fees and accounting fees and any and all taxes due with respect to Gross Compensation. In the event Manager advances any of the foregoing fees, costs or expenses on Artist's behalf, Artist shall reimburse Manager for such advances within thirty (30) days of Manager's payment

and/or in the event Manager does not take or withhold its Commission from Gross Compensation for any reason, such amounts shall be deemed a loan from Manager to Artist. Artist hereby authorizes and empowers Manager to deduct the amount of any such loans and advances from any sums received by Manager for Artist's account.

(e) Any and all agreements between Artist and any corporation, partnership, trust and/or other business entity which furnishes Artist's services or which is owned (in whole or in part) or controlled (directly or indirectly) by Artist or Artist's family shall provide that such entity shall only furnish Artist's services subject to the terms and conditions of this Agreement. Any such entity shall become a party to this Agreement.

**4.** (a) Artist shall notify and irrevocably direct and cause any and all third parties for whom Artist renders services in connection with the entertainment industry to pay directly to Manager the Commission due to Manager hereunder, and such Commission shall be payable to Manager immediately upon payment or credit to Artist or to any person on Artist's behalf of the Gross Compensation upon which such Commission is based. The aforesaid direction to any such third party shall be included in any and all agreements of every kind and nature in respect of Artist's activities in and throughout the entertainment industry, including, without limitation, recording agreements, publishing agreements and agency agreements and shall be substantially as follows:

"Artist hereby irrevocably authorizes and directs you to pay to Management Company, Inc. or its assignee, a sum equal to twenty percent (20%) of all sums due to, or paid on behalf of, the undersigned hereunder. Such payment shall be made at the same time that payments are due to the undersigned hereunder. Each payment shall be accompanied by a duplicate of the statement rendered to the undersigned."

(b) The interest and compensation set forth hereinabove which shall be paid to Manager shall be a continuing interest, and shall not be revocable at Artist's pleasure. It is intended by Artist to create an agency coupled with an interest and the appointment and engagement of Manager and Manager's right to receive the Commission as provided for herein are the inducements for Manager to enter into this Agreement.

(c) In the event Artist receives Gross Compensation with respect to which Manager's Commission has not been paid pursuant to paragraph 4(a), above, Artist shall, within fifteen (15) days after the close of each monthly period during the Term of this Agreement and thereafter so long as Artist collects or receives such Gross Compensation hereunder, render a written accounting statement to Manager setting forth all Gross Compensation received by Artist hereunder during the preceding month, specifying the source thereof and Manager's Commission hereunder and including the amount of any expenses and any loans or advances paid by Manager to Artist or on Artist's behalf. Each such accounting statement shall be accompanied by payment to Manager of the sum thereon shown to be due to Manager for such accounting period.

[Alternate to paragraphs 4(a)-(d): Artist and Manager shall select an accountant or business manager ("Accountant") who shall have the right to collect and receive, on

Artist's behalf, all of Artist's Gross Compensation hereunder and deposit such Gross Compensation in one or more segregated bank accounts. Manager shall have the right to approve Artist's selection of an Accountant, it being understood and agreed that Manager approves _____, the accountant presently engaged by Artist. Artist shall notify and direct any and all third parties to pay all Gross Compensation directly to Accountant and shall authorize, direct and cause Accountant to pay Manager all Commission due hereunder as well as any reimbursement or payment for expenses pursuant to paragraph 3(d), above, from the first monies received within each month during the Term. Such payments shall be accompanied by a written accounting statement setting forth all Gross Compensation received by the Accountant on Artist's behalf during the preceding month and specifying the source thereof.]

(d) Artist agrees that Manager and Manager's representatives may inspect and audit Artist's books and records to ascertain the amounts due Manager hereunder. The aforementioned audits and/or inspections, if any, shall be conducted upon reasonable notice to Artist. "Books and records" as used hereunder shall include ledgers, journals, receipt books, checks and all other records concerning financial matters.

**5.** No breach of this Agreement on the part of Manager shall be deemed material, unless Artist shall have given written notice specifying the nature of such breach to Manager and Manager shall have failed to cure such breach within thirty (30) days after receipt of such notice or, if such breach is not capable of being cured within such thirty (30) day period, if Manager commences reasonable efforts to cure, and proceeds with reasonable diligence to complete the curing of such breach.

**6.** Artist hereby irrevocably authorizes and appoints Manager as Artist's true and lawful agent and attorney-in-fact to execute for Artist in Artist's name and on Artist's behalf, any and all agreements, documents, and contracts for Artist's services. Artist hereby ratifies and affirms all acts performed by Manager pursuant to this power of attorney and confirms that this power is coupled with an interest. Notwithstanding the foregoing, Manager shall not execute for Artist in Artist's name and on Artist's behalf any major agreement committing Artist's time, services and/or artistic and musical materials, the terms of which Agreement shall not have been previously approved by Artist.

**7.** (a) Manager shall not assign this Agreement or any rights or obligations hereunder without Artist's consent, except that Manager may assign this Agreement without Artist's consent to any parent, subsidiary or other related or affiliated company or to any other person, firm or corporation acquiring a significant portion of Manager's stock or assets or entering into a merger or joint venture with Manager.

(b) Artist may not assign this Agreement or any of Artist's rights hereunder and any such attempted assignment shall be void. This Agreement shall be binding upon Artist and Manager and shall inure to the benefit of Artist's and Manager's successors. This Agreement shall also be binding upon any entity (including, without limitation, any loanout company which furnishes Artist's services) which directly or indirectly, in whole or in part, through one or more intermediaries, owns or controls, or is under common

ownership or control with, Artist. Accordingly, this Agreement is hereby accepted by Artist on Artist's behalf and on behalf of any such entity.

**8.** Artist hereby jointly and severally warrants and represents that:

(a) Artist is free to enter into and to perform under this Agreement and is not a party to any presently existing contract which would interfere with the full performance of the terms and conditions of this Agreement.

(b) Artist is over eighteen (18) years of age and has retained thoroughly experienced and knowledgeable attorneys in the entertainment industry to advise and counsel Artist with regard to this Agreement.

(c) Artist will at all times during the Term devote himself to his career in the entertainment industry and do all things necessary to promote such career.

**9.** Artist agrees that during the Term Artist will not assign, sell, convey, pledge or otherwise dispose of any property rights in Artist, his trade or personal name, by stock interest, wage assignments, partnerships or percentage or otherwise, without the prior written consent of Manager.

**10.** (a) Artist hereby acknowledges and agrees that Manager's right to represent Artist as Artist's sole and exclusive personal manager and Artist's obligation to solely and exclusively use Manager in such capacity are unique, irreplaceable and extraordinary rights and obligations and that any breach or threatened breach by Artist thereof shall be material and shall cause Manager immediate and irreparable harm to its reputation and goodwill in the entertainment industry, and other immediate and irreparable harm which cannot be adequately compensated for by a money judgment. Accordingly, Artist agrees that, in addition to all other forms of relief and all other remedies which may be available to Manager in the event of any such breach or threatened breach by Artist, Manager shall be entitled to specific performance, an injunction or other equitable relief against Artist to enforce Manager's exclusive rights hereunder.

(b) If at any time Artist fails, for any reason whatsoever, to fulfill or perform any obligation assumed by Artist hereunder, or engages any other person or entity to perform any services which Manager is entitled to perform exclusively on Artist's behalf hereunder, then, without limiting Manager's rights, Manager shall have the right, exercisable at any time by notice to Artist, to extend the expiration date of the then-current period of the Term. Such extension shall continue until Artist has fully cured such failure or engagement or terminated any engagement which is in violation of this Agreement and the then-current period of the Term shall be extended for a period of time equal to the duration of any such failure or engagement. Artist hereby acknowledges that Manager's exercise of its rights hereunder shall not in any way affect or diminish its right to equitable relief under this paragraph 10.

**11.** As used herein, the term "Artist" shall be deemed to refer to the entertainment unit

presently known as "_____" (the "Group"), as well as to each individual member of the Group who is a signatory hereto. In the event any such member should leave the Group or pursue a solo career while remaining a member of the Group, this Agreement shall continue to be binding with respect to such member during the Term hereof. In the event Artist wishes to add a new or additional member to the Group, Artist shall cause such member to accept the terms and conditions of this Agreement and such member shall be deemed a signatory hereto. This Agreement shall be binding jointly and severally upon said persons and the Group. Wherever required, the singular shall include the plural and, unless the context otherwise requires, the masculine gender includes the feminine and the neuter.

[Variation: If the individual members of Artist shall cease to record together as the group currently, collectively and professionally known as "_____" ("Group") or to perform live together as a Group or to engage in other professional activities together as a Group, Artist shall promptly give to Manager written notice thereof. Manager shall have the irrevocable option to continue to furnish Manager's services as a sole and exclusive personal manager to each member of the Group on the same terms contained in this Agreement and as if each member was Artist hereunder. Manager shall exercise that option independently with respect to each member of the Group not later than thirty (30) days after Manager's receipt of Artist's written notice described above. If Artist fails to so notify Manager, Manager shall be deemed to have exercised Manager's option referred to above for each member of Group.]

**12.** All notices hereunder shall be in writing and shall be given by mail, postage pre-paid or by facsimile transmission with all charges pre-paid at the addresses first indicated above, or such other address as either Artist or Manager may designate by notice to the other and date of such mailing or facsimile transmission shall be the time of the giving of notice. A copy of all notices to Manager shall concurrently be addressed to: .

**13.** (a) This Agreement sets forth the entire understanding between the parties with respect to the subject matter thereof, and no modification, amendment, waiver, termination or discharge of this Agreement or any provisions thereof shall be binding upon either party unless confirmed by a written instrument signed by Manager and Artist. No waiver of any provision of, or default under this Agreement shall affect either party's rights thereafter to enforce such provision or to exercise any right or remedy in the event of any other default whether or not similar.

(b) This Agreement and all of its provisions shall be interpreted and construed everywhere in accordance with the Laws of the State of California applicable to contracts executed and to be performed therein.

(c) If any part of this Agreement shall be determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having jurisdiction to make such determination, the remainder of this Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the 21 day of May, in the year of 2005.

_____ YoWorld Management Company, Inc.

Artist: DREKO/Hannibal Lee

Studio Representative: Robert R. Fuente (MADADY)

Witness: Eliz Porter