1

**Robert R. Prunté, (pro sé)**
1702 Linden Avenue

2

Baltimore, Maryland 21217

3

410.225.9940   301.514.4028

**RECEIVED**

JUN 2 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

4

5

# UNITED STATES DISTRICT COURT

6

## FOR THE DISTRICT OF COLUMBIA

7

8

9

10

**ROBERT R. PRUNTÉ**                    **CASE NUMBER: 06CV00480**

11

**Plaintiff,**

12

**Vs.**                                 **JUDGE:  PAUL L. FRIEDMAN**
                                        **(PLF)**

13

**UNIVERSAL MUSIC GROUP, et al;**

14

15

**Defendant (s)**

16

17

18

19

**PLAINTIFF'S MOTION TO STRIKE DEFENDANTS POINTS AND**

20

**AUTHORITIES IN OPPOSITION TO PLAINTIFFS MOTION FOR**

21

**PARTIAL SUMMARY JUDGMENT AND DEFENDANTS REPLY BRIEF**

22

**IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED**

23

**COMPLAINT AND MEMORANDUM OF LAW**

24

25

Comes now the plaintiff, with its Motion to Strike pursuant to **Fed. R. Civ. P. Rule 12(f),** due to the motion papers and attendant arguments being insufficient, immaterial, scandalous and frivolous as a matter of fact and law.

## COUNSELS LEGAL THEORIES ARE INTENTIONALLY MISLEADING

Even this pro se plaintiff can see through the blustering attempts by counsel to create some defense for the massive and brazen theft of this plaintiff's coveted works. Such inaccuracies about restating the law are not being well taken. From falsely depicting plaintiff as a *"Whitehead-type litigious Character"* to disingenuously espousing the *"Taylor Gifts v. Kay Berry"* case, and then deceitfully concurring with *Dawson* and *Sturdza* Courts of Appeals while hoping Federal Courts have been stricken with a Judicial Alzheimer's Disease of some sort, forgetting the original proceedings and resultant decisions which arose from those cases, these defendants are making their recalcitrance well known.

Now, after massive backpedaling from the *Whitehead* and *Kay Berry* legal postures and propositions, and last minute babbling footnote justification/explanations for inaccurate renditions or restatements of the law, Counsel for the defendants finally concurs with the plaintiff when it claims that the *"Sturdza"* case is the one upon which it now <u>chiefly</u> relies, and that *Dawson* supports its legal propositions.

A brief glance at the record would have informed counsel that the plaintiff had already restated the accurate *Sturdza* and *Dawson* propositions to this Court in the Motion for Partial Summary Judgment, which is before the Court presently. This

shenanigan by Counsel is worthless and time consuming, and as a matte of fact and law, real evidence of Counsel *surreptitiously* agreeing with plaintiffs entire case in chief. Every dispositive type proposition from counsel has been wrong and not one should be relied upon by this Court.

Even though counsel saw itself having to make nearly a whole page footnote justification of the *Kay Berry* case proposition, as well as being caught failing to tell the Court that in *Prunte I*, indeed Prunte' **Won**, unlike the frivolous and vindictive *Whitehead*, and also surreptitiously concurring with plaintiff concerning the *Sturdza* case, now counsel for the defendants boldly depicts the *Dawson v. Hinshaw* case in the same light, yet concurring with plaintiff still. Counsel's argument is deemed to be one merely being made in bad faith and for an improper purpose.

Of course *Dawson v. Hinshaw* supports every part of plaintiffs claim and rejects that of the defendants. Counsel has run out of breath stating that expert testimony in this matter is merely inappropriate, while hypocritically espousing cases where expert testimony was utilized and restated as the law on the first prong of the substantial similarity test as well as to identify what part of a plaintiffs works are protectible by Copyright Laws.

*Sturdza* concurs. If a District Court does not, the D.C. Court of Appeals would mandate, as in Sturdza a thorough examination of a plaintiffs works for substantial similarity as well as protectible expression, and a precise determination of the specific audience for the works in question.

The United States Registrar of Copyrights has already determined that obviously some parts of plaintiff's works are protected by Copyrights. This is all the more reason why any judgment of such complex musical works requires expert guidance.

The works were certainly complex enough to earn millions of dollars (howbeit allegedly unlawfully) for the recalcitrant defendants. Surely this Court or any Court will zealously seek to protect the interests of such magnitude without prejudice to any party, and with a steady view to the value the United States Copyright Office has already placed in plaintiffs coveted and now, allegedly "purloined" works.

Counsel briefly summed up the *Dawson* case in a trivial manner, claiming it was about sheet music, and that *Dawson* required no experts for ordinary songs, as if that were actually all that Court said, and if that was the bottom line of the decision. Counsel is flat out wrong. In *Dawson*, the District Court ruled against *Dawson* on the second prong of the substantial similarity inquiry.

More specifically, like the District Court in *Dawson*, counsel interprets the case to mean any lay observer could determine the second prong of the substantial similarity inquiry, which imposed upon *Dawson* an insurmountable hurdle which the Court of Appeals took note of.

4

1   Thus, at <u>that</u> particular stage of <u>that</u> case, the <u>only</u> evidence before the District

2   Court was indeed, sheet music of the two arrangements.

3   The District Court ultimately acted as a "<u>lay observer</u>" ruling against *Dawson*.

4   Ironically, Counsel for the defendants' argument tries to merely echo Counsel for

5   *Hinshaw* and the District Court in that case, since the 4th Circuit Court of Appeals

6   remanded the case due to the District Court failing to recognize the <u>limits</u> of the

7   "<u>ordinary observer characterization</u>" of the "<u>ordinary observer test</u>". **(See Dawson,**

8   **supra.)**

9

10  The *Dawson* Court clearly and unequivocally stated that those principles regarding

11  the "ordinary observer test" require focused orientation of the "ordinary observer

12  test" to the works "intended audience", and only permitting the "ordinary observer

13  test" where the lay public fairly represents the works intended audience. **(Quoting**

14  **Arnstein v. Porter, 154, F. 2d 464 (2d Cir. 1946).**

15

16  The *Dawson* Court realized that District Courts around the country and the legal

17  community at large had been slow to recognize explicitly the need for refining the

18  "<u>ordinary observer test</u>" in such a way that it would adopt the prospective of the

19  "<u>intended audience</u>". **(See: Dawson v. Hinshaw & Whelan associates v. Jaslow**

20  **Dental Laboratory, 797 F.2d 1222 (3rd Cir. 1986) cert. Denied 479 U.S. 1031**

21  **(1987).**

22

23  The Dawson Court further stated that:

24

25          *"Only reckless indifference to common sense would lead a Court to*
            *embrace a doctrine that requires a copyright case to turn on the*

*opinion of someone who is ignorant of relevant differences and similarities between two work...Instead, judgment should be an informed judgment made by people who are familiar with the media at issue"...*

*Dawson* <u>mandated</u> expert guidance in all cases involving <u>specialized</u> works made for <u>targeted</u> <u>audiences</u>, as Counsel for the defendants are well aware. However, and as the Dawson Court reiterated:

> *"Before departing from the typical "ordinary lay observer test", a Court must determine if the intended audience possesses "<u>specialized expertise</u>" which goes beyond mere "differences in taste" of the general public, and instead rises to the level of special knowledge which the lay public lacks"....*

In *Dawson*, the Appeals Court ruling stood firm and The United States Supreme Court denied certiorari. In *Dawson*, the works were directed to two different audiences. In this case, the works are directed to the same audiences. However, the main issue here, as in Dawson, is whether the targeted audience of the copyright owners is a "specialized" one, which possesses a special knowledge, which the lay public is lacking. The Hip Hop music audience is just such an audience, as evidenced by the *Oakland California School Board* in 1996.

Furthermore, and as a matter of fact and law, the *Linguistic Society of America*, as a society of scholars engaged in the scientific study of language, has already resolved to make it known to the world, concerning *Ebonics* that describes the language thusly:

6

A. *The language variety known as "Ebonics" or "African American Vernacular English", (AAVE), and "Vernacular Black English" and by other names is systematic and rule-governed like all natural speech varieties. In fact, all human linguistic systems—spoken, signed, and written---are fundamentally regular. The Systematic and expressive nature of the grammar and pronunciation patterns of the African American vernacular has been established by numerous scientific studies over the past 30 years. Characterizations of Ebonics as "slang", "mutant", "lazy", "defective", "ungrammatical", or "broken English" are incorrect and demeaning.*

B. *The distinction between languages and "dialects" is usually made more on social and political grounds than on purely linguistic ones. For example, different varieties of Chinese are popularly regarded as "dialects", though their speakers cannot understand each other, but speakers of Swedishland Norwegian, which are regarded as separate "languages", generally understand each other. What is important from a linguistic and educational point of view is not whether AAVE is called a language or a dialect, but rather that its systematicity be recognized.*

C. *As affirmed in the LSA Statement of Language Rights (June 1996), there are individual and group benefits to maintaining vernacular speech varieties and there are group benefits to maintaining vernacular speech varieties and there are scientific and human advantages to linguistic diversity. For those living in the United States there are also benefits in aspiring Standard English and resources should be made available to all who aspire to mastery of Standard English. The Oakland School Board's commitment to helping students master Standard English is commendable.*

D. *There is evidence from Sweden, the U.S. and other countries that speakers of other varieties can be aided in their learning of the standard variety by pedagogical approaches, which recognize the legitimacy of the other varieties of a language. From this perspective, the Oakland School Board's decision to recognize the vernacular of African American students in*

7

*teaching them Standard English is linguistically and
pedagogically sound. (Chicago, Illinois, January 1997).*

If the songs at issue were indeed directed at different audiences, then counsel's argument would seem more plausible. Counsel's argument against Ebonics/English Linguistics experts is a bit outlandish, since plaintiff is certain that even counsel needs *Ebonics* guidance in this case as well.

If Country songs, or Pop songs or Opera or even Urban Contemporary music were at issue, perhaps expert guidance would not be necessary since popular English language is used universally in those particular musical genres. On the contrary, the world of Ebonics is relatively new, and its adherents virtually unknown to American Society but well known as a sub-language or dialect of the streets to many.

This is the reality, which represents a starkly different lingo than the vernacular of the average member of the general public. Large segments of the general public are still in the dark concerning the meaning of many expressions commonly being employed by today's inner-city youth.

The lay public may have generally heard the word "*hip hop*" or "*rap*", but the genre has been denigrated to the point by the media in this country that it is doubtful whether they have ever purchased a rap or hip hop CD.

Thus, only a *"highly specialized audience"* purchases rap or hip-hop music, as a matter of fact and law.

8

1  Any argument that *Ebonics* does not represent the *linguistic sub-dialect* of a

2  specialized class of people possessing specialized knowledge and expertise about

3  the *Ebonics* lingo, is legally immature and politically naïve.

4

5  Therefore, and as a matter of fact and law, the *Dawson* Court entirely supplanted

6  the phrase "*Ordinary Observer*" with the phrase "*Intended Audience*", as the

7  appropriate label for the test for substantial similarity of expression, forever.

8

9  The 4th Court of Appeals remanded the case because the District Court did not

10  inquire into whether the audience for Dawson's work possessed *special knowledge*

11  or *expertise* that the lay public lacks, and, if the general "*undifferentiated*" lay

12  public fairly represents the "*Intended Audience*" of the Dawson arrangement....

13  **(See Dawson, Supra).**

14

15  Like Dawson, this plaintiff did not and does not sell CD's to the general public in

16  the pure sense of the phrase, but instead at hip hop/rap venues or places where

17  people who appeal to such genres congregate.  Finally, the *Dawson* case was

18  remanded with further special instructions to the District Court to determine

19  whether members of the "*intended audience*" would find the arrangements to be

20  substantially similar. **(Quoting Dawson v. Hinshaw, 905 F.2d 731; United States**

21  **Court Of Appeals, Fourth Circuit, Decided June 7, 1990).**

22

23  Counsel's argument against expert testimony while at the same time

24  disingenuously espousing the *Sturdza, Dawson* and *Kay Berry* cases, which clearly

25

9

1  restated the need for expert testimony, is more evidence of the shenanigans of
2  counsel and the recalcitrance of its client, as well as disregard for Rule 11.

3

4  These defendants have already allegedly made millions, if not billions from the
5  infringements at issue. When its (the defendants) songs have been stolen, they are
6  the first to demand every letter of the law be spelled out to the entire world, as
7  evidenced by their actions in *Universal v. Napster*. See company statement below:

8

9      *"Businesses, (as well as those individuals who control them) premised*
10     *on massive copyright infringement of works created by artists, should*
       *face the legal consequences for their actions", said a joint statement*
11     *from the two record labels.... (Statement made by Universal Music*
       *Group and a co-plaintiff where "their" copyrights were allegedly*
12     *infringed...(Universal v. Napster, 2001)*

13

14 Because counsel is well aware of the ultimate remarks of the Courts of Appeals in
15 *Sturdza*, *Dawson* and *Kay Berry*, it should be firmly admonished by this Court for
16 its inaccurate renditions and expressions of those case results, and all its arguments
17 regarding those cases should be stricken as <u>immaterial</u>, <u>insufficient</u>, <u>redundant</u> and
18 <u>frivolous</u> since all those cases fully support the plaintiff and not the defendants
19 proposition.

20

21 The D.C. Court of Appeals even sent the *Sturdza* case flying back to the District
22 Court because it determined there were "sufficient similarities" for a jury to reach a
23 different conclusion opposite the District Courts previous ruling. It was indeed in
24 *Sturdza* that the Court firmly declared and restated that:

25

1

2

3

4

> *"No principle can be stated as to when an imitator has gone*
> *beyond copying the idea, and has borrowed its expression".*
> *"Decisions must inevitably be ad hoc". (Quoting Judge Learned*
> *Hand, in Peter Pan Fabrics, Inc., v. Martin Weiner Corp., 274 F.2d*
> *487, 489 (2d cir. 1960) & Sturdza, Supra).*

5

6

7

8

9

10

11

The *Sturdza* Court purely concurred with the *Dawson* Court by re-stating the above state of the law which they felt required extreme flexibility concerning experts, and remanded the case to the District Court in order to determine if the audience for a spiritual composition was sufficiently specialized, and the lay audience therefore sufficiently unfamiliar with such works----to warrant expert evidence on the substantial similarity question. **(See Sturdza, Supra).**

12

13

14

15

16

17

Counsel's sudden concurrence with *Dawson* and *Sturdza* is proof positive of the unlikelihood of these defendants prevailing at a full trial of this case.  Counsel for the defendants broad and hopeful postulations, speculations and incredulities have no basis in fact or reality as a matter of fact and law, and as such they must be stricken from these proceedings.

18

19

20

21

22

23

Counsel's feeble attempt to surreptiously state such a unilateral principle frowned upon in *Peter Pan Fabrics*, is merely made in support of its client's recalcitrance, as a matter of fact and law. Counsel statement that the two works are so dissimilar that no reasonably ordinary person could find for the plaintiff…is highly suspect when no dissimilarities were mentioned or outlined by Counsel.

24

25

Nor has counsel made any attempt to bless this Court with the identity of any protectible expression in its clients or the plaintiff's works.

11

Likewise, Counsel has failed to claim any of the defendant's works are or were "independently created" in the face of evidence that plaintiff is the "sole mastermind" of all the words or chorus lines at issue in this case.  Counsels flimsy propositions and semantical position papers are plain frivolous and dilatory and must be stricken.

Furthermore, in *Sturdza*, the Court filtered out those elements of *Sturdza's* designs it viewed as "unprotectible ideas" and then moved to the issue of the expression of the protectible ideas of *Sturdza*.  Counsel has not done this for any work in question.  Instead, counsel attempts to mislead this Court concerning Copyright protection for the very heart of plaintiffs copyright protected works.   Never has Counsel mentioned that the issues of this case concern the very heart of the works in question.  Perhaps only experts will convince counsel that a song chorus lines are the most copyright protected elements on the books.

## SUMMARY JUDGMENT FROWNED UPON IN STURDZA

Also, the *Sturdza* Court postulated that summary adjudication of copyright cases should be frowned upon, as a matter of fact and law.  **(See A. A. Hoehling, 618 F2d at 977 & Sturdza, Supra)**.  The *Sturdza* Court thus concurred with the Dawson Court by restating the fact that:

> *"A flexible approach is required concerning using experts for highly specialized musical arrangements". (Quoting Sturdza Court, Supra).*

12

1   Furthermore, counsel is equally well aware that when a party moves under **Rule**
2   **12(b)(6)**, and the Court does not exclude outside materials, which are presented to
3   it, the motion may be treated as one for Summary Judgment under **Rule 56**. **(See**
4   **Rule 12(b)(6)**.

6   Counsel is in no position now to cry foul against this plaintiff merely because
7   plaintiff chose to oppose the motion to dismiss by countering with its Partial
8   Summary Judgment motion.

10   Thus, this defense counsel-created summary judgment proceeding scenario shall
11   instead pierce the pleadings to the extent where counsel will have no further legs to
12   stand upon, since it now espouses cases, which fully support the plaintiffs cause in
13   every way, as a matter of fact and law.

15   On its face counsel's **12(b)(6)** paper is further suspect of being highly frivolous
16   and suspect since it is well established that:

18       *"All the allegations in the complaint are taken as true, and should be*
19       *liberally construed in his or her favor". (See Leatherman v. Tarrant*
         *City Narcotics and Coordination Unit, 507 U.S. 163, 164 (1993);*
20       *Phillips v. D.C. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir.*
         *1979) &*
21

22       *"The plaintiff should be given every favorable inference that may be*
         *drawn from the allegations of fact. (See Scheuer v. Rhodes, 416 U.S.*
23       *232, 236 (1974); Sparrow v. United Airlines, Inc., 216 F.3d 1111,*
24       *1113, (D.C. Cir. 2000).*

25

Counsels all out attack on plaintiffs "factual allegations" is merely a charade for a desperate client. Issues like *ownership* and *authorship* for instance, having been proven to counsel by competent authority like the United Copyright Office, still caused counsel to make the unwarranted attacks on plaintiff's integrity and or the integrity of the United States Copyright Office. When, to the extreme contrary, the integrity of the defendants is at issue here, and none other.

## DATES AND TIMES OF INFRINGEMENTS AS WELL AS BY WHAT ACTS OF INFRINGEMENT WERE PERPETRATED BY WHOM, HAVE ALREADY BEEN ALLEGED IN THE AMENDED COMPLAINT

This plaintiff merely alleged and stated that he and only he is the claimant and author of the songs chorus lines allegedly infringed by the defendants, and the dates and times known to plaintiff concerning when these infringements allegedly occurred and by what acts of infringement were perpetrated by whom, has already been fully set forth in the Amended Complaint, as Counsel is well aware. **(See Amended Complaint, Page 20, paragraph 64 *"The alleged songs are believed to have been infringed during the years of 2004, 2005 and into 2006, based upon plaintiff's information and belief"...and...***

**By what type of infringement acts**:

See Amended Complaint at page 41, paragraphs 122 through 130 and more specifically, in the "*Liability as it relates to each person*" section of the Amended Complaint, Page 66, paragraphs 211 through 231 & Page 75, paragraphs 250 through 255.)

# DIRECT ACCESS HAS BEEN SHOWN OVERWHELMINGLY AND NOT CONTROVERTED BY THE DEFENDANTS

Counsel for these defendants claims that it has not conceded direct access to plaintiffs coveted works, when the exact opposite is the case. Here again counsel attempts to debate and argue about plaintiff's <u>factual allegations</u> as if they were not the immovable force that they are. These facts speak for themselves, and no defendant or its lawyer can controvert the <u>factual allegations</u> concerning "<u>Direct Access</u>" to plaintiff's coveted works. See below:

# INSURMOUNTABLE FACTS WHICH SUPPORT DIRECT ACCESS TO PLAINTIFF'S PROPERTY:

1. Inside Sessions literally "<u>duped</u>" plaintiff's company representatives into submitting original song materials to Universal Music Group under the guise of "professional song critiquing," which built plaintiffs confidence in defendants, merely to acquire songs "with" an authors permission. (**See: Amended Complaint, Exhibit B**):

   *"I like what you guys are doing. You have all the skills with regard to the grooves and lyrics. And the passion you feel about your music comes through. Now, I want you to get to that next level. I think you need to focus on the hooks a bit. Good isn't good enough. They have to be great"...****Quoted by Geof Seigal, Inside Sessions/Universal Music Group A&R Executive.***

2. Inside Sessions continued to *court and extort* plaintiff out of its coveted song properties by further bamboozling and hoodwinking YoWorld Company

representatives with more *"smoking gun"* type statements. **(See: Amended Complaint, Exhibit C).**

> *"Your demo is good, and with a few of the ideas I suggested to you, this could be a demo that a lot of people would really want to listen to. Please keep in touch and feel free to send me any new songs or demos that you would like to be heard"*... **Quoted by Brian Wittmer, Inside Sessions/Universal Music Group A&R Executive.**

3. Plaintiff's company most assuredly relied upon the deceitful statements made by high-level A&R executives of Universal Music Group. Plaintiff was so pleased with Universals statements, that he authorized the continued submissions of original songs on an open academy type basis. **(See Amended Complaint, Exhibit O, pg. 3 and specific albums, Exhibit E, as well as concerts held by plaintiff where cds were given away freely to the hip hop community on a promotional basis.**

4. To further induce action from the plaintiff as well as reinforce high confidence and trust, defendants repeatedly employed the phrase: *"Experience Is The Best Teacher"* in many email transmissions to plaintiff. **(See Amended Complaint, Exhibit O).**

5. Kanye West, a defendant person and alleged infringer of plaintiff's property, actually admitted that he uses other author's works in creating his own works, without their permission. **(See: Amended Complaint, Exhibit(s) R & S & also below).**

*"I didn't do the "Benjamin's", (a popular movie soundtrack), I wish I did. I tried to copy it though". " Imitation is the sincerest form of stealing! I don't mind because I used to imitate others when I was trying to learn how to do it. I think it's a good way to learn how to do something. I studied music that I liked, and then tried my best to emulate it".* **Recent quotes from Kanye West on MTV.com and The Wire radio show.**

6. Mr. Rich Christina and Mr. Adam Fischell, of Atlantic Records received songs from YoWorld and instructed YoWorld to continue sending them songs for their consideration. **(See Amended Complaint, Exhibit(s) J & L).**

*"I highly encourage you to send current and future projects for consideration".* **Quoted by Atlantic's Mr. Rich Christina, Senior Director, A&R, Atlantic Records.**

Thus, counsel's total argument is without merit and should be stricken as insufficient and immaterial since not one part of its argument is presented in accord with **Fed. R. Civ. P. Rule 8(b),** which plainly states that:

> *"All denials must fairly meet the substance of the averment denied"....*

Counsel should have said something to this Court like " My client did not have direct access to plaintiffs works because they got lost in the mailroom", or "Adam

17

Fischell was fired because he secretly worked for Kanye West and was taking many songs from others as well".

Merely stating loosely and off-handedly that discovery will help gain evidence controverting direct access is like going on a fishing expedition, which is also frowned upon by Federal Jurisprudence.

Counsel's "diatribe by footnote" about some day during discovery expecting to be able to find a way to controvert plaintiffs factual allegations is mere hogwash, and counsel is well aware it is being dilatory at this time. Counsels **Rule 12(b)(6)** motion is without merit and must be stricken, since the complaints material and factual allegations cannot be merely "spoken away" by recalcitrant defense lawyers.

The facts already uncovered in plaintiff's investigation of defendants show overwhelming direct access and exploitation of plaintiff's coveted works. In many cases, each song stolen has become an epic song, which handed the defendants wrongly and fraudulently placed Grammy awards, Oscars, Platinum and Gold records and other status based on the allegedly stolen property.

Aside from the aforementioned instances of direct access to plaintiff's coveted property as well as blatant extortion, it must be realized that these facts are gleaned from defendant's own open statements and admissions with regard to the acquisition of plaintiff's copyrighted works, which defendants have allegedly desired to wrongfully own and exploit.

18

Thus, the above-mentioned factual scenarios totally preclude defendant's ability to rebut or overcome such facts by competent evidence.  The defendants obviously wished to "view" YoWorld Music Companies "entire catalog" of songs for some business reason, howbeit unlawful in purpose and objective.

Such direct access and extortionate methods of acquiring songs, cannot be explained away lightly, and further precludes defendants from claiming "independent creation" of any song property allegedly stolen from plaintiff.  All remaining or future arguments of Counsel for the defendants must, at a minimum "fairly meet the substance of the averment denied", or plaintiff will seek to strike them as well.

## MEMORANDUM OF LAW

The U.S. Copyright Act is Federal Legislation enacted by Congress under its Constitutional grant of authority to protect the *writings* of authors.  A copyright gives the author the exclusive right to reproduce, distribute, perform, display, or license his work.  The owner also receives the exclusive right to produce or license the production of derivatives of his or her work.

Changing technology has led to an ever expanding use and understanding of the word "*writings*".  The Copyright Act now reaches architectural designs, software, the graphic arts, motion pictures and sound recordings.  However, today, as in yesterday, the standard for originality is quite low.

"Original" in this context means only that the work has its origin in the author. There is no requirement that the work be different from everything that has come before, it need only embody a minimum level of creativity and owe its origin to the author claiming copyright.

As an extreme example, if two poets, each working in total isolation and unaware of one another's work, were to compose identical poems, both of the poems would meet the originally requirement for purposes of the copyright statute. **(See Feist Publ's v. Rural Tel. Serv. Co. Inc., 111 S. Ct., 1991)**.

## DIRECT ACCESS IS HIGHLY SUSPECT OF INFRINGEMENT

Although lack of originality and copying, are essential elements in copyright cases, direct evidence of copying is not usually available. Therefore, copying is generally proven through verification of one or more of (4) four circumstances: *Direct Access---Substantial Similarity---Striking Similarity....* and *---Subconscious Copying*.

It is thus well established that access to a particular copyrighted recording, and substantial similarity between it and the infringing work, are in and of themselves deemed sufficient to create an inference of infringement. **(See Broadcast Music, Inc., v. Moore-Law, Inc., 484 F. Supp. 357, 1980).**

As for the Motion to Dismiss and its accompanying issues herein shown and proven to be dilatory and frivolous, scandalous and insufficient, redundant and

immaterial as a matter of fact and law, these should be stricken out of hand and

Counsel sternly admonished about its inaccuracies, and this matter placed on the

trial calendar as soon as possible, and for any other and further relief this Court

deems just and proper.


Respectfully Submitted,


## CERTIFICATE OF SERVICE

I HEREBY DECLARE, UNDER PENALTY OF PERJURY, THAT THE FOREGOING IS A TRUE AND
CORRECT ACCOUNT OF THE HEREIN ALLEGED MATTERS AND EVENTS, AND THAT THE
FOLLOWING ENTITIES REPRESENT THE INDIVIDUAL DEFENDANT PERSONS NAMED IN THE
CAPTION AS INTERESTED PERSONS, AND WERE MAILED A TRUE AND CORRECT COPY OF THIS
COMPLAINT ON OR ABOUT _Monday_ _JUNE 19th_ 2006.

BY: Robert R. Prunte'

JENNER & BLOCK, C/O MR. MICHAEL B. DESANCTIS, 601 THIRTEENTH STREET, N.W. SUITE

1200 SOUTH, WASHINGTON, D.C. 20005; & THE UNITED STATES COURTHOUSE OF THE

DISTRICT OF COLUMBIA, F. BARRETT PRETTYMAN BUILDING, 333 CONSTITUTION

AVENUE, N.W. WASHINGTON, D.C. 20001, C/O, CLERK'S OFFICE.

BY:

ROBERT R. PRUNTE'

1702 LINDEN AVENUE

BALTIMORE, MARYLAND 21217

1.410.225.9940  / 1.301.514.4028