1  **Robert R. Prunte', (pro se')**
   614 Wyanoke Avenue
2  Baltimore, Maryland 21218
   301.514.4028  410.225.9940
3

4

5                      **UNITED STATES DISTRICT COURT**

6                      **FOR THE DISTRICT OF COLUMBIA**

7

8       **ROBERT R. PRUNTE'**

9            Plaintiff,                          **CASE NUMBER: 1:06-cv-0048**
                  Vs.
10  UNIVERSAL MUSIC GROUP dba UMG                     **JUDGE: PLF**
    RECORDINGS; C/O CT CORPORATION SYSTEM,
11  111 EIGHTH AVENUE, NEW YORK, N.Y. 10011; &
    BOARD OF DIRECTORS & ZACH HOROWITZ,
12  NICK HENRY, SHAWN (JAY-Z) CARTER; L.A.
    REID, "BABY" (CASH MONEY RECORDS) &
13  INSIDE SESSIONS, DINO DELVAILLE; DAMON
    DASH OF ROC-A-FELLA RECORDS; DEF JAM
14  MUSIC GROUP; INTERSCOPE RECORDS &           **FIRST AMENDED COMPLAINT**
    CASH MONEY RECORDS/BABY, GEOFF SEIGEL,
15  BRIAN WITTMER; (SUBSIDIARIES) &
    PERIPHERAL ARTIST/AGENTS: KANYE WEST;
16  BRANDY NORWOOD; G-UNIT RECORDS & 50           **JURY TRIAL DEMAND**
    CENT, JUVENILE; LIL WAYNE; ROY JONES JR.
17  EMINEM; DMX, T.I.; YING YANG TWINS; FAT
    JOE; LUDACRIS, SHAWNNA, AKON, T-PAIN, YO
18  GOTTI (YOUNG GOTTI), THE GAME & JOHN
    LEGEND;  WARNER MUSIC GROUP ; dba
19  ATLANTIC RECORDING CORPORATION); :C/O
    CT CORPORATION SYSTEM, 111 EIGHTH
20  AVENUE, NEW YORK, N.Y. 10011 & BOARD OF
    DIRECTORS & CHAIRMAN TED TURNER &
21  AHMET ERTEGUN & ATLANTIC RECORDS &
    WARNER CHAPPELL PUBLISHING COMPANY
22  (SUBSIDIARIES), & ADAM FISCHELL & BLACK
    ROBB, RICH CHRISTINA; VIACOM
23  INTERNATIONAL, C/O SPIEGEL & UTRERA,
    P.A.P.C., 45 JOHNS STREET 711, NEW YORK, N.Y.
24  10038; & BOARD OF DIRECTORS & SUMMER
    REDSTONE & BET , MTV  & VHI & PARAMOUNT
25  PICTURES, (SUBSIDIARIES) & SONY (BMG), 550
    MADISON AVENUE, NEW YORK, N.Y. 10022-3211
    & ROLF SCHMIDT-HOLTZ & TIM BOWEN,
    EXECUTIVES.  Defendant (s)

                                    1

# A CIVIL COMPLAINT FOR DIRECT COPYRIGHT INFRINGEMENT & CONTRIBUTORY COPYRIGHT INFRINGEMENT OF PLAINTIFFS COMMERCIAL AND COPYRIGHT PROTECTED EXPRESSIONS, MUSIC AND SAMPLED SOUND RECORDINGS

## BACKGROUND AVERMENTS

*"In an appropriate case, copying might be demonstrated, with no proof or weak proof of access, by showing that a single brief phrase, contained in both pieces, was so idiosyncratic in its treatment as to preclude coincidence...." Opinion by Judge Frank in Heim v. Universal City Pictures*

1. This case is based upon a song harvesting operation known as "Inside Sessions", which dupes authors into sending them original songs, (for $250.00 dollars), (See previous Amended Complaint), and then decides later whether to give the original authors works to artists whom they already have signed on their rosters. A commercial song is a complex literary and musical work composed of discreet literary components. Everyone, from the schoolchild to the scholar, knows that any song, of any genre, always contains a "**most commercial part**" or a "**chorus line**" that determines the force and effect of the songs literal payoff to the listener.

2. A hot chorus line may mean the difference between the success or failure of a commercial song. When someone chooses to lift the chorus lines from the works of original creators, it becomes obvious that some individuals have unraveled the formula that made the original chorus line so hot in the first place, while at the same time intentionally de-valuing the original authors work.

2

3. In their drive to maintain the attention of huge audiences, this enterprise, has created an *"open academy type hit factory"*, as well as puppet/slave-like actors known as *"contract/ recording artists/employee/slave lackeys"* who are cast to appear in starring roles performing completely stolen works.

4. After creating the unlawful derivative work, the enterprise then distributes and exploits the project as if it has gone through the proper and traditional evolution of popular song creation, production and exploitation.

5. After unlocking the secrets of the song, so to speak, these unscrupulous agents and operators of the enterprise, then unlawfully counterfeit the derivative works of the original copyright owners, without compensating them, or even returning their original and now mutilated works.

6. Although the complained of enterprise recently ceased active operation of the *"Inside Sessions"* program via the Internet, the firm still exists and is doing business. This equals a strong intimation that they intend to reactivate it on Internet after resolving the issues of this case and others, and resurrect the professional copyright infringement services of *"Inside Sessions"* at a later date.

7. In doing the acts averred herein above, the defendant persons and each of them, have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which has been, among other things to serve each of these defendant persons and the overall enterprise' own economic benefit by knowingly, willfully and intentionally re-creating derivative works from copyrighted songs.

8. Thus, each of these defendants knowingly, willfully and intentionally has committed the herein complained of acts either passively or actively, directly or indirectly and have thusly committed the acts herein above described in furtherance of the conspiracy, common enterprise, and common course of conduct.

3

9. Therefore, each defendant actively participates in, facilitates, materially contributes to, and encourages the infringing activities of each other defendant person in compliment of the overall enterprise, and each defendant greatly profits from those activities. Plaintiff and countless others are being irreparably harmed by the conduct of the defendants, and each of them, and has further suffered significant damages for which each defendant person is liable in varying degrees.

## JURISDICTION AND VENUE

10. This is an action for Copyright Infringement arising under the Copyright Act **17 U.S.C. 101 et seq., 17 U.S. C. 104 et seq., 501 & 506 et seq.** this court has exclusive jurisdiction under **28 U.S.C. 1338(a), 28 U.S.C. 1331.**---also liability is premised upon 17 U.S.C. 106 et seq. as well as *17 U.S.C. 107 thru 122.*

11. Venue is proper in this district as well as personal jurisdiction over the defendants in this district under **28 U.S.C. 1391(b)(1)(c) & (d) & 28 U.S.C. 1400(a)**, in that all infringing articles can be found in this district and defendants can therefore be found as well.

12. All defendants are hereby presumed to have the necessary minimum contacts with this instant forum and others, nationally and internationally so as to justify being hauled into court anywhere.

## PARTIES

13. Plaintiff, Robert R. Prunté, is a citizen of the state of Maryland, as well as the sole owner and author of all the copyrighted expressions allegedly purloined by the defendants. Mr. Prunte' specializes in the creation of original songs in several genres, e.g. Urban Contemporary R&B—Hip Hop—Pop and Country. Mr. Prunte's Independent record

4

label, Rowdy City Records, creates original music and lyrics, develops raw talent into fine acts and then sells the songs in album form throughout the east coast and the southern states mainly with a vertically integrated approach like Motown of old.

14. Defendant, Warner Music Group, is a Delaware corporation with a principle place of business in California and New York. Warner Music Group is a defendant allegedly in violation of the United States Copyright Act.

15. Defendant, Viacom International, is a Delaware corporation with a principle place of business in California and New York. Viacom International is a defendant allegedly in violation of the United States Copyright Act.

16. Defendant, Interscope Records is a defendant person and subsidiary of Universal Music Group as well as defendant allegedly in violation of the United States Copyright Act.

17. Defendant, Universal Music Group, is a Delaware corporation with a principle place of business in California and New York. Universal Music Group is a defendant allegedly in violation of the United States Copyright Act.

18. Sony (BMG) is an entertainment conglomerate as well as a Delaware Corporation with offices worldwide.

19. Defendant Ted Turner & Ahmet Ertegun are the chief executives of Atlantic Music Group and Atlantic Records & Warner Chappell Publishing respectively, and are defendants allegedly in violation of the United States Copyright Act.

20. Defendant Adam Fischell is an employee and executive officer of Atlantic Records, and also a defendant allegedly in violation of the United States Copyright Act.

21. Defendant Dino Delvaille is employee of Universal Music Group and allegedly in violation of the United allegedly in violation of the United States Copyright Act.

22. Defendant, Geoff Siegel, is an employee with Universal Music Group, as well as executive officer of the firm. Mr. Siegel is also a defendant allegedly in violation of the United States Copyright Act.

22.   Defendant Summer Redstone is CEO of Viacom and also a defendant allegedly in violation of the United States Copyright Act.

23. Likewise BET, MTV & VH1 are defendants as well as Paramount Pictures, as subsidiaries of Viacom International, are also defendants allegedly in violation of the United States Copyright Act.

24. Defendant(s) Zach Horowitz and Nick Henry are chief executives of Universal Music Group and are defendants allegedly in violation of the United States Copyright Act.

25. Inside Sessions, Def Jam Music Group, Interscope and Cash Money Records, being subsidiaries of Universal Music Group, are also defendants allegedly in violation of the United States Copyright Act.

26. Kanye West is defendant employee or other agent of Atlantic Music Group/ Def Jam/Universal Music Group, and also a defendant allegedly in violation of the United States Copyright Act.

27. Defendant, Brian Wittmer is an employee of Universal Music Group and allegedly in violation of the United States Copyright Act.

28. Defendant, Brandy Norwood, is an employee of Atlantic Records & also a defendant allegedly in violation of the United States Copyright Act.

29. Defendant, Lil Wayne, is an employee or other agent of Universal Music Group/Cash Money Records and also a defendant allegedly in violation of the United States Copyright Act.

30. Defendant, Roy Jones, Jr., is an employee or other agent of Universal Music Group and also a defendant allegedly in violation of the United States Copyright Act.

32.  Defendant, Eminem, is an employee or other agent of Universal Music Group and Interscope Records and  also a defendant allegedly in violation of the United States Copyright Act.

33.  Defendant, T.I., is an employee or other agent of Universal Music Group and the alleged enterprise and also a defendant allegedly in violation of the United States Copyright Act.

34.  Defendant, the Ying Yang Twins, are also employees or other agents of Universal Music Group and also a defendant allegedly in violation of the United States Copyright Act.

35.  Defendant, Fat Joe, is an employee or other agent of Universal Music Group and also a defendant

36.  Defendant, Ludacris, is an employee or other agent of Universal Music Group and also a defendant allegedly in violation of the United States Copyright Act.

37.  Defendant, Baby of Cash Money Records, is an employee or other agent of Universal Music Group and also a defendant allegedly in violation of the United States Copyright Act.

38.  Defendant, John Legend, is an employee or other agent of Universal Music Group and also a defendant allegedly in violation of the United States Copyright Act.

39.  Defendant Rich Christina is an employee and executive of Atlantic Recording Group as well as a defendant allegedly in violation of the United States Copyright Act.

40.  Defendants Shawn (Jay-Z) Carter and Damon Dash are employees, agents of Universal Music Group and subsidiary owners of Def Jam and Roc-A-Fella Records, and are also defendants allegedly in violation of the United States Copyright Act.

41.  Defendant, DMX, is a former employee of Def Jam, and is also a defendant allegedly in violation of the United States Copyright Act.

42. Defendant Akon and T-Pain are also Universal Music Group employees or agents as well as defendants allegedly in violation of the United States Copyright Act.

43. Defendant, The Game, is an employee of Interscope Records, a subsidiary of Universal Music Group and also a defendant allegedly in violation of the United States Copyright Act.

44. Defendant, Yo Gotti, "Young Gotti", is an employee or other agent of Cash Money Records, a subsidiary of Universal Music Group and also a defendant allegedly in violation of the United States Copyright Act.

45. Defendant, Black Rob, is an employee or other agent of Bad Boy Entertainment, which is a subsidiary of Warner Music Group, and is also a defendant allegedly in violation of the United States Copyright Act.

46. The above named defendant persons both corporate and individual, are hereafter referred to collectively as "defendants", and each defendant is, and at all times averred herein, alleged to be a party to the unlawful activities, complained of herein, directly and or indirectly, and thus conspired with and or acted in concert or in combination with each of the other defendants, and has aided or abetted such other defendants, and or has acted as an agent for each of the other defendants both complimentary and peripherally, either committing criminal acts or thereby providing support under a cloak of legitimacy, with respect to the actions and matters described within this complaint.

## STATEMENT OF THE CASE

50.  Plain and simply put, this case is about the originators and authors of those precious and meaningful words that are needed by people through generation upon generation for inspiration

8

and confidence. These "originators of words" do not come a dime a dozen, and are usually made of an intellectual, spiritual and moral fiber rarely found amongst men.

51. One such "*originator of words*", Francis Scott Key, was also a prominent Attorney who appeared before the United States Supreme Court many times, and known internationally as the man whose single song inspired a nation to greatness.

52. During the War of 1812, Key, accompanied by the American Prisoner Exchange Agent Col. John Stuart Skinner, dined aboard the British ship HMS *Tonnant*, as the guests of Vice Admiral Alexander Cochrane, Rear Admiral Sir George Cockburn and Major General Robert Ross. They were there to negotiate the release of a prisoner, Dr. William Beanes. A resident of Upper Marlboro, Maryland, Beanes had been captured by the British after he placed rowdy stragglers under citizen's arrest with a group of men. Skinner, Key and Beanes were allowed to return to their own sloop, but were not allowed to return to Baltimore because they had become familiar with the strength and position of the British units and of the British intention to attack Baltimore.

53. As a result of this, Key was unable to do anything but watch the bombarding of Ft. McHenry during the Battle of Baltimore, and was inspired to write a poem describing the experience. Entitled "The Defense of Fort McHenry", intended to fit the rhythms of composer John Stafford Smith's "To Anacreon in Heaven", it has become better known as "The Star Spangled Banner". Under this name, the song was adopted as the American national anthem, first by an Executive Order from President Woodrow Wilson in 1916 (which had little effect beyond requiring military bands to play it,) and then by a Congressional resolution in 1931, signed by President Herbert Hoover.

9

54.   As illustrated below, the original version of the song *"Star Spangled Banner"* is a far cry from the one well known by contemporary Americans.  Obviously, the demands of the market and necessity caused such a great condensation.

Oh, say can you see by the dawn's early light
What so proudly we hailed at the twilight's last gleaming?
Whose broad stripes and bright stars thru the perilous fight,
O'er the ramparts we watched were so gallantly streaming?
And the rocket's red glare, the bombs bursting in air,
Gave proof through the night that our flag was still there.
Oh, say does that star-spangled banner yet wave
O'er the land of the free and the home of the brave?

On the shore, dimly seen through the mists of the deep,
Where the foe's haughty host in dread silence reposes,
What is that which the breeze, o'er the towering steep,
As it fitfully blows, half conceals, half discloses?
Now it catches the gleam of the morning's first beam,
In full glory reflected now shines in the stream:
'Tis the star-spangled banner!  Oh long may it wave
O'er the land of the free and the home of the brave!

And where is that band who so vauntingly swore
That the havoc of war and the battle's confusion,
A home and a country should leave us no more!
Their blood has washed out their foul footsteps' pollution.
No refuge could save the hireling and slave
From the terror of flight, or the gloom of the grave:
And the star-spangled banner in triumph doth wave
O'er the land of the free and the home of the brave!

Oh! thus be it ever, when freemen shall stand
Between their loved home and the war's desolation!
Blest with victory and peace, may the heav'n rescued land
Praise the Power that hath made and preserved us a nation.
Then conquer we must, when our cause it is just,
And this be our motto: "In God is our trust."
And the star-spangled banner in triumph shall wave
O'er the land of the free and the home of the brave!

**55. Indeed, the spark of inspiration required for Mr. Key to create such a timeless song, is no less than that required to create the songs at issue.**

56. And so it is today. The demands of the public for condensation for convenience sake realize that even the miniscule has great meaning to large groups of people.

## COPYRIGHT PROTECTION FOR SHORT PHRASES

57. *"There is a great power in words"* wrote Josh Billings, *"If you don't hitch too many of them together"*. No doubt about it, a well-turned phrase can have a powerful effect on a reader. A judicious choice of words can result in the perfect punchline, an incisive aphorism, a moral tenet, or, as in the case of a haiku-beauty.

58. However, as insignificant as they may seem, short phrases are usually severable from a larger text of works and commonly become the object and subject of theft, on myriad levels. They are often plucked, and recycled in other literary, musical or artistic works or on merchandise.

60. So, how many words must be strung together before Copyright protects such works? The law states that it is not a matter of numbers. As a matter of fact and law, even if two works contain dozens or hundreds of similar short phrases, that is still not enough to demonstrate "substantial similarity" if the short phrases are common, public domain or do not exhibit the minimal creativity required for Copyright protection. *(See: Arica Institute, Inc., v. Palmer, 970 F.2d 1067, 1072 (2nd Cir. 1992).*

61.  In short, sharing similar phrases, particularly common descriptive phrases, is usually not enough, by itself to win a copyright claim. In order to stop an infringer, the author must

either demonstrate that the phrases exhibit sufficient creativity, or that the taking of the phrases, along with other elements such as similar plot, or characters, amounts to infringement. *(Please see: Cook v. Robbins).*

62.  For all rules there are exceptions. In this 2000 case, the author of a book, Wall Street Money Machine, claimed that motivational speaker, Anthony Robbins used a few of his phrases in a "Financial Power" manual, given out at a Robbins seminar. *(The phrases were based on metaphors comparing investing to driving a taxi).*

63.  The jury determined that Cook held a valid copyright and that there was infringement on two oe the four allegedly copied phrases" *"Money is Made on The Meter Drop"* and *"No one I know has come up with a name for what I call " Rolling Stocks".* It works on stocks that roll up and down in repeated waves…Some roll fast and some slow. The Ninth Circuit upheld the damage award against Robbins. *(See: Cook, Supra).*

## THIS CASE INVOLVES DEFENDANTS ACTUAL ADVERTISING AND MARKETING OF SONGS HIJACKED FOR COMMERSIAL PURPOSES

64.  The songs allegedly infringed by the defendants were selected and arranged to mimic the song expressions that plaintiff was already selling in the streets of Baltimore, Virginia, Philly, D.C. Atlanta, Miami, Ft. Lauderdale and New Orleans.

65.  The sheer ambition of plaintiff's young company was obviously threatening enough to these gargantuan defendants that they decided to "parrot" the same phrases for larger commercial gain and appeal. *(Please See: Klitzner Industries Inc., v. H.K. James & Company, 535 F. Supp.*

*1249 (E.D.P.A. 1982) & Raffoler, Ltd., v. Peabody & Wright, Ltd., 671 F. Supp. 947 (E.D.N.Y. 1987).*

66.  When Courts deal with short phrases in cases like these, they are often swayed by the connection of a phrase with a fictional character or real people. (*Please See*:  *Martin Luther King Jr. Center for Social Change v. American Heritage Products, Inc., 508 F. Supp. 854 (N.D.Ga 1981)*

67.  One prime example, of the higher degree of creativity necessary for copyright protection is further evidenced by *Ashleigh Brilliant*, the author of literary phrases sold on postcards and merchandise. (See: www.asheighbrilliant.com)

68.  Subsequently, in a 1979 case, a company copied two of Brilliant's phrases: "*I may not be totally perfect, but parts of me are excellent*" and "*I have abandoned my search for truth and am now looking for a good fantasy*".

69.  The district court acknowledged that the phrases were distinguished by "conciseness, cleverness and a pointed observation", and ruled that the phrases were protected by copyright.

70.  In *Brilliant*, the clever arrangement of a small group of words established the required degree of originality.  However, arrangement of words is not the only means of demonstrating originality in a short phrase.

71.  Evidence of creativity is also demonstrated by the use of inventive words or language.

72.  For example, in *Heim*, Judge Frank also mentioned a phrase from "Jabberwocky"—"Twas brillig and the slithy toves"---as an example of sufficient originality. (*See: Exxon Corp. v. Exxon Ins. Consulting Int'L, (1981) 2 All E.R.495, 504, FYI, In case you're wondering, the word "Supercalifragilisticexpialidocious", was not an invented word when used in the song of*

the same name, *(Please See: Life Music, Inc., v. Wonderland Music, Co. 241 F. Supp. 653 (S,D, N.Y. 1965).*

73. A similar style of nonsense "code words" prompted Judge Learned Hand to write:

> *"Conceivably, there may arise a poet who strings together words without rational sequence—perhaps even coined syllables---through whose beauty, cadence, meter and rhyme he may seek to make poetry"...Judge Learned Hand in Reiss v. National Quotation Bureau, Inc.276 F. 717 (S.D,N.Y. 1921.*

74. Lastly, Judge Frank's observation in **Heim v. Universal Pictures** remains the most insightful guideline for the protection of short phrases:

> *"A literary phrase must be so idiosyncratic that its appearance in another work would preclude coincidence".*

75. The value of short phrases is even moreso evidenced by computer cases and especially a case involving literary expressions of songs like *"Uh Oh"*, in which a Court determined the phrase should be applied monopolistically and "for such limited times" in order to protect the plaintiff from a ruthless theft by performer, M.C. Hammer. *(See: Santrayll v. Burrell, 91 civ. 3166, decided: January 15, 1998, S.D.N.Y., 993 F.Supp. 173; 1998 U.S. Dist. LEXIS 297; 45 U.S.P.Q. 2d (BNA) 1696).*

76. For the defendant *Burrell's* mere repeating the chorus line of *"Uh Oh"*, and alternating a two-note pattern, the Court considered such an expression to be protected by copyright law and found for the plaintiff overwhelmingly.

77. Likewise, in **Cook v. Robbins**, the court found that phrases like "**Meter Drop**" and "**Rolling Stocks**" were creative and valuable enough to warrant protection and win the case.

78. Accordingly, in *Foxworthy v. Custom Tees, Inc*, *879 F. Supp. 1200 U.S.D.C. 3/6/1995,* the plaintiff printed and sold jokes on t-shirts that carried slogans like:

> *"You might be a redneck...if you've ever financed a tattoo"*
>
> *"You might be a redneck....if your two year old has more teeth than you do"*
>
> *"You might be a redneck ....if your dog and your wallet are both on a chain"....*

79. The defendant in the case created and sold replicas of the shirts across country with slight plays on words to achieve the same expressions of the plaintiff, Foxworthy. The court decided that even though the word "*redneck*" and its attendant known expressions are common, the original contributions of Foxworthy were notable and commercial enough to warrant protection, and found for the plaintiff.

80. Furthermore, in *Salinger v. Random House*, the District Judge rejected Salinger's claim of infringement as to several passages of copyrighted letters because they employed a cliché or word combination that is so ordinary that it does not qualify for the copyright law's protection. However, the Court of Appeals remanded the case.

81. Though a cliché or an ordinary word combination will by itself frequently fail to demonstrate even the minimum level of creativity necessary for copyright protection, see, e.g.*, Alberto-Culver Co. v. Andrea Dumon, Inc., 466 F. 2d 705, 711 (7ᵗʰ Cir. 1972)*, such protection is available for the association, "presentation" and "combination" of the ideas and thought which go to make up the authors literary composition". *(See: Nutt v. National Institute Inc. For the Improvement of Memory, 31 F. 2d 236, 237 (2d Cir. 1929).*

82. Or, as Courts have more recently said:

> *"What is protected is the manner of expression, the authors analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words and the emphasis he gives to particular developments}. (See: Wainwright Securities, Inc., v. Wall Street Transcript Corp., 558 F. 2D 91, 95-96 (2D Cir.. 1977), cert. denied, 434 U.S. 1014, 98 S. Ct. 730, 54 L.Ed 759, 196 U.S.P.Q (BNA) 864 (1978).*

83. The ordinary phrase may enjoy no protection as such, but its use in a sequence of expressive words does not cause the entire passage to lose protection. And though the ordinary phrase may be quoted without fear of infringement, a copier may not quote or paraphrase the sequence of creative expression that includes such a phrase.

84. The Court determined that even though the phrases were commonplace and some were expressions of factual content, they represented "***the heart of the book***" , *(Harper & Row Supra, 471 u.s. AT 565 {99}{Quoting the District Courts opinion, 557 F. Supp. 1072 (1983)*, and are at least an important ingredient of the book as it now stands. To a large extent, ***"they make they book worth reading".***

85. The same applies to words that are used within the context of popular song creation: Just as certain words of a book can be viewed as the source of commercial and personal enjoyment of its contents, "The words of the chorus lines of songs are what make the song worth hearing".

86. Even more remarkable and noteworthy is that in ***Boosey v. Empire Music, 224 F. 646 (S.D.N.Y 1915),*** the Court decided the works were considerably different, both in theme and execution, except for the phrases, "I hear you calling me" occurring in both works, and in that, there is a marked similarity.

16

87. In that case, one work was of a dignified and religious arrangement and the other was ragtime, and at the time, a commercial hit about a Negro with strong desires to go back to his home in Tennessee.

88. The court in **Boosey** ultimately declared"

> *"The main thing that impressed me was the plaintive "I hear you calling me" in both songs. "I hear you calling me" has the kind of sentiment that causes the listener to listen, applaud, and buy copies in the corridor on the way out of the theater.*

89. That Court ruled for the plaintiff on the basis of *sentiment* alone.

# SCOPE OF COPYRIGHT PROTECTION FOR COMMERCIAL SONGS AND LITERARY WORKS

90. Given that copyright protects only those portions of the work that are original to the author, whereas, works with minimal creativity receive minimal or slight protection, and works with high creative content receive a significantly higher level of protection. Works of minimal creativity typically rely heavily upon materials that are in the public domain or are scenes a faire. *(See Vargas v. Pfizer, 418 F. Supp. 2d 369 (S.D.N.Y. 2005).*

91. Song lyrics which generate millions of dollars for conglomerate record companies are hardly trivial scenes a faire when viewed as a whole, but instead are a conglomeration of colorful and descriptive literary elements describing and expressing concepts and ideas geared to a certain specific and targeted music genre and not the general public at large.

92. Scenes a faire may apply when the public domain is at issue, but not where an author's intellectual productions are at issue. *(See: Vargas Supra.)*

17

93. Likewise, and as in this case, none of plaintiff's works came from the public domain when created. Therefore, this case is not about the words, per se, but the way plaintiff expresses those words, or, in the words of the Court in *Holmes v. Hurst, 174 U.S. 82 (1899):*

> *"The subject of property is the order of words in the authors composition; and not the words themselves, they being analogous to the elements of matter, which are not appropriated unless combined, nor the ideas expressed by those words, they existing in the mind alone, which is not capable of appropriation...."*

## PLAINTIFF'S PHRASES UNLAWFULLY APPROPRIATED TO SELL A PRODUCT

94. In the genre of urban contemporary music, commonly known as "hip hop", plaintiff's phrases are highly valuable to customers who buy such record products. The complaint will allege how defendants obtained plaintiffs works and lifted the expression found in the chorus lines of the works at issue, merely to use the chorus lines to appeal to a broader audience than that being reached by the plaintiff, which implicates the defendants further with charges of Unfair Competition.

95. The lifted phrases belong to the plaintiff and were created in order to sell songs to the hip hop audience specifically, and not the general public. *(See: Nichols v. Universal Pictures Corp. 45 F. 2d 119, 122 (2 Cir.) (Decision by Judge Learned Hand) and Brilliant v. W.B. Productions, Inc., Civ. No. 79-1893-WMB (S.D. Cal. Oct. 22, 1979).*

96. Thus, this plaintiff is suing for the ***heart of its works*** which were allegedly taken by the defendants in their efforts to control the minds and pocketbooks of the market by whatever means necessary.

# MOTION PICTURES AND VIDEO PRODUCTIONS UNLAWFULLY

## MADE OF PLAINTIFFS ORIGINAL SONGS

97. In every instance of copyright infringement, the defendants have unlawfully created motion

picture/video productions of the songs.  This factor is far from ironic and is a  mere tip  of the

iceberg when one recalls what the great Samuel Goldwyn said concerning the level of script it

takes to make a motion picture from it:

> *"A great picture has to start with a great story.  Just as water can't*
> *rise higher than its source, so a picture can't rise higher than its*
> *story.  Yet, there seems to be agreement among industry insiders that*
> *it is not the dialogue, style, or language of the work which is valuable.*
> *"What a director really looks for in a literary work is the general*
> *skeleton of the action. He can fill in all the dialogue, he can recreate*
> *all the settings, and he can reproduce the emotion and excitement.*
> *Give a good basic story, a director can produce a motion picture, a*
> *television program, or a stage play"....*

98. In this case it is being alleged that defendants chose unilaterally to lift the expressions of

plaintiff merely to capitalize on the market in a greater and more profound manner than

the plaintiffs company.  The defendants allegedly decided to lift the plot, narrative

techniques, settings, fact situations, arrangement, dialogue, selection of words, music and

samples from the original and fixed expressions of plaintiff's songs, as well as a whole

host of other elements relative to the massive lifting of music, sound recordings and

literary works unlawfully and without the copyright owner's permission.

# ON THE APPLICABLE LEGAL STANDARDS FOR COPYRIGHT

## INFRINGEMENT

99. Copyright, is a Federal legal regime of exceptional influence on both American art and commerce. Literature, film, music, sculpture, architecture and software all rely primarily upon Federal Copyright Law for protection against unauthorized copying, which, if left unconstrained, would unquestionably squelch the incentives to create, or to invest in such creation.

100. Yet, the legal standard relied upon to determine copyright infringement is deeply fissured between the two major copyright courts—the Second and Ninth Circuits. The remaining regional circuits appear to be unaware of this fissure, as evidenced by the fact that several of them apply both tests interchangeably.

101. Additionally, the infringement test is, by consensus, complicated, time-consuming and multi-pronged, having vague and redundant nomenclature, and for these reasons alone, resists straightforward explanation.

102. No serious attempt has been made in the scholarly literature to reconcile or to harmonize these two disparate standards, nor to urge one over the other, despite the urgent need to do so. *(See: Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., 150 F. 3d 132, 137 (2nd Cir. 1998), (quoting Repp v. Webber, 132 F. 3d 882, 889 (2nd Cir. 1997)).*

103. In effect, the standards for proving "unauthorized copying" are hazy at times and lack uniformity, sometimes at peril of a litigants rights.

The Court in *Arnstein* emphatically declared:

> *"The test for infringement is of necessity vague. In the case of "verbal works" it is well settled that although the "proprietors" monopoly extends beyond an exact reproduction of the words, there can be no copyright in the "ideas" disclosed but only in their "expression". Obviously, no principle can be stated as to when an imitator has gone beyond copying the "idea" and has borrowed its "expression". Decisions must inevitably be ad hoc."...*

20

104. Now, precedentially speaking, there is a focus upon "*probative similarities*" as well as "*substantial similarities*". In fact, the late Professor Alan Latman was the first to suggest this change in nomenclature in, Alan Latman, *"Probative Similarity" As Proof of Copying: Towards Dispelling Some Myths in Copyright Infringement,* 90 Colum. L. Rev. 1187 (1990).

105. Prior to Latman's article, the term "*substantial similarity*" appeared *twice* in the Second Circuit's infringement test: once in the copying prong, and once in the illicit copying prong. *See, e.g., Reyher v. Childrens' Television Workshop,* 533 F.2d 87, 90. ("*[c]opying...is usually proved by circumstantial evidence of access to the copyrighted work and substantial similarities as to protectable material in the two works.")*

107. But a few years after Latman's article, the (not trivial) re-labeling he suggested was *firmly reticulated* in Second Circuit law. *See, e.g., Castle Rock, 150 F.3d 132, 137 ("Actual copying may be established 'either by direct evidence of copying or by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony," (citing, Laureyssens, 964 F.2d at 140)).*

108. In this circuit, the case of *Sturdza* v. *United Arab Emirates* appears to restate the proposition relating to the depths of these two tests, and reduced the jargon to a workable concept.

109. In *Sturdza*, the Court spelled it out clearly and fairly:

> "*Although differences between the two embassy designs could permit a reasonable jury to conclude that Demetriou's design is not "substantially similar" to Sturdza's, because we believe there are sufficient similarities for the jury to reach the opposite conclusion, we reverse the grant of summary judgment and remand for trial of the copyright infringement claim*".

21

110. The "*sufficient similarities*" the Court referred to are the same as the "*similarities*" referred to in ***Arnstein v. Porter:***

> "It is important to avoid confusing two separate elements essential to a plaintiff's case in such a suit: a.) that defendant copied from plaintiff's copyrighted work, and b.) that the copying (assuming it to be proved) went so far as to constitute improper appropriation". (See: Arnstein v. Porter, 154 F. 2d 464 (2nd Cir. 1946), cert. den., 330 U.S. 851, 1947)----

> -furthermore,----- said the Court, "Proof of copying can be found, either in defendant's admission or, as is almost uniformly the case, by circumstantial evidence---usually evidence of access and *similarity*— if there is access, and *similarities* exist, then the trier of fact must determine whether the *similarities* are sufficient to prove copying."...

111.   Therefore, and as a matter of fact and law, the Court in *Arnstein* clearly instructed future Courts to first consider ***any*** similarities within a work before setting out to determine if such similarities are sufficient to reach the "substantial similarity" level of abstraction required to prove an "unlawful misappropriation" of a valid copyright.

112.   *Sturdza* also restated the propositions of *Arnstein v. Porter* by declaring:

> "The question therefore, is whether defendant took from plaintiff's works so much of what is pleasing to the.....lay.....audience.....that defendant wrongfully appropriated something which belongs to the plaintiff"...(See: Sturdza, supra).

113. Accordingly, *Sturza* fortified and clarified the "substantial similarity" determination thusly:

> "The substantial similarity determination requires comparison not only of the two works individual elements in isolation, but also of their "overall look and feel". (Sturdza, supra). An allegedly infringing work is considered substantially similar to a copyrighted work if the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same". (Sturdza, supra).

22

114. In Literature, authors use a variety of techniques to appeal to our *"aesthetic values"* in order to generate *"aesthetic appeal"*.

115. Depending on the writing, an author may employ: *rhythm, illustrations, structure, time shifting, juxtaposition, dualism, imagery, fantasy, suspense, analysis, humor/cynicism,* and *thinking aloud.*

116. In literary aesthetics, the study of "effect" illuminates the deep structures of reading and receiving literary works. These effects may be broadly grouped by their modes of writing and the relationship that the reader assumes with time.

117. <u>Kenosis</u> is the effect of lyric poetry which creates a sense of emptiness and timelessness. In music, the aesthetic appeal or elements expressed aesthetically, include lyricism, harmony, hypnotism, emotiveness, temporal dynamics, volume dynamics, resonance, playfulness, color, subtlety, elatedness, depth, and mood.

118. Aesthetics in music are often believed to be highly sensitive to their context: what sounds good in modern rock music might sound terrible in the context of the early baroque age.

119. In this case, plaintiff seeks to restate the law at least beginning at the level it had obtained in *Boone v. Jackson, 2006 WL 3327058 (2nd Circuit Nov. 15 2006).*

120. In *Boone*, the District Court apparently "hyper dissected" the songs at issue into protectible and nonprotectible elements instead of considering the songs as a whole, and there were still issues of material fact whether substantial similarities existed between the songs such that an ordinary observer would recognize an appropriation of plaintiffs song by defendant.

23

121. The 2nd Circuit Court of Appeals determined that the District Court was not clear on what test it was undertaking, the *probative similarity test* or the *substantial similarity test*. *(See Repp v. Webber, 132 F. 3d 882 & n. 1 (2nd Cir. 1997).*

122. In its unpublished opinion, the Court of Appeals declared that "The court below seems to have employed the "more discerning ordinary observer test" discussed in Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1003 (2d Cir.1995), from which the district court concluded that in examining the works at issue to determine whether improper use has occurred, it must extract unprotectible elements "from consideration to determine if the protectable elements standing alone, are substantially similar." *Boone, 2005 WL 1560511, at *3 (citing Knitwaves, 71 F.3d at 1002).* however, we expressly cabined the broad application of this standard, In Knitwaves, *see 71 F.3d at 1003,* and our subsequent decisions have emphasized that "[i]n applying this test, a court is not to dissect the works at issue into separate components and compare only the copyrightable elements." *Boisson v. Banian, Ltd., 273 F.3d 262, 272-73 (2d Cir.2001).*

123. Instead, a Court, confronted with an allegedly infringing work, must analyze the two works closely to figure out in what respects, if any, they are similar, and then determine whether these similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking." *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 134-35 (2d Cir.2003).*

124. This is because a defendant may infringe a copyright not only by literally copying a portion of a work, but also by *"parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art … are considered in relation to one another." Id. at 134.*

125. Accordingly, as for the plaintiff's right to publicly perform its works, it is widely known

24

that a literary work can be infringed by dramatizing it as well. *(See: Kalem Co., v. Harper Brothers, 222 U.S. 55 (1911)*, and that defendants are implicated in the violation of that set of exclusive rights as well.

126. Finally, in that case, the Court resoundingly stated that:

> *"Authors have the exclusive right to dramatize any of their works. So, if the exhibition was or was founded on "Ben Hur", this copyright was infringed. We are of the opinion that Ben Hur was dramatized by what was done. Whether we consider the purpose of this clause of the statute, or the etymological history and present usage of language, drama may be achieved by action as well as by speech. Action can tell a story, display all the most vivid relations between men, and depict every kind of human emotion, without the aid of a word." (See also, Daly v. Palmer, 6 Blatchf. 256, 264 Fed. Cas. No. 3,552). The defendant was found liable on principles recognized in every part of the law. (See: Rupp & W. Co. v. Elliott, 65 C.C.A. 544, 131 Fed. 730, 732; Harper v. Shoppell, 28 Fed. 613, Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 152 U.S. 425, 433, 38 S. L. Ed 500, 503, 14 Sup. Ct. Rep 627).*

127. Thus, *Kalem* Court fully supported and restated the Courts findings in *Holmes v. Hurst, 174 U.S. 82 (1899)*, where that Court stated:

> *"It is the intellectual production of the author which the copyright laws protect, and not the particular form which such production ultimately takes".*

128. Profoundly, and in these times of modernity, Courts are saying the same thing. In *Nihon Keizai Shimbun, Inc., v. Commline Bus. Data, 166 F. 3d 65 (2nd Cir. 1999)*. That court held that Copyright protects:

> *"The manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments".*

129. The District Court in that case had found that ***Commline*** had used the "same structure and organization and resulted in the same *conclusions* or *resolutions*, *phraseology* and *word choices*" as the plaintiff had, and ruled for the plaintiff.

## SUBSTANTIAL SIMILARITY ANALYSIS AND DETERMINATION ARE CLOSE QUESTIONS OF FACT

130. This principle was restated and re-established again in *Sturza v.* United Arab Emirates where that court declared"

> *"Finally, and of particular importance to this case, "because substantial similarity is customarily an extremely close question of fact, Summary Judgment has traditionally been frowned upon in copyright litigation". (See: A.A. Hoehling v. Universal City Studios, Inc., 618 F. 2d 972, 977 (2nd Cir. 1980d; See Also: Wickham v. Knoxville Int'l Energy Exposition, Inc., 739, F. 2d 1094, 1097 (6th Cir. 1984).....Summary Judgment .....is a practice to be used sparingly in copyright infringement cases....*

## HIGH DEGREE OF ACCESS MEANS SUBSTANTIAL SIMILARITY BURDEN OF PROOF IS LOWERED(See: Three Boys Music v. Bolton, 212 F. 3d  477, 485 (9th Cir. 2000).

26

As such, after the Court has viewed the multiple opportunities for defendants to view plaintiff's works via "Inside Sessions", the law requires the Court to break the works down into their *constituent elements* and compare those elements for proof of copying as measured "substantial similarity".  **(See Rice v. Fox Broadcasting Co., 148 F. Supp. 2d 1029, 1051 (C.D. Cal.  2001).**

Most importantly, the Court in *Swirsky v. Carey, (9th Cir. 2004)*, clearly outlined the task at hand in thewse type cases involving musical sound recordings combined with literary works. (See Below:

> "*In analyzing musical compositions under the extrinsic test, we have never announced a uniform set of factors to be used. We will not do so now. Music, like software programs and art objects, is not capable of ready classification into only five or six constituent elements; music is comprised of a large array of elements, some combination of which is protectable by copyright. For example, in Three Boys we upheld a jury finding of substantial similarity based on the combination of five otherwise unprotectable elements: (1) the title hook phrase (including the lyric, rhythm, and pitch); (2) the shifted cadence; (3) the instrumental figures; (4) the verse/chorus relationship; and (5) the fade ending. Three Boys, 212 F.3d at 485. Other courts have taken account of additional components of musical compositions, including melody, harmony, rhythm, pitch, tempo, phrasing, structure, chord progressions, and lyrics. See Ellis v. Diffie, 177 F.3d 503, 506 (6th Cir. 1999) (noting that the district court had compared idea, phraseology, lyrics, rhythms, chord progressions, "melodic contours," structures, and melodies under "ordinary observer" test); Cottrill v. Spears, 2003 U.S. Dist. LEXIS 8823, 2003 WL 21223846, at \*9 (E.D. Pa. May 22, 2003) (unpublished disposition)*

27

*(comparing pitch, chord progression, meter, and lyrics under extrinsic test); Tisi v. Patrick, 97 F. Supp. 2d 539, 543 (S.D.N.Y. 2000) (analyzing structure, melody, harmony, and rhythm under "striking similarity" test); McKinley v. Raye, 1998 U.S. Dist. LEXIS 3019, 1998 WL 119540, at \*5 (N.D. Tex. March 10, 1998) (mem.) (analyzing lyrics, melodies, and song structure); Damiano v. Sony Music Entm't, Inc., 975 F. Supp. 623, 631 (D. N.J. 1996) (analyzing instrumentation and melody under the extrinsic test); Sylvestre v. Oswald, 1993 U.S. Dist. LEXIS 7002, 1993 WL 179101, at \*4 (S.D.N.Y. May 18, 1993) (analyzing melody and lyrics under "striking similarity" test); Intersong-USA v. CBS, Inc., 757 F. Supp. 274, 280 (S.D.N.Y. 1991) (analyzing chord progression, structure, pitch, and harmony under substantial similarity [16] test). In addition, commentators have opined that timbre, tone, spatial organization, consonance, dissonance, accents, note choice, combinations, interplay of instruments, basslines, and new technological sounds can all be elements of a musical composition. See Brent, supra, at 248-89; Stephanie J. Jones, Music Copyright in Theory and Practice: An Improved Approach for Determining Substantial Similarity, 31 Duq. L. Rev. 277, 294-95 (1993).*

# FIRST CLAIM FOR RELIEF
# COPYRIGHT INFRINGEMENT

131.    Plaintiff repeats and re-avers each and every averment contained in paragraphs 1 through 130, inclusive, and as if fully set forth herein.

132.    Plaintiff is alleging in this complaint that he knows of at least (14) fourteen original songs, owned by him, that are allegedly being infringed by the defendant companies and their cadre of artists, to the tune of billions of dollars.

133.    The titles of such original songs and comparative offending derivative songs are as follows"

1.  "Fire In Tha Hole"  By Plaintiff &  "Fire In a Hole" By Defendants

2.  "God Pick Up The Phone"  By Plaintiff &  Lord, Give me a Sign, By Defendants

3.  "Im So High" By Plaintiff & "So High" By Defendants

4.  "Smoke, Drink, Cuss Fight" By Plaintiff & I Smoke, I Drink & I Smoke by Maself

5.  "Kings In The City" By Plaintiff & "I'm A King" By defendants

6.  "We Got It Poppin" By Plaintiff & "Gon Git Git Git It Poppin" By Defendants

7.   "Wish A Mutha Fuggah Would" By Plaintiff &  "The Heat" By Defendants.

8.  "Strippa Girl" By Plaintiff & "In Love Wit A Stripper" By Defendants

9.  "Slow Neck" By Plaintiff & "Slow Motion" & "Getting Some" By Defendants

10. "Everybody's Talkin Bout Us" By Plaintiff & "Talk about Our Love"—

11. "Shoot To Kill" By Plaintiff &  Battle Song & "Welcome To The South" By Defendants

12. "Im A Maniac" By Plaintiff & "Break Bread" By Defendants

13. First Blood By Plaintiff & "One Blood" By Defendants.

14. "That's What's Up" By Plaintiff & "That's What's Up" By Defendants

## PROBATIVE/SURFACE ANALYSIS

In this search for probative evidence of copying, evidence probative enough to mandate a trial on the merits where the serious fact issues shown below must be decided.  It is with a view to the Court's statements in *Nichols*, that this preliminary analysis was devised.

*"Likewise, when a study of (2) two writings is made, and it is plain from the study that one of them is not in fact the creation of the putative author, but instead has been copied in substantial part exactly or in transparent re-phrasing to produce essentially the story of the other writing, it infringes". (See: Nichols v. Universal Pictures Corp., 11930, 45 F. 2d 119 & Warner Brothers Pictures v. Majestic Pictures Corp, 2 Cir. 70 F. 2d 310, 311).*

## SONG ONE: "FIRE IN THE HOLE"

TITLE: *"FIRE IN THE HOLE"*- (PLAINTIFF, ARTISTS, ROWDY BOYZ)

TITLE: *"FIRE IN THE HOLE"*-(DEFENDANTS, ARTIST, BLACK ROBB)


RIGHTS ALLEGELY VIOLATED: 17 USC 106(1), (RIGHT OF REPRODUCTION), 17 USC 106(2), (RIGHT TO PREPARE DERIVATIVE WORKS), 17 USC 106(3), 17 USC 106(4) (RIGHT OF PUBLIC DISTRIBUTION), 17USC 106(5) RIGHT TO PUBLICLY PERFORM)....17 U.S.C. 102 ET SEQ. &  SECTIONS 107 THRU 122


LIABILITY IS ATTRIBUTTED TO: BAD BOY RECORDS (17 USC 106(1),(2)(3)(4)&(5), UNIVERSAL MUSIC GROUP (17 USC 106(1),(2)(3)(4)&(5)& VIACOM 17 USC 106(4)&(5), FOR DIRECT COPYRIGHT INFRINGEMENT & CONTRIBUTORY COPYRIGHT INGRINGEMENT.

## ***Alleged Sampled Sound Recording Violations***

….. under 17 U.S.C. 106 et seq & 107 through 122, Section 106 provides; Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: 1.) to reproduce the copyrighted work in copies or phono records; 2.) to prepare derivative works base upon the copyrighted work; 3.) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; 4.) in the case of literary, musical, dramatic, and chorographical works, pantomimes, and motion pictures and other audio visual works to perform the copyrighted work publicly; 5.) in the case of literary, musical dramatic and choreographic works, pantomimes, and pictorial, graphic or sculptural works, including the individual images of a motion picture or other audio visual work, to display the copyrighted work publicly; and 6.) in the case of sound recordings, to perform the copyrighted work publicly by means of audio transmission…

Section 114(b) states: (b). The exclusive right of the owner of copyright in a sound recording under clause (1) of section 106, is limited to the right to duplicate the sound recording in the form of phonorecords or copies that directly or indirectly recapture the actual sounds fixed in the recording. The exclusive right of the owner of copyright in a sound recording under clause (2) of section 106 is limited to the right to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed or otherwise altered in sequence or quality.

Therefore, it is being further alleged that in order to use plaintiff's works as the starting point for defendant's alleged derivative creations, plaintiff's original sound recordings were sampled into a digital recorder and manipulated in order to achieve the same musical and lyrical expression as

31

the plaintiff, by merely changing pitch, time signature and sounds, all in order to come as close as possible to plaintiff's original expressions.

## SIDE BY SIDE COMPARISON OF LYRICS TO CHORUS LINES OF BOTH WORKS

**PLAINTIFF**: FIRE IN THA HOLE-- FIRE IN THA HOLE--- FIRE IN THA HOLE----- ...OHH..TAKE COVER....(REPEATED OVER AND OVER AGAIN FOR 8 BARS)

**DEFENDANT(S):** NUTTIN BUT FLESH AND FRAGMENTS—YOU CANT ESCAPE— THE FIRE IN THA HOLE—LOUD TALK DON'T MOVE ME, YOU AINT UNRULY— PUNK YOU SCARED TA DEAF A DAT---FIRE IN THA HOLE—YOU AIN AFRAID TA DIE, OH MY MY MY---YOU FRONTIN YOU SCARED TA DEAF A DAT---FIRE IN THA HOLE—YO BOYS SCOPE IS DOPED OUT, YO WE RIDE NO WAY OUT—YALL NIGGAS BOUT TA SEE---THE FIRE IN THA HOLE—LIKE CANCER BABY, YALL GON GET TURNED INSIDE OUT WIT DAT---FIRE IN THA HOLE—BETTA STOP DROP AND ROLL---AND WATCH THAT FIRE IN THA HOLE---

Therefore, as a matter of fact and law, it can be presumed that the probative value here points not only to the identical expression and verbatim titles, but more directly, the plaintiff's "take cover" chorus line ending also appearing in the ending of the defendants chorus line, but stated as "stop drop and roll", which literally means the same thing as "taking cover".

As of this writing, experts are being consulted to serve in this matter, both musically and lyrically. *Dr. Rober Walser* is a world renowned musicologist and highly visible in the

Copyright cases. He is a person of interest to plaintiff at this point, and is analyzing the songs presently. However, plaintiff does not object to a Court selected expert as well for the purpose of this phase of analysis, and fairness to the defendants.

The Court can see from the side by side comparisons, identical beginnings and endings, and verbatim expressions what the experts will say concerning the words and the music and a trial on the merits will become inevitable.

It is further alleged that the defendants made a video out of plaintiff's song and mass marketed and distributed the video as well as thousands of the Black Robb Report CD which sold tremendously.

## PROTECTED ELEMENTS LIFTED FROM PLAINTIFF'S WORK INCLUDE:

1. Title to chorus line "Fire in the Hole".

2. Sampled music and transposed and time stretched to create derivative.

3. Entire expression of plaintiff's "Fire in the Hole".

4. Entire dialogue, including plaintiff's "take cover" statement at end of chorus. Defendants work states: "stop, drop and roll".

5. Rhythm, Melody, Harmony, Chords, Phraseology, Motif, Time Signature. Sound recording sampled.

6. Chorus line in its entirety, as well as the hook, "Fire in the Hole".

7. Same Aesthetic appeal.

8. Sentiment

9. Imagery

10. Identical personification, Allusion, Symbolism---Gothic Elements—Allegory—Ambiguity

11. Same Assonance—Diction—Hyperbole—Syntax—Tone

12. Repetition of same Theme

13. Same Climax same Resolution.

14. Same figurative language.

15. Idiosyncratic appearance of such a phrase in defendant's chorus line as in plaintiffs.

16. Reasonable jurors would find substantial similarity of ideas and expression.

## SONG TWO: ""GOD, PICK UP THE PHONE"

TITLE: *"GOD PICK UP THE PHONE"*- (PLAINTIFF, ARTISTS, ROWDY BOYZ)

TITLE: *"LORD, GIMME A SIGN"*-(DEFENDANTS, ARTIST, DMX)

RIGHTS ALLEGELY VIOLATED: 17 USC 106(1), (RIGHT OF REPRODUCTION), 17 USC 106(2),(RIGHT TO PREPARE DERIVATIVE WORKS), 17 USC 106(3), 17 USC 106(4) (RIGHT OF PUBLIC DISTRIBUTION), 17USC 106(5) RIGHT TO PUBLICLY PERFORM)....17 U.S.C. 102 ET SEQ. &  SECTIONS 107 THRU 122

LIABILITY IS ATTRIBUTTED TO:  (SONY/BMG---17 U.S.C. 106 ET SEQ. AND 17 U.S.C. 102 ET SEQ. & 107 THRU 122 & VIACOM 17 USC 106(4) & (5), FOR DIRECT COPYRIGHT INFRINGEMENT & CONTRIBUTORY COPYRIGHT INGRINGEMENT.

# SIDE BY SIDE COMPARISON OF LYRICS TO CHORUS LINES OF BOTH WORKS

**PLAINTIFF**: "<u>GOD—PICK UP THE PHONE</u>. LOVE IS ALMOST GONE—EVERYTHING WOULD CHANGE TODAY IF YOU WOULD JUST PICK UP THE PHONE---<u>GOD, PICK UP THE PHONE</u> WE IN THE DANGER ZONE, MAMAS CRYIN OUT AT NIGHT BECAUSE THEIR BABIES IS GONE---<u>GOD, PICK UP THE PHONE</u>, IF WE THE PEOPLE YOU OWN—REMEMBER WHAT YOU SAID ABOUT THAT FIELD OF DRY BONES---<u>GOD---PICK UP THE PHONE</u>, YOU HEAR THESE MOANS AND GROANS, WE GETTING BEAT DOWN DAILY WIT STICKS AND STONES"...

**DEFENDANTS**: <u>LORD GIMME A SIGN</u>—LET ME KNOW WHATS ON YO MIND—LET ME KNOW WHAT IM GONNA FIND—ITS ALL THE TIME—SHOW ME HOW TA TEACH THA MIND---SHOW ME HOW TO REACH THE BLIND---<u>LORD GIMME A SIGN</u>---SHOE ME WHAT I GOTS TO DOTO GET ME CLOSER TO YOU—CAUSE IMA GO THROUGH WHATEVER YOU WANT ME TO---JUST LET ME KNOW WHAT TO DO---<u>LORD GIMME A SIGN</u>----

Therefore, as a matter of fact and law, it can be presumed that the probative value here points not only to the identical expression and near-verbatim titles, but more directly, both works are asking God to do something for the speaker—howbeit while speaking to a hip hop audience---and not a gospel one. Such a reality is to idiosyncratic to be mere coincidence.  Defendants work is nothing more than a mere derivative of plaintiff's original expression.

In reality, the literal expression of "God, Pick up the Phone" is the exact same as "Lord, Gimme A Sign", both metrically and sonically, musically and aurally. Also, God, Pick Up The Phone and Lord, Gimme a Sign" both share 5 syllables each.

It is further alleged that the defendants made a video out of plaintiff's song and mass marketed and distributed the video as well as the album of DMX, which sold tremendously.

## PROTECTED ELEMENTS LIFTED FROM PLAINTIFF'S WORK INCLUDE:

1. Closely Paraphrased song titles.
2. Sampled music transposed and time stretched to create derivative.
3. Entire expression of plaintiffs "God, Pick up the Phone" is found within the "Lord, Gimme a Sign" expression.
4. Entire dialogue, especially the idiosyncratic appearance of this expression found within the body of defendant's song which is not coincidence.
5. Same Melody, Phraseology, Motif. Sampled sounds.
6. Chorus line in its entirety, as well as the hook, expressed the same.
7. Exact Same Aesthetic appeal.
8. Identical Sentiment
9. Imagery
10. Identical personification, Allusion, Symbolism---Gothic Elements—Allegory—Ambiguity
11. Same Assonance—Diction—Hyperbole—Syntax—Tone
12. Same Repetition of same Theme

36

13. Same Climax same Resolution.

14. Same Figurative language. Both refer to a supernatural being.

15. Identical syllables. "God, Pick up the Phone" is 5 syllables and so is "Lord, Gimme a Sign".

16. Reasonable jurors would find substantial similarity of ideas and expression.


## SONG THREE: "IM SO HIGH"


**TITLE: *"IM SO HIGH"*- (PLAINTIFF, ARTISTS, ROWDY BOYZ)**

**TITLE: *"SO HIGH"* – (DEFENDANT, ARTIST, JOHN LEGEND)**


**RIGHTS ALLEGELY VIOLATED: 17 USC 106(1), (RIGHT OF REPRODUCTION), 17 USC 106(2), (RIGHT TO PREPARE DERIVATIVE WORKS), 17 USC 106(3), 17 USC 106(4) (RIGHT OF PUBLIC DISTRIBUTION), 17USC 106(5) RIGHT TO PUBLICLY PERFORM)....17 U.S.C. 102 ET SEQ. &   SECTIONS 107 THRU 122**


**LIABILITY IS ATTRIBUTTED TO: SONY BMG (17 USC 106(1), (2), (3)(4)&(5), & VIACOM 17 USC 106(4)&(5), FOR DIRECT COPYRIGHT INFRINGEMENT & CONTRIBUTORY COPYRIGHT INGRINGEMENT.**


## SIDE BY SIDE COMPARISON OF LYRICS TO CHORUS LINES OF BOTH WORKS

**PLAINTIFF**: "IM SO HIGH—HIGHER THAN THE CLOUDS IN THE SKY—SO HIGH I COULD TOUCH THE SKY---SO HIGH I COULD KISS THE SKYY

**DEFENDANT(S)**: "YOU'VE GOT ME UP SO HIGH, SO HIGH MY SHOES ARE SCRAPING THE SKY, SO HIGH –YOU'VE GOT ME UP SO HIGH—OHH…MY SHOES ARE SCRAPING THE SKY"…

Therefore, as a matter of fact and law, it can be presumed that the probative value here points not only to the identical expression and verbatim titles, but more directly, the defendants "shoes are scraping the sky" while the plaintiff is so high it could "kiss the sky".

It is further alleged that the defendants made a video out of plaintiff's song and mass marketed and distributed the video as well as thousands of the John Legend CD which sold tremendously.

## PROTECTED ELEMENTS LIFTED FROM PLAINTIFF'S WORK INCLUDE:

1.  Title is verbatim to plaintiffs "I'm So High".
2.  Entire expression of plaintiffs "I'm So High".
3.  Entire dialogue, including plaintiff's "touch the sky" and "kiss the sky" statements paraphrased.
4.  Phraseology, Motif, Time Signature. Sampled sound recording.
5.  Chorus line in its entirety, as well as the hook, "I'm so High".
6.  Same Aesthetic appeal.

7. Sentiment

8. Imagery

9. Identical personification, Allusion, Symbolism--Allegory—Ambiguity

10. Diction—Hyperbole—Syntax—Tone

11. Repetition of same Theme

12. Same Climax same Resolution.

13. Same figurative language.

14. Idiosyncratic appearance of such a phrase in defendant's chorus line as in plaintiffs.

15. Reasonable jurors would find substantial similarity of ideas and expression.

## SONG FOUR: "SMOKE, DRINK, CUSS FIGHT"

TITLE: *"SMOKE, DRINK, CUSS FIGHT"*- (PLAINTIFF, ARTISTS, ROWDY BOYZ)

TITLE: *"I SMOKE, I DRINK & SMOKE, DRINK"*-(DEFENDANTS, ARTISTS, YING

YANG TWINS—ROY JONES JR).

RIGHTS ALLEGELY VIOLATED: 17 USC 106(1), (RIGHT OF

REPRODUCTION), 17 USC 106(2), (RIGHT TO PREPARE DERIVATIVE WORKS), 17

USC 106(3), 17 USC 106(4) (RIGHT OF PUBLIC DISTRIBUTION), 17 USC 106(5)

RIGHT TO PUBLICLY PERFORM)....17 U.S.C. 102 ET SEQ. &   SECTIONS 107 THRU

122

LIABILITY IS ATTRIBUTTED TO: INTERSCOPE RECORDS (17 USC

106(1),(2)(3)(4)&(5), UNIVERSAL MUSIC GROUP (17 USC 106(1),(2)(3)(4)&(5)&

**VIACOM 17 USC 106(4)&(5), FOR DIRECT COPYRIGHT INFRINGEMENT & CONTRIBUTORY COPYRIGHT INGRINGEMENT.**

## SIDE BY SIDE COMPARISON OF LYRICS TO CHORUS LINES OF BOTH WORKS

**PLAINTIFF**: WE GONE SMOKE, DRINK CUSSS FIGHT, STAB SHOOT, CUZ WE WILDIN TONIGHT---WE GONE PASS THE DICE—ITS MONEY IN THE POT--- SOMEBODY GETTING DROPPED—SOMEBODY GETTING ROCKED"..(REPEAT 2 X)

**DEFENDANT(S)**: *YIN YANG TWINS VERSION*: I SMOKE BY MYSELF—DRINK BY MYSELF---FUCK THESE HOES BY MY GOTDAMN SELF"..

**DEFENDANT,** *ROY JONES JR. VERSION*: " I SMOKE, I DRINK, IM SUPPOSED TO STOP BUT I CANT—IM A DOG---I LOVE HOES---AND IM ADICTED TO MONEY CARS AND CLOTHES---

Therefore, as a matter of fact and law, it can be presumed that the probative value here points not only to the identical expression and verbatim titles, but more directly, the plaintiff's entire literal expression of "Smoke, Drink, Cuss Fight", has been supplanted by defendants mere derivative creations.

It is further alleged that the defendants made videos out of plaintiff's song and mass marketed and distributed the video as well as thousands of the CD released on Roy Jones Jr. and the Yin Yang Twins, which sold tremendously.

# PROTECTED ELEMENTS LIFTED FROM PLAINTIFF'S WORK INCLUDE:

1. Title and expression of plaintiff's "smoke, drink, cuss fight" song.

2. Sampled music transposed and time stretched to create derivative.

3. Entire expression of plaintiff's "Smoke, Drink" song.

4. Entire dialogue, as expressed in chorus line.

5. Chorus line in its entirety, as well as the hook.

6. Same Aesthetic appeal.

7. Sentiment

8. Imagery

9. Identical personification, Allusion, Symbolism---Allegory—Ambiguity

10. Same Assonance—Diction—Hyperbole—Syntax—Tone

11. Repetition of same Theme

12. Same Climax same Resolution.

13. Same figurative language.

14. Idiosyncratic appearance of such a phrase in defendant's chorus line as in plaintiffs.

15. Reasonable jurors would find substantial similarity of ideas and expression.

## <u>SONG FIVE: "KINGS IN THE CITY"</u>

**TITLE: ""- (PLAINTIFF "KINGS IN THE CITY, ARTISTS, ROWDY BOYZ)**

**TITLE: ""-(DEFENDANTS, "IM A KING" ARTIST, T.I.)**

**RIGHTS ALLEGELY VIOLATED: 17 USC 106(1), (RIGHT OF**

41

REPRODUCTION), 17 USC 106(2), (RIGHT TO PREPARE DERIVATIVE WORKS), 17

USC 106(3), 17 USC 106(4) (RIGHT OF PUBLIC DISTRIBUTION), 17 USC 106(5)

RIGHT TO PUBLICLY PERFORM)....17 U.S.C. 102 ET SEQ. &   SECTIONS 107 THRU

122

LIABILITY IS ATTRIBUTTED TO: PARAMOUNT PICTURES(17 USC

106(1),(2)(3)(4)&(5), UNIVERSAL MUSIC GROUP (17 USC 106(1),(2)(3)(4)&(5)&

VIACOM 17 USC 106(4)&(5), FOR DIRECT COPYRIGHT INFRINGEMENT &

CONTRIBUTORY COPYRIGHT INGRINGEMENT.

## SIDE BY SIDE COMPARISON OF LYRICS TO CHORUS LINES OF BOTH WORKS

**PLAINTIFF**: "WE THE KINGS IN THE CITY, ROCK THE BLOCK AND THE CLUB AND
EVERYWHERE THAT WE GO THEY BE SHOWIN US LOVE—WE THA KINGS IN THA
CITY—SPORTIN HOODIES AS CROWNS—FROM A LONG LINE A HUSTLAS THAT
ALL GET DOWN----WE DA KINGS IN THA CITY MAKIN MONEY WIT MIKES—
CRUISIN THRU YO TOWN—ON FANCY MOTORBIKES----WE DA KINGS IN THA
CITY---CRUSHIN LORDS AN PRINCES---MAKIN MIDNIGHT MOVES IN MERCEDES
BENZES".....

**DEFENDANT(S)**: "IM A KING—BANK ROLLS IN THE POCKETS OF MA JEANS—IM A
KING---YOU PUSSY NIGGAS COULDN'T SEEE ME IN YO DREAMS—IM A KING—
TOP TOPIC OF ALL YO MAGAZINES---IM A KING---REMEMBER I CAN GET YOUR
BLOCK KNOCKED OFF---IM A KING—A BENTLEY COUPE WIT THA TOP CHOPPED

OFF---<u>IM A KING</u>---IM CONNECTIN NATIONWIDE BUT IN THE SOUTH---<u>IM A KING</u>---

JUST RESPECT IT AND KEEP MA NAME OUTTCHA MOUTH"...

Therefore, as a matter of fact and law, it can be presumed that the probative value here points not only to the identical expression and near- verbatim titles, but more directly, the plaintiff's "Kings In The City" appears to have become a derivative work in the fore of the defendants "Im A King", which was made the theme song of a major Motion Picture distributed by Paramount Pictures. Also, a video was published and distributed worldwide as well. The sales of the CD relating to the motion picture and the artist T.I. were astronomical.

## PROTECTED ELEMENTS LIFTED FROM PLAINTIFF'S WORK
## INCLUDE:

1.  Title and expression to chorus line "Kings in the City".

2.  Sampled music and transposed notes time stretched to create derivative.

3.  Entire expression of plaintiff's "Kings in the City" found in "I'm A King".

4.  Entire dialogue, including plaintiff's statement about "cars" which supposedly is a sign of "urban kingship"..I.e. Plaintiff: "Makin midnight Moves in Mercedes Benzes".
    Defendants: "Bentley coupe with the top chopped off".

5.  Phraseology, Motif. Chorus line in its entirety, as well as the hook, "Kings in the City".

6.  Same Aesthetic appeal. Sentiment. Imagery

7.  Identical personification, Allusion, Symbolism—Allegory—Ambiguity

8.  Same Assonance—Diction—Hyperbole—Syntax—Tone

9.  Repetition of same Theme

10. Same Climax same Resolution.

11. Same figurative language.

12. Idiosyncratic appearance of such a phrase in defendant's chorus line as in plaintiffs.

13. Reasonable jurors would find substantial similarity of ideas and expression.

## SONG SIX: "WE GOT IT POPPIN"

**TITLE:** *"WE GOT IT POPPIN"*- **(PLAINTIFF, ARTISTS, THA DELEGATION)**

**TITLE:** *"WE GONE GET GET IT POPPIN"*-**(DEFENDANTS, ARTIST, FAT JOE).**

**RIGHTS ALLEGELY VIOLATED: 17 USC 106(1), (RIGHT OF**
**REPRODUCTION), 17 USC 106(2), (RIGHT TO PREPARE DERIVATIVE WORKS), 17**
**USC 106(3), 17 USC 106(4) (RIGHT OF PUBLIC DISTRIBUTION), 17USC 106(5)**
**RIGHT TO PUBLICLY PERFORM)....17 U.S.C. 102 ET SEQ. &   SECTIONS 107 THRU**
**122**

**LIABILITY IS ATTRIBUTTED TO:  UNIVERSAL MUSIC GROUP (17 USC 106(1),**
**(2)(3)(4)&(5)& VIACOM 17 USC 106(4)&(5), FOR DIRECT COPYRIGHT**
**INFRINGEMENT & CONTRIBUTORY COPYRIGHT INGRINGEMENT.**

## SIDE BY SIDE COMPARISON OF LYRICS TO CHORUS LINES OF
## BOTH WORKS

**PLAINTIFF**: "WHO GOT IT POPPIN---WE GOT IT POPPIN—BROOKLYN GOT IT
LOCKED IN—WE GOT IT LOCKED IN—SHORTY WIT THA NICE THIGHS—I KNOW

YOU WANNA STOP US BUT WE AIN STOPPIN---WHO GOT IT POPPIN---WE GOT IT

POPPIN---MA PEOPLES IN ST LOUIS—MA PEOPLE OUT IN DETROIT----WHO GOT IT

POPPIN---SHORTY ON THA DANCE FLOOR—BUT SHE AINT STOPPIN"....


**DEFENDANTS**: "IT'S 2 UP IN THA MORNIN—GURL—AND THE DJ PLAYIN THAT

SONG---NOW WHATCHA GON DO---<u>IMA GET GET GET IT POPPIN</u>---WHATCHA GON

DO---<u>IM GON GET GET GET IT POPPIN</u>----ITS 2 UP IN THA MORNIN NOW—AND IM

TRYIN TO GO WITCHU---GURL WHAT CHU GON DO---<u>IM GON GET GET GET IT</u>

<u>POPPIN</u>---WHATCHA GON DO---<u>IM GON GET GET GET IT POPPIN</u>"....


Therefore, as a matter of fact and law, it can be presumed that the probative value here points not

only to the identical expression and completely verbatim titles, but more directly, both songs

speak of being in a club environment and both songs speak of women in their respective chorus

lines.

It is further alleged that the defendants made a video out of plaintiff's song and mass marketed

and distributed the video as well as thousands of the Fat Joe CD's which sold tremendously.


# PROTECTED ELEMENTS LIFTED FROM PLAINTIFF'S WORK
## INCLUDE:


1. Identical Title to chorus line "Get It Poppin".

2. Sampled music and transposed notes time stretched to create derivative.

3. Entire expression of plaintiff's "Who Got It Poppin".

4. Entire dialogue, including plaintiffs words describing club life as well as a girl or a
   woman of a promiscuous nature.

5. Phraseology, Motif.

6. Chorus line in its entirety, as well as the hook, "Who Got It Poppin".

7. Same Aesthetic appeal.

8. Sentiment

9. Imagery

10. Identical personification, Allusion, Symbolism—Allegory—Ambiguity

11. Same Assonance—Diction—Hyperbole—Syntax—Tone

12. Repetition of same Theme

13. Same Climax same Resolution.

14. Same figurative language.

15. Idiosyncratic appearance of such a phrase in defendant's chorus line as in plaintiffs.

16. Reasonable jurors would find substantial similarity of ideas and expression.

## SONG SEVEN: "WISH A MUTHA FUGGA WOULD"

TITLE: "WISH A MUTHA FUGGA WOULD"- (PLAINTIFF, ARTISTS, ROWDY BOYZ)

TITLE: *"THE HEAT"*-(DEFENDANTS, ARTIST, LIL WAYNE)

RIGHTS ALLEGELY VIOLATED: 17 USC 106(1), (RIGHT OF REPRODUCTION), 17 USC 106(2), (RIGHT TO PREPARE DERIVATIVE WORKS), 17 USC 106(3), 17 USC 106(4) (RIGHT OF PUBLIC DISTRIBUTION), 17 USC 106(5) RIGHT TO PUBLICLY PERFORM)....17 U.S.C. 102 ET SEQ. &   SECTIONS 107 THRU 122

**LIABILITY IS ATTRIBUTTED TO: CASH MONEY RECORDS/BABY (17 USC 106(1),(2)(3)(4)&(5), UNIVERSAL MUSIC GROUP (17 USC 106(1),(2)(3)(4)&(5)& VIACOM 17 USC 106(4)&(5), FOR DIRECT COPYRIGHT INFRINGEMENT & CONTRIBUTORY COPYRIGHT INGRINGEMENT.**

## SIDE BY SIDE COMPARISON OF LYRICS TO CHORUS LINES OF BOTH WORKS

**PLAINTIFF**: "WE WISH DEM MUTHA FUGGAS WOULD—TRY TA SET UP A SHOP—ON THIS BLOCK—CUZ WE DEM REAL THUGS THAS HARD TA STOP—WE WISH DEM MUTHA FUGGAS WOOULD TRY TA COME TO THA TABLE RUNNIN A STABLE—JUS BECAUSE THEY THINK THEY STRONG AN THEY ABLE—WE WISH DEM MOTHA FUGGAS WOULD---TRY TA FUCK WIT OUR SKRILLA—WE GOT THAT THRILLA---U BOUT TA MAKE A DATE WIT A KILLA---WE WISH DEM MUTHA FUGGAS WOULD---TRY STATIN DEY CASE—IN OUR FACE---WE MAKE EM DISAPEAR –WITOUT A TRACE—WE WISH DEM MUTHA FUGGAS WOULD---

**DEFENDANT(S)**: "I SHOOT YOUR ARM, LEG, LEG ARM HEAD—THE HEATER BURNER BRUISER ON MA HIP THIS YEAR---I SHOOT YOUR ARM, LEG, LEG, ARM HEAD---I WISH A MUTHA FUGGA WOULD TRIP THIS YEAR"---

Therefore, as a matter of fact and law, the expression of the defendants is a mere "condensation" of the threat that the speaker "wishes a mutha fugga would". It can thus be presumed that the probative value here points only to the identical expression and aesthetic value found within the defendant's chorus lines and plaintiff's.

47

It is further alleged that the defendants made a video out of plaintiff's song and mass marketed and distributed the video as well as thousands of the Lil Wayne Carter Album CD which sold tremendously.

## PROTECTED ELEMENTS LIFTED FROM PLAINTIFF'S WORK INCLUDE:

1. Titles are totally different in the two songs; however, the punch lines of "Wish a Mutha Fugga Would" occur in both songs as a chant.

2. Sampled music transposed and time stretched to create derivative.

3. Entire expression of plaintiff's "Wish a Mutha Fugga Would".

4. Entire dialogue which speaks in a threatening manner to all listeners that the speaker "Wishes a Mutha Fugga Would" do anything the speaker doesn't like and will retaliate with gun play if forced.

5. Same Aesthetic appeal. Sentiment. Imagery

6. Identical personification, Allusion, Symbolism—Allegory—Ambiguity—Alliteration.

7. Same Assonance—Diction—Hyperbole—Syntax—Tone

8. Repetition of same Theme

9. Same Climax same Resolution.

10. Same figurative language.

11. Idiosyncratic appearance of such a phrase in defendant's chorus line as in plaintiffs.

12. Reasonable jurors would find substantial similarity of ideas and expression.

## SONG EIGHT: "STRIPPER GIRL"

TITLE: *"STRIPPER GIRL"*- (PLAINTIFF, ARTISTS, ROWDY BOYZ)

TITLE: *"IM IN LOVE WIT A STRIPPER"*-(DEFENDANTS, ARTIST, T-PAIN)

RIGHTS ALLEGELY VIOLATED: 17 USC 106(1), (RIGHT OF REPRODUCTION), 17 USC 106(2), (RIGHT TO PREPARE DERIVATIVE WORKS), 17 USC 106(3), 17 USC 106(4) (RIGHT OF PUBLIC DISTRIBUTION), 17 USC 106(5) RIGHT TO PUBLICLY PERFORM)….17 U.S.C. 102 ET SEQ. &   SECTIONS 107 THRU 122

LIABILITY IS ATTRIBUTTED TO: AKON & KONVICT MUSIC (17 USC 106(1),(2)(3)(4)&(5), UNIVERSAL MUSIC GROUP (17 USC 106(1),(2)(3)(4)&(5)& VIACOM 17 USC 106(4)&(5), FOR DIRECT COPYRIGHT INFRINGEMENT & CONTRIBUTORY COPYRIGHT INGRINGEMENT.

## SIDE BY SIDE COMPARISON OF LYRICS TO CHORUS LINES OF BOTH WORKS

PLAINTIFF: "STRIPPER GIRL STRIPPER GIRL KEEP STRIPPIN—STRIPPER GIRL— YOURE WELL KNOWN AROUN THA TOWN---STRIPPER GURL STRIPPER GIRL –BIG TIPPIN---STRIPPER GURL---YOU SLANG BOODY BY THE POUND----STRIPPER GURL STRIPPER GIRL---SLOW STRIPPIN—STRIPPER GIRL-----MAKE IT BOUNCE TO THA SOUND…STRIPPER GURL STRIPPER GIRL---- POLE SWINGIN---STRIPPER GURL— ROLL IT ROUND AND AROUND"….

**DEFENDANTS**: "IM IN LOVE WIT A STRIPPER—SHE POOPIN---SHE ROLLIN---SHE CLIMBIN THAT POLE---IM IN LOVE WIT A STRIPPER---SHE TRIPPIN SHE PLAYIN---IM NOT GOIN NOWHERE GIRL IM STAYIN---IM IN LOVE WIT A STRIPPER

Therefore, as a matter of fact and law, it can be presumed that the probative value here points not only to the identical expression and verbatim titles, but more directly, the plaintiff's love affair with a stripper girl followed closely by defendants claim to love the same stripper type girl. Defendants even describe her as she manipulates the "pole", as do the plaintiff's in their expression of "pole swingin", versus defendants "pole climbin".

It is further alleged that the defendants made a video out of plaintiff's song and mass marketed and distributed the video as well as thousands of the T-Pain CD which sold tremendously.

## PROTECTED ELEMENTS LIFTED FROM PLAINTIFF'S WORK INCLUDE:

1. Verbatim titles and expressions to both songs about loving an appreciating a "Stripper Girl".
2. Sampled music transposed and time stretched to create derivative.
3. Entire expression of plaintiff's "Stripper Girl".
4. Entire dialogue, including plaintiff's reference to the stripper girls agility on "the pole".
5. Rhythm, Melody, Harmony, Chords, Phraseology, Motif, Time Signature.
6. Chorus line in its entirety, as well as the hook, "Stripper Girl".
7. Same Aesthetic appeal.
8. Sentiment

9.  Imagery

10. Identical personification, Allusion, Symbolism---Gothic Elements—Allegory—
    Ambiguity

11. Same Assonance—Diction—Hyperbole—Syntax—Tone

12. Repetition of same Theme

13. Same Climax same Resolution.

14. Same figurative language.

15. Same idiosyncratic appearance of such a phrase in defendant's chorus line as in plaintiffs.

16. Reasonable jurors would find substantial similarity of ideas and expression.

## SONG NINE: "SLOW NECK"

TITLE: *"SLOW NECK"*- (PLAINTIFF, ARTISTS, ROWDY BOYZ)

TITLE: *"SLOW MOTION &*-(DEFENDANTS, ARTIST'S JUVENILE & SHAWNNA).

RIGHTS ALLEGELY VIOLATED: 17 USC 106(1), (RIGHT OF
REPRODUCTION), 17 USC 106(2), (RIGHT TO PREPARE DERIVATIVE WORKS), 17
USC 106(3), 17 USC 106(4) (RIGHT OF PUBLIC DISTRIBUTION), 17USC 106(5)
RIGHT TO PUBLICLY PERFORM)....17 U.S.C. 102 ET SEQ. &   SECTIONS 107 THRU
122

LIABILITY IS ATTRIBUTTED TO: CASH MONEY RECORDS (17 USC
106(1),(2)(3)(4)&(5), UNIVERSAL MUSIC GROUP (17 USC 106(1),(2)(3)(4)&(5) &
VIACOM 17 USC 106(4)&(5), FOR DIRECT COPYRIGHT INFRINGEMENT &
CONTRIBUTORY COPYRIGHT INGRINGEMENT.

# SIDE BY SIDE COMPARISON OF LYRICS TO CHORUS LINES OF BOTH WORKS

**PLAINTIFF**: "CAN YOU SLOW NECK, TO YOUR KNEES WILL YOU DROP, TAKE THA WOOD IN YA HANDS LICK IT LIKE A LOLLYPOP---CAN U SLO NECK –WIT 68  69--- DRINK IT DRY TO THA BONE LIKE YA FAVORITE WINE---GIMMME SLO NECK— WIT STRAWBERRIES ON ICE---IF YOU GO DOWN ONCE WILL YOU GO DOWN TWICE----GIMME SLO NECK----AN DON'T MOVE TOO FAST---YOU MAKE ME FEEL SO GOOD THAT I WANT IT TO LAST"….

**DEFENDANTS**: JUVENILE: "SKULLL----SLOW MOTION FOR ME—SLOW MOTION FOR ME—MOVE IT SLOW MOTION FOR ME----SLOW MOTION FOR ME—SLOW MOTION FOR ME---MOVE IT SLOW MOTION FOR ME---UHHHH----I LIKE IT LIKE DAT---SHE WORKIN DAT BACK….I DON'T KNOW HOW TO ACT---SLOW MOTION FOR ME---SLOW MOTION FOR ME---SLOW MOTION FOR ME---SLOW MOTION FOR ME—MOVE IT SLOW MOTION FOR ME"…

**DEFENDANT**: SHAWNNA:  "I WAS GETTING SOME HEAD---GETTING GETTING SOME HEAD---I WAS GETTING SOME HEAD---GETTING GETTING SOME HEAD---I WAS GETTING SOME HEAD—GETTING SOME HEAD---I WAS GETTIN SOME HEAD— GETTING GETTING SOME HEAD---I WAS WITH THA KINDA GIRL THAT MAKE YOUR TOES CURL"…

Therefore, as a matter of fact and law, both songs by the defendants depict XXX sexual situations, where one merely states that it prefers "slow motion" sex from a doggy style position-

--while the other chooses to state bluntly, without use of the simile of "Slow Neck", that the speaker was having oral sex, ebonically, by "gettin some head"—"gettin gettin some head", instead of mere "Slow Neck".

It is further alleged that the defendants made videos out of plaintiff's song and mass marketed and distributed the video as well as thousands of the Juvenile and Shawnna albums where the songs "Slow Motion" and "Getting Some" appear on the CD's, which sold tremendously.

# PROTECTED ELEMENTS LIFTED FROM PLAINTIFF'S WORK INCLUDE:

1. Title to chorus line "Slow Neck", is only used 50% as defendants song is entitled "Slow Motion", yet it expresses scandalous sexual situations in the same candid manner as plaintiff's work, "Slow Neck", yet suggests the sexual position is "doggy style", since defendants stated "She's work-in that back", in a feeble effort to mask the initial taking of "Slow Neck" relating to oral sex maneuvers and not rear-entry type sexual positions. However, Shawnna's "Getting Some"—bluntly expresses the concept of having oral sex---by stating the speaker was "getting some head".

2. Sampled music transposed and time stretched to create derivative.

3. Entire expression of plaintiff's song about oral pleasures captured within expression of defendants song titled "Slow Motion", yet changed to reflect a doggy style sexual position---while retaining the utterance of "Skull", where the published lyrics exclaim the speaker says: "UUhhhhh" and sometimes the word "Skulll", in the chorus chant. The word "Skull", ebonically, means oral sexual pleasures. Shawnnas "Getting Some" bluntly

expresses the "Slow Neck" concept of oral sex by merely stating "I was getting some Head"...

4. Entire dialogue, including plaintiff's wish that the female sexual participant do whatever she does---in a slow manner---.

5. Rhythm, Melody, Harmony, Chords, Phraseology, Motif, Time Signature.

6. Chorus line in its entirety, as well as the hook, partially, but meant to express the same thing.

7. Same Aesthetic appeal. Sentiment. Imagery

8. Identical personification, Allusion, Symbolism—Allegory—Ambiguity

9. Same Assonance—Diction—Hyperbole—Syntax—Tone

10. Repetition of same Theme

11. Same Climax same Resolution.

12. Same figurative language.

13. Same idiosyncratic appearance of such a phrase in defendant's chorus line as in plaintiffs.

14. Reasonable jurors would find substantial similarity of ideas and expression.


## SONG TEN: "EVERYBODIES TALKIN BOUT US"


**TITLE: *"EVERYBODIES TALKIN BOUT US"*- (PLAINTIFF, ARTISTS, ROWDY BOYZ)**

**TITLE: *"TALK ABOUT OUR LOVE"*-(DEFENDANTS, ARTIST, KANYE WEST & BRANDY NORWOOD)**

LIABILITY IS ATTRIBUTTED TO: ATLANTIC RECORDS (17 USC

106(1),(2)(3)(4)&(5), UNIV RIGHTS ALLEGELY VIOLATED: 17 USC 106(1), (RIGHT

OF

REPRODUCTION), 17 USC 106(2), (RIGHT TO PREPARE DERIVATIVE WORKS), 17

USC 106(3), 17 USC 106(4) (RIGHT OF PUBLIC DISTRIBUTION), 17 USC 106(5)

RIGHT TO PUBLICLY PERFORM)....17 U.S.C. 102 ET SEQ. &   SECTIONS 107 THRU

122

ERSAL MUSIC GROUP (17 USC 106(1), (2), (3), (4) &(5)& VIACOM 17 USC 106(4)&(5),

FOR DIRECT COPYRIGHT INFRINGEMENT & CONTRIBUTORY COPYRIGHT

INGRINGEMENT.


## SIDE BY SIDE COMPARISON OF LYRICS TO CHORUS LINES OF
## BOTH WORKS


**PLAINTIFF**: "EVERYBODIES TALKIN BOUT US—THEY SEE ITS ME YOU TRUST AN

GUYS BE TRYIN TA GET WITH YOU BUT THEY CANT DO A THING FOR YOU—

EVERYBODIES TALKIN BOUT US—THEY SAY ITS ONLY LUST—BUT I AM YOURS

AND YOU ARE MINE—THIS LIVE WILL LAST OUR WHOLE LIFETIME"....


**DEFENDANTS**: "THE MORE THEY TALK ABOUT OUR LOVE—THE MORE THEY

MAKE IT OBVIOUS---THE MORE THEY SEEM SO ENVIOUS---HOW CAN THEY TALK

ABOUT OUR LOVE—WHEN THEY DON'T KNOW---WHEN THEY DON'T KNOW ONE

THING ABOUT (US)—AND THEN THEY JUST RUNNIN THEY MOUTHS—ALL WE DO

IS TUNE THEM OUT".....

Therefore, as a matter of fact and law, it can be presumed that the probative value here points not only to the identical expression and near-verbatim titles, but more directly, the plaintiff's song and its attendant expression, appears perfectly within the chorus line of defendants song as well. Both songs appear to speak about the "other" people who choose to talk and gossip about the love affair being had by the speaker and some unknown other person. The video really personifies the total expressive meaning of the work by showing crowds of gossipers being faded in and out of scenes.

It is further alleged that the defendants made a video out of plaintiff's song and mass marketed and distributed the video as well as thousands of the Kanye West/ Brandy CD's which sold tremendously.

## PROTECTED ELEMENTS LIFTED FROM PLAINTIFF'S WORK INCLUDE:

1. Both Titles mean the same thing and are thus synonymous with each other.".
2. Sampled music transposed and time stretched to create derivative.
3. Entire expression of plaintiff's "Everybodies Talkin Bout Us" appears as a perfect paraphrase within the chorus line of defendant's work entitled "Talk About Our Love".
4. Entire dialogue, including plaintiff's expression about the nature of the gossipers who surround these lovers. Both songs achieve this same expressive message.
5. Rhythm, Melody, Harmony, Chords, Phraseology, Motif, Time Signature.
6. Chorus line in its entirety, as well as the hook, "Everybodies Talkin Bout Us" versus "Talk About Our Love".
7. Same Aesthetic appeal. Sentiment. Imagery

8. Identical personification, Allusion, Symbolism—Allegory—Ambiguity

9. Same Assonance—Diction—Hyperbole—Syntax—Tone

10. Repetition of same Theme

11. Same Climax same Resolution.

12. Same figurative language.

13. Idiosyncratic appearance of such a phrase in defendant's chorus line as in plaintiffs.

14. Reasonable jurors would find substantial similarity of ideas and expression.

## SONG ELEVEN: "SHOOT TO KILL"

**TITLE: *"SHOOT TO KILL"*- (PLAINTIFF, ARTISTS, ROWDY BOYZ)**

**TITLE: *"WELCOME TO THE SOUTH & EMINEM BATTLE SONG"*-(DEFENDANTS,**

**ARTISTS, YOUNGBUCK & EMINEM)**

**LIABILITY IS ATTRIBUTTED TO: INTERSCOPE RECORDS (17 USC**

**106(1),(2)(3)(4)&(5), UNIVERSAL MUSIC GROUP (17 USC 106(1),(2)(3)(4)&(5)&**

**VIACOM 17 USC 106(4)&(5), FOR DIRECT COPYRIGHT INFRINGEMENT &**

**CONTRIBUTORY COPYRIGHT INGRINGEMENT.**

**RIGHTS ALLEGELY VIOLATED: 17 USC 106(1), (RIGHT OF**

**REPRODUCTION), 17 USC 106(2), (RIGHT TO PREPARE DERIVATIVE WORKS), 17**

**USC 106(3), 17 USC 106(4) (RIGHT OF PUBLIC DISTRIBUTION), 17USC 106(5)**

**RIGHT TO PUBLICLY PERFORM)....17 U.S.C. 102 ET SEQ. &   SECTIONS 107 THRU**

**122**

# SIDE BY SIDE COMPARISON OF LYRICS TO CHORUS LINES OF BOTH WORKS

**PLAINTIFF**: "IF I GOTTA SHOOT I SHOOT TA KILL—GOTTA KEEP IT REAL---SEND THEM THREATS—GONNA GET WET---ME AN MA HOMEYS PACKIN STEEL---IF I GOTTA SHOOT I SHOOT TA KILL---GLOCK IS CONCEALED—LOOSE LIPS SINK SHIPS—LEAVIN EM SLUMPED BEHIND THE WHEEL---IF I GOTTA SHOOT I SHOOT TA KILL----UP ON THA HILL---THUGS DIE, MAMAS CRY—PEOPLE ALWAYS TRYIN TA STEAL---IF I GOTTA SHOOT I SHOOT TA KILL---DEY WONT I WILL---KEEP A CLIP, NEVA SLIP, GOTTA MAKE SURE DEY PAY DEM BILLS"---

**DEFENDANT**: ("EMINEM'S BATTLE SONG") "IF I CANT SHOOT YOU, IMA HAFTA KILL YOU BY SPITTIN---BALLIN MOTH FUCKAS MY RUCKAS AINT WRITTEN--- WHEN MY BULLETS MISS, MA WORDS KEEP HITTIN---IF YOU LIKE PAIN, THEN THAT'S WHAT YOURE GETTING"—(REPEAT 2X)

**DEFENDANT**: "WELCOME TO THE SOUTH" PERFORMED BY YOUNGBUCK: "GOLD GRILLS, COUPE DEVILLES, SITTIN ON 20-20---IT'S THE DIRTY DIRTY BABY---SHOW EM HOW THE SOUTH DO—WE POP PILLS—SHOOT TO KILL---YOU KNOW WHAT WE BOUT---AND ON BEHALF OF G-UNIT---WELCOME TO THE SOUTH"---

Therefore, as a matter of fact and law, it can be presumed that the probative value here points directly to defendants using plaintiff's work as a starting point for their own since the same "aesthetic appeal" has been achieved in both works, effectively lifting the coveted expression of plaintiff for unlawful purposes.

It is further alleged that the defendants made a video out of plaintiff's song and mass marketed and distributed the video as well as thousands of the Youngbuck & Eminem CDs which sold tremendously.

## PROTECTED ELEMENTS LIFTED FROM PLAINTIFF'S WORK INCLUDE:

1. Different titles used in order to mask the "Shoot to Kill" motif surreptitiously lifted from plaintiffs "Shoot to Kill" song.

2. Sampled music transposed and time stretched to create derivative.

3. Entire expression of plaintiff's song "Shoot to Kill".

4. Dialogue, all relating to the "Shoot to Kill" motif.

5. Rhythm, Melody, Harmony, Chords, Phraseology, Motif, Time Signature.

6. Chorus line expression in its entirety, as well as the hook, "Shoot to Kill".

7. Same Aesthetic appeal. Sentiment.  Imagery

8. Identical personification, Allusion, Symbolism—Allegory—Ambiguity

9. Same Assonance—Diction—Hyperbole—Syntax—Tone

10. Repetition of same Theme

11. Same Climax same Resolution.

12. Same figurative language.

13. Same idiosyncratic appearance of such a phrase in defendant's chorus line as in plaintiffs.

14. Reasonable jurors would find substantial similarity of ideas and expression.

## SONG TWELVE: "I'M A MANIAC"

59

**TITLE:** *"I'M A MANIAC"*- (PLAINTIFF, ARTISTS, ROWDY BOYZ)

**TITLE:** *"BREAK BREAD"*-(DEFENDANTS, ARTIST, LUDACRIS)

**RIGHTS ALLEGELY VIOLATED: 17 USC 106(1), (RIGHT OF REPRODUCTION), 17 USC 106(2), (RIGHT TO PREPARE DERIVATIVE WORKS), 17 USC 106(3), 17 USC 106(4) (RIGHT OF PUBLIC DISTRIBUTION), 17USC 106(5) RIGHT TO PUBLICLY PERFORM)....17 U.S.C. 102 ET SEQ. &   SECTIONS 107 THRU 122**

**LIABILITY IS ATTRIBUTTED TO: UNIVERSAL MUSIC GROUP (17 USC 106(1),(2)(3)(4)&(5)& VIACOM 17 USC 106(4)&(5), FOR DIRECT COPYRIGHT INFRINGEMENT & CONTRIBUTORY COPYRIGHT INGRINGEMENT.**

## SIDE BY SIDE COMPARISON OF LYRICS TO CHORUS LINES OF BOTH WORKS

**PLAINTIFF**: "IM A MANIAC—I CANT KEEP OUT OF THE ZONE, I SPEND MA NITES ON THE PHONE, MA TRIGGA FINGAS ON THE CHROME---CUZ IM A MANIAC—MA MIND IS ALMOST GONE—THESE STREETS IS MA HOME, THE ONLY THING THAT I OWN---IMA MANIAC---AND NOBODY KNOWS BUT ME, EVERYWHERE THAT I GO, THERE BE DEMONDS CALLIN ME----IMA MANIAC, AND QUICK TO LOSE CONTROL—GOT A HOLE IN MA SOUL---FILLED WITH DIAMONDS AND GOLD"—

**DEFENDANT**: "HEYYY---IMA MANIAC---GO AND TELL THE WHOLE WORLD MR. PAIN IS BACK---SO GO GET THEM THANGS OUT---YOU BETTER LOCK UP YOUR HOUSE---AND TELL THE COPS THEY LET THE ANIMALS OUT"---(REPEAT 2X)

Therefore, as a matter of fact and law, it can be presumed that the probative value here points not only to the identical expression, but more directly, the plaintiff's "Maniac" motif, which is repeated by defendants in the offending work. Both works contain allusions to weapons. Plaintiff: "Ma trigger fingers on the chrome" versus Defendants: "Go and get them thangs out".

It is further alleged that the defendants made a video out of plaintiff's song and mass marketed and distributed the video as well as thousands of the Ludacris CD containing the song "Break Bread", which sold tremendously.

## PROTECTED ELEMENTS LIFTED FROM PLAINTIFF'S WORK INCLUDE:

1. Titles to chorus lines are entirely different "I'm a Maniac", versus "Break Bread".
2. Sampled music transposed and time stretched to create derivative.
3. Entire expression of plaintiff's "I'm a Maniac" is found in "Break Bread" song.
4. Similar dialogue, including plaintiff's statements about guns.
5. Rhythm, Melody, Harmony, Chords, Phraseology, Motif, Time Signature.
6. Chorus line expression in its entirety, as well as the hook, "I'm a Maniac", since "Break Bread" opens with the statement, "Heyyy—I'm a Maniac", repeatedly and in the chorus lines.
7. Same Aesthetic appeal. Sentiment. Imagery

8.  Identical personification, Allusion, Symbolism—Allegory—Ambiguity

9.  Same Assonance—Diction—Hyperbole—Syntax—Tone

10. Repetition of same Theme

11. Same Climax same Resolution.

12. Same figurative language.

13. Same idiosyncratic appearance of such a phrase in defendant's chorus line as in plaintiffs.

14. Reasonable jurors would find substantial similarity of ideas and expression.

## SONG THIRTEEN: "FIRST BLOOD"

**TITLE: *"FIRST BLOOD"*- (PLAINTIFF, ARTISTS, ROWDY BOYZ)**

**TITLE: *"ONE BLOOD"*-(DEFENDANTS, ARTIST, THE GAME)**


**RIGHTS ALLEGELY VIOLATED: 17 USC 106(1), (RIGHT OF**

**REPRODUCTION), 17 USC 106(2), (RIGHT TO PREPARE DERIVATIVE WORKS), 17**

**USC 106(3), 17 USC 106(4) (RIGHT OF PUBLIC DISTRIBUTION), 17USC 106(5)**

**RIGHT TO PUBLICLY PERFORM)....17 U.S.C. 102 ET SEQ. &   SECTIONS 107 THRU**

**122**

**LIABILITY IS ATTRIBUTTED TO: INTERSCOPE RECORDS (17 USC**

**106(1),(2)(3)(4)&(5), UNIVERSAL MUSIC GROUP (17 USC 106(1),(2)(3)(4)&(5)&**

**VIACOM 17 USC 106(4)&(5), FOR DIRECT COPYRIGHT INFRINGEMENT &**

**CONTRIBUTORY COPYRIGHT INGRINGEMENT.**

## SIDE BY SIDE COMPARISON OF LYRICS TO CHORUS LINES OF BOTH WORKS

**PLAINTIFF**: "IMA DRAW FIRST BLOOD---IMA SAY MA FLOW—GIVIN YOU WHAT YOU NEED---LEADIN YOU TO THA FLOOR—IMA DRAW FIRST BLOOD—IMA SPIT MA FLOW---IMA FINISH WHAT THEY STARTED---DEN LEAVE EM WIT DEY ARMS BARELY DEPARTED"---(REPEAT 2X)

**DENENDANTS:** "ONE BLOOD—ONE BLOOD---ONE BLOOD (REPEAT 17X)

Therefore, as a matter of fact and law, it can be presumed that the probative value here points not only to the identical expression and verbatim titles, but more directly, the plaintiff's decision to use the phrase "first blood" in its chorus line while defendants decided to use only the word "Blood", replacing the word First with One, resulting in the One Blood chanting of defendants song. In any event, the two expressions mean the same thing. One Blood---First Blood--- obviously a veiled attempt to mask the theft.

It is further alleged that the defendants made a video out of plaintiff's song and mass marketed and distributed the video as well as thousands of The Game CD's, which sold tremendously.

## PROTECTED ELEMENTS LIFTED FROM PLAINTIFF'S WORK INCLUDE:

1. Verbatim title to chorus line "First Blood", slyly replacing it with "One Blood".
2. Sampled music transposed and time stretched to create derivative.

3.  Entire expression of plaintiff's "First Blood".

4.  Entire dialogue, having the audacity to chant repeatedly the hookline of "First Blood" paraphrased but still having the same force and effectiveness.

5.  Rhythm, Melody, Harmony, Chords, Phraseology, Motif, Time Signature and Tempo.

6.  Chorus line in its entirety, as well as the hook, "First Blood".

7.  Same Aesthetic appeal. Sentiment. Imagery

8.  Identical personification, Allusion, Symbolism—Allegory—Ambiguity

9.  Same Assonance—Diction—Hyperbole—Syntax—Tone

10. Repetition of same Theme

11. Same Climax same Resolution.

12. Same figurative language.

13. Same idiosyncratic appearance of such a phrase in defendant's chorus line as in plaintiffs.

14. Reasonable jurors would find substantial similarity of ideas and expression.

## SONG FOURTEEN: "THAT'S WHATS UP"

**TITLE: *"THAT'S WHATS UP"*- (PLAINTIFF, ARTISTS, ROWDY BOYZ)**

**TITLE: *"THAT'S WHATS UP" DEFENDANTS,* ARTIST, YO GOTTI/YOUNG GOTTI)**

**RIGHTS ALLEGELY VIOLATED: 17 USC 106(1), (RIGHT OF REPRODUCTION), 17 USC 106(2), (RIGHT TO PREPARE DERIVATIVE WORKS), 17 USC 106(3), 17 USC 106(4) (RIGHT OF PUBLIC DISTRIBUTION), 17 USC 106(5) RIGHT TO PUBLICLY PERFORM)....17 U.S.C. 102 ET SEQ. &   SECTIONS 107 THRU 122**

**LIABILITY IS ATTRIBUTTED TO: CASH MONEY RECORDS (17 USC 106(1),(2)(3)(4)&(5), UNIVERSAL MUSIC GROUP (17 USC 106(1),(2)(3)(4)&(5)& VIACOM 17 USC 106(4)&(5), FOR DIRECT COPYRIGHT INFRINGEMENT & CONTRIBUTORY COPYRIGHT INGRINGEMENT.**

## SIDE BY SIDE COMPARISON OF LYRICS TO CHORUS LINES OF BOTH WORKS

**PLAINTIFF**: "IF YOU REALLY GUCCI DOWN—THAS WHUS UP..WELL KNOWN ROUN TOWN'THAS WHATS UP--COP WEED BY THE POUND—THAS WHUS UP— GOT 24S ON THA GROUN…THAS WHUS UP----AN IF U RECOGINIZE GAME…THAS WHUS UP--TOAST TOP CHAMPAGNE—THAS WHUS UP---FLUSH HATAS DOWN THA DRAIN…THAS WHUS UP---EVERYDAY GETTING BRAIN"---

**DENENDANTS:** "YOU SEE ME NIGGA SAY WHUS UP---WANNA BE ME NIGGA---SAY WHUS UP---BOUT YO DOLLA—POP YA COLLA---DEN YOU HOLLA---DATS WHUS UP----SEE ME SHAWTY---SAY WHUS UP---WANA FUCK ME SHAWTY –THAS WHUS UP THAS WHUS UP

Therefore, as a matter of fact and law, it can be presumed that the probative value here points not only to the identical expression and verbatim titles, but more directly, the plaintiff's decision the phrase "That's What's Up" in its chorus line has been closely followed by defendants as both works speak about money and girls.

It is further alleged that the defendants made a video out of plaintiff's song and mass marketed and distributed the video as well as thousands of Yo Gotti's CD's, which sold tremendously.

**PROTECTED ELEMENTS LIFTED FROM PLAINTIFF'S WORK INCLUDE:**

1. Verbatim title to chorus line "That's What's Up" ".

2. Sampled music transposed and time stretched to create derivative.

3. Entire expression of plaintiff's "That's What's Up" chorus line.

4. Entire dialogue.

5. Rhythm, Melody, Harmony, Chords, Phraseology, Motif, Time Signature and Tempo.

6. Chorus line in its entirety, as well as the hook, "That's What's Up".

7. Same Aesthetic appeal. Sentiment. Imagery

8. Identical personification, Allusion, Symbolism—Allegory—Ambiguity

9. Same Assonance—Diction—Hyperbole—Syntax—Tone

10. Repetition of same Theme

11. Same Climax same Resolution.

12. Same figurative language.

13. Same idiosyncratic appearance of such a phrase in defendant's chorus line as in plaintiffs.

14. Reasonable jurors would find substantial similarity of ideas and expression.

134.    The above examples of derivative versions of plaintiff's original songs, namely, the chorus lines allegedly re-created into derivative works by the defendants (in most cases), did not occur by mere accident, chance, or independent creation, since a high degree of access has been shown, and because the songs occupy the <u>same hip hop marketplace</u>, targeted for the <u>same hip hop audience</u> and because the defendants have taken "*<u>the very heart of</u>*

*plaintiff's original songs*", merely to exploit their success without compensating plaintiff. This is unacceptable.

Section 103 of The Copyright Act provides that the subject matter of copyright includes compilations and derivative works. Section 101 defines derivative works as:

> *"A work based on one or more pre-existing works, such as a translation, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed or adapted. A work consisting of editorial revisions, annotations, or other modifications, which, as a whole, represent an original work of authorship, is a derivative work."*

## SECOND CLAIM FOR RELIEF
## CONTRIBUTORY COPYRIGHT INFRINGEMENT

**By plaintiff against all defendant persons for Contributory and Vicarious Copyright Infringement, pursuant to 17 USC 501 Et. Seq.**

135.    Plaintiff repeats and reavers each and every allegation contained in paragraphs 1 through 134 as if fully set forth herein, and further alleges that, at all relevant times, each defendant person has engaged in, and on information and belief, continues to engage in the business of knowingly and systematically participating in facilitating, materially contributing to and encouraging the above described unauthorized creation of derivative works of plaintiffs original songs (as well as other authors), reproducing them, making adaptations, distributing and otherwise commercially exploiting them at will, thereby infringing plaintiffs copyrights, intentionally, and each defendant person had actual and constructive knowledge, either directly or indirectly, of the infringements committed by

and through the unlawful enterprise and its agent employees or such defendant persons merely provided necessary support.

136.     Furthermore, and at all relevant times, each defendant has derived substantial financial benefit from the infringement of plaintiff's copyrights by each defendant. Defendants have even charged fees to take possession of plaintiff's and other author's coveted and original works with their permission and consent

137.     At all relevant times, each defendant person has had the right and ability to supervise and or control the infringing conduct of each other defendant, whether directly or indirectly, from a criminality standpoint or a support standpoint.

138.     Defendant persons, through their active participation in the unauthorized reproduction and creation of derivative works and distribution and exploitation of plaintiffs property, thereby provided provisions of the means and facilities for unauthorized reproduction and creation of derivative works of plaintiffs property, thereby adapting and distributing and publishing plaintiffs works unlawfully, providing encouragement of and assistance to each other defendant to engage in the unauthorized infringement actions, and each defendants material contribution to each other defendants acts, as well as their control over the means and facilities by which such unauthorized reproductions and derivative works were created, as well as the substantial direct financial benefits that defendants derived from all the aforesaid acts, all done with full knowledge of their illegal consequences, and all defendant persons are thus contributorily and vicariously liable for a vast number of intentional and direct copyright infringements.

139.     The infringement of each of plaintiff's rights in and to each of the copyrighted works constitutes separate and distinct acts of infringement.

68

140.    The foregoing acts of infringement by defendants have been willful, intentional and purposeful in disregard of and with indifference to plaintiffs and other author's rights.

141.    As a direct and proximate result of defendant's infringement of plaintiff's copyrights and exclusive rights under copyrights and exclusive rights under copyright, plaintiff is entitled to damages as well as defendants profits pursuant to **17 USC 504(b)** for each infringement.

142.    Plaintiff is further entitled to attorney fees and full costs pursuant to **17 USC 505**.

143.    Defendants conduct threatens to cause, and is causing harm to plaintiff's business and property, and unless enjoined and restrained by this Court, will continue to cause plaintiff great and irreparable injury that cannot be fully compensated for or measured in money.  Plaintiff has no adequate remedy at law.  Pursuant to **17 USC 502**, plaintiff is entitled to preliminary and permanent injunctions prohibiting further infringements of its copyrights and exclusive rights under copyright.

## CONCLUSION

144. "Get a license or do not sample", Sixth Circuit Judge Ralph Guy states in a tone reminiscent of Judge Kevin Duffy, who opened his dreadful opinion in *Grand Upright v. Warner (1991),* with the biblical admonition "Thou Shallt Not Steal".  In this case, the actual copying of the "Sound Recording" has been alleged".  Sound recordings and their underlying musical compositions are separate works with their own separate and distinct copyrights.  *(See: 17 U.S.C. 102(a)(2), (7) Bridgeport Music, Inc., v. Still In The Water Publishing, 327 F. 3d 472 n. 475 n. 3 (6th Cir.), cert. denied, 540 U.S. 948, 124 S.Ct. 399, 157 L.Ed 2d 279 (2003).*

69

145. In most copyright actions, the issue is whether the infringing work is substantially similar to the original work.... The scope of inquiry is much narrower when the work in question is a sound recording. The only issue is whether the actual sound recording has been used without authorization. Substantial Similarity is not an issue. *("Bradley C. Rosen, Esq. 22 CAUSES OF ACTION 12 (2d ed. 2003).* Since the exclusive right encompasses remixing, re-arranging or otherwise altering the actual sounds, the statute, by its own terms precludes the use of a substantial similarity analysis.

## RELIEF SECTION

146. Plaintiff incorporates herein by this reference each and every allegation contained in each paragraph above. Plaintiff is, and at all relevant times has been, the **copyright** owner or licensee of exclusive rights under United States **copyright** with respect to certain copyrighted sound recordings, including but not limited to the copyrighted sound recordings identified in Exhibit A attached hereto, each of which is the subject of a valid Certificate of **Copyright** Registration issued by the Register of Copyrights (the "Copyrighted Recordings") or pre-registration, as the case may be.

147. Among the exclusive rights granted to each Plaintiff under the **Copyright** Act are the exclusive rights to reproduce the Copyrighted Recordings and to distribute the Copyrighted Recordings to the public. Plaintiffs are informed and believe that Defendants, without the permission or consent of Plaintiffs, has used, and continues to use, plaintiff's sound recordings, samples and lyrics and an online media distribution system to download the Copyrighted Recordings, to distribute the Copyrighted Recordings to the public, and/or to make the Copyrighted Recordings available for distribution to others. In doing so, Defendant has violated

Plaintiffs' exclusive rights of reproduction and distribution. Defendant's actions constitute **infringement** of Plaintiffs' copyrights and exclusive rights under **copyright**.

148. Exhibit C contains a complete listing of songs or sound recordings Defendants have made available for distribution to the public. Plaintiffs are informed and believe that virtually all of the sound recordings listed on Exhibit C have been downloaded, marketed, advertised. distributed sold, promoted and/or offered for distribution without permission of the respective **copyright** holder.

149. Plaintiff is informed and believes that the foregoing acts of **infringement** have been willful and intentional, in disregard of and with indifference to the rights of Plaintiff. As a result of Defendant's **infringement** of Plaintiffs' copyrights and exclusive rights under **copyright**, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c) for Defendant's **infringement** of each of the Copyrighted Recordings.

150. Plaintiff is further entitled to their attorneys' fees and costs pursuant to 17 U.S.C. § 505. The conduct of Defendant is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiffs are entitled to injunctive relief prohibiting Defendant from further infringing Plaintiffs' copyrights, and ordering Defendant to destroy all copies of sound recordings made in violation of Plaintiffs' exclusive rights.

*WHEREFORE*, Plaintiff prays for judgment against Defendants as follows:

71

151. For an injunction providing: "Defendant shall be and hereby is enjoined from directly or indirectly infringing Plaintiffs' rights under federal or state law in the Copyrighted Recordings and any sound recording, whether now in existence or later created, that is owned or controlled by Plaintiffs (or any parent, subsidiary, or affiliate record label of Plaintiffs) ("Plaintiffs' Recordings"), including without limitation by using the Internet or any online media or land based retail/wholesale distribution system to reproduce (*i.e.,* download) any of Plaintiffs' Recordings, to distribute (*i.e.,* upload) any of Plaintiffs' Recordings, or to make any of Plaintiffs'

152. Recordings available for distribution to the public, in any manner whatsoever, except pursuant to a lawful license or with the express authority of Plaintiffs. Defendant also shall destroy all copies of Plaintiffs' Recordings that Defendant possesses or has downloaded onto any computer hard drive or server. without Plaintiffs' authorization and shall destroy all copies of those downloaded recordings transferred onto any physical medium or device in Defendant's possession, custody, or control." For statutory damages for each **infringement** of each Copyrighted Recording pursuant to 17 U.S.C. § 504.

## Prayer for Relief

**THEREFORE**, Plaintiff prays for judgment against Defendants as follows:

A. Declaring that Defendants' unauthorized conduct violates Plaintiffs' rights under common law and the Federal Copyright Act.

B. Immediately and permanently enjoining Defendants, their officers, directors, agents, servants, employees, representatives, attorneys, related companies, successors, assigns, and all others in active concert or participation with them from copying and publishing and or republishing any of

Plaintiffs' copyrighted articles or copyrighted material without consent or otherwise infringing Plaintiffs' copyrights or other rights in any manner;

C. Ordering Defendants to account to Plaintiffs for all gains, profits, and advantages derived by Defendants by their infringement of Plaintiffs' copyrights or such damages as are proper, and since Defendants intentionally infringed plaintiffs' copyrights, for the maximum allowable statutory damages for each violation;

D. Awarding Plaintiffs actual and/or statutory damages for Defendants' copyright infringement in an amount to be determined at trial;

E. Awarding Plaintiffs their costs, reasonable attorneys' fees, and disbursements in this action, pursuant to 17 U.S.C. § 505; and or alternatively, award plaintiff a sum certain, equally split between all defendants based on degrees of culpability, of no less than $50 million dollars, without an accounting, and

F. Awarding Plaintiffs such other and further relief as is just and proper.

DATED: June 26, 2007

By _____

73

**CERTIFICATE OF SERVICE**

I HEREBY DECLARE, UNDER PENALTY OF PERJURY, THAT THE FOREGOING

IS A TRUE AND CORRECT ACCOUNT OF THE HEREIN ALLEGED MATTERS AND

EVENTS, AND THAT THE FOLLOWING ENTITIES REPRESENT THE INDIVIDUAL

DEFENDANT PERSONS NAMED IN THE CAPTION AS INTERESTED PERSONS,

AND WERE MAILED A TRUE AND CORRECT COPY OF THIS COMPLAINT ON OR

ABOUT _12 AM_ JUNE _26_ 2007.

BY: Robert R. Prunte'

**JENNER & BLOCK**, C/O MR. MICHAEL B. DESANCTIS, 601 THIRTEENTH

STREET, N.W. SUITE 1200 SOUTH, WASHINGTON, D.C. 20005; **LEVINE,**

**SULLIVAN, KOCH & SCHULTZ**, C/O MICHAEL D. SULLIVAN, 1050

SEVENTEENTH STREET, N.W., SUITE 800, WASHINGTON, D.C. 20036-5514 &

**THE UNITED STATES COURTHOUSE** OF THE DISTRICT OF COLUMBIA, F.

BARRETT PRETTYMAN BUILDING, 333 CONSTITUTION AVENUE, N.W.

WASHINGTON, D.C. 20001, C/O, CLERK'S OFFICE.

BY:

ROBERT R. PRUNTE'

614 WYANOKE AVENUE

BALTIMORE, MARYLAND 21218

1.410.323.2483  / 1.301.514.4028