1  **Robert R. Prunté, (pro sé)**
   614 Wyanoke Avenue
2  Baltimore, Maryland 21218
   443.615.1745 or 43.682.7292
3

4

5                UNITED STATES DISTRICT COURT

6                FOR THE DISTRICT OF COLUMBIA

7

8

9   ROBERT R. PRUNTÉ                    CASE NUMBER: 1:06-CV-0048

10      Plaintiff,
                                        JUDGE: Paul L. Friedman (PLF)
11      Vs.
                                        
12  UNIVERSAL MUSIC GROUP
                                        JUN 1 3 2008
13  RECORDINGS, et al
                                        NANCY MAYER WHITTINGTON, CLERK
14                                      U.S. DISTRICT COURT
        Defendant (s)
15

16  **PLAINTIFF'S (INCLUSIONARY) MOTION IN LIMINE REQUESTING**

17  **THAT PERSONS REPRESENTING THE ACTUAL "INTENDED**

18  **AUDIENCE" FOR THE SONGS AT ISSUE ASSIST THE COURT IN**

19  **UNDERSTANDING THE MUSIC GENRE, IN ACCORD WITH DAWSON**

20  **V. HINSHAW AND MEMORANDUM OF LAW.**

21

22  Comes now the plaintiff with its "Inclusionary" Motion In Limine seeking to have

23  this Court appoint, or the parties mutually agree upon and select, an individual or

24  individuals, who represent the class of people who make up the "specialized"

25  audience" of people known as buyers of "Hip Hop" music.

1

These people are deemed to possess a special expertise that should be recognized in all cases where such a specialized musical genre is involved.

This Court has already stated that this case can actually be decided by "an ordinary person of reasonable attentiveness" who can merely listen to the (15) fifteen hip hop/rap songs, as well as their lyrical content, and unilaterally and fairly decide if there has been any unlawful appropriation. The plaintiff respectfully disagrees with this premise.

This theory of the Court and the defendants would destroy the rights vested in a copyright owner to have his or her specialized music judged by "the intended audience".

Furthermore, it appears that even though access is no longer an issue in this case, as the Court put it, it is very relevant in terms of making determinations about "substantial similarity" since, where there is a strong showing of access, as in this case with the "Inside Sessions" song harvesting operation, less similarity needs to be shown on the issue of unlawful coping. *(Please See: Smith v. Jackson, 84 F.3d 1213 (9th Cir. 1996) & Shaw v Lindheim, 919 F.2d 1353, (9th Cir. 1990).*

Therefore, this plaintiff fully expects this rule to be applied in this case as well, along with the Court making definite record reflections regarding this alleged song harvesting operation, which granted the defendants huge amounts of access to plaintiff's works.

## THE ORDINARY OBSERVER TEST HAS BEEN REFINED AS A MATTER OF FACT AND LAW

Many Courts have been slow or reluctant to recognize explicitly the need for refining the ordinary observer test in such a way that it would adopt the perspective of the intended audience, because, in most fact scenarios, the general lay public fairly represents the works intended audience.

As a result, a considerable of ambiguity exists in this area, and courts have not always made it apparent whether they were using a member of a specific audience, or simply an average lay observer as their spectator.

As correctly noted by the District Court, there are two prongs to the substantial similarity inquiry. The plaintiff must establish substantial similarity of both the ideas of the two works and of the expression of those ideas. *(See Litchfield v. Spielberg, 736 F2d. 1352, 1355, (9th Cir. 1984).*

Although this Honorable Court has stated it intends to judge this case without the help of experts whatsoever, this appears to be inaccurate and unfair, since, even in Sturdza v. United Arab Emirates, expert testimony was employed to assist the fact finder concerning whether the ideas of the works in question were similar. *(See: **Sturdza v. United Arab Emirates, 281 F.3d at 1296-97.***

This Courts intentions to act, as Ordinary Lay Observer will impose upon this plaintiff, the obligation to prove to such lay observer that the expressions are substantially similar. This test is perfect where the ordinary observer represents the intended audience of the complained of works, or where the lay public fairly represents the works intended audience.

With this thought in mind, it is the Arnstein Court, which provided the most light in this touchy area, when it stated:

"The question therefore, is whether defendant took from plaintiff's work so much of what is pleasing to the ears of the lay listeners, who comprise the audience for whom such popular music is composed, that defendant wrongfully appropriated something which belongs to the plaintiff"....

Thus, according to Arnstein, the Court should look to the reaction of lay listeners, because they comprise the audience of the plaintiffs work.

The total concept and feel of ordinary literary works is relevant because it is the basis on which potential purchasers of the wok identify and choose them, and the same factor applies when it comes to a works intended audience.

## HIP HOP'S INTENDED AUDIENCE IS SIGNIFICANTLY MORE SPECIALIZED THAN THE TYPICAL POOL OF LAY LISTENERS AS A MATTER OF FACT AND LAW

As the Court stated in *Whelan Associates v. Jaslow Dental Laboratory, 797 F2d. 1222 (3rd Cir. 1986), cert. Denied 479, U.S. 1031, 107 S.Ct. 877, 93 L.Ed. 2d (1987),:*

> "Only a reckless indifference to common sense would lead a Court to embrace a doctrine that requires a copyright case to turn on the opinion of someone who is ignorant of the relevant differences and similarities between the two works. Instead, the judgment should be informed by people who are <u>familiar with the media at issue</u>".

Likewise, in cases dealing with works of broad public appeal, the best representative of the audience may in fact be the "average lay person". But in all other cases, identification of the audience, and the subsequent decision about whether to narrow the group of average lay observers to this particular audience, should enter into the determination of substantial similarity.

Professor Nimmer put it another way:

"If the works in issue are directed to a particular audience, then the spontaneous and immediate reaction of that audience is determinative" *(See: 3M. Nimmer & D. Nimmer Nimmer On Copyright Sec. 13.03[E], at 13-62.4 n. 202 (1989).*

Thus, it is absolutely necessary to rely on the reaction of persons who do typify the members of the intended audience.

## A COURT MUST CONSIDER THE NATURE OF THE INTENDED AUDIENCE ON SECOND PRONG OF SUBSTANTIAL SIMILARITY INQUIRY

Where the intended audience is more narrow, as in the case of hip hop music or gangsta rap, as the case may be, the Court must recognize fact that this audience possesses a specialized expertise relevant to their purchasing decisions that lay people simply lack.

The intended audience in this case knows the lingo or language of "Ebonics" by heart, whereas a lay member of the general public would not. Therefore, it must be a member of this specialized audience who finds the two works to be substantially similar. Such an inquiry may include, and no doubt in many cases will require, admission of testimony from members of the intended audience or, possibly, from those who possess expertise with reference to the tastes and perceptions of the intended "hip hop audience".

The lay ordinary observer test spares a Court the burden of inquiring into, and drawing conclusions regarding, the nature of the works' intended audience. This would be decidedly unfair to this plaintiff as well as the specific and intended audience plaintiffs music serves.

## INTENDED AUDIENCE FOR "HIP HOP OR GANGSTA RAP" MUSIC POSESSES SPECIFIC KNOWLEDGE THAT THE LAY PUBLIC LACKS

January 23, 1997

(a portion of) Testimony submitted by William Labov, Professor of Linguistics at the University of Pennsylvania, Past President of the Linguistic Society of America, member of the National Academy of Science.

I am testifying today as a representative of an approach to the study of language that is called "sociolinguistics, " a scientific study based on the recording and measurement of language as it is used in America today. I am now completing research supported by NSF and NEH that is mapping changes in the English language through all of North America, for both mainstream and minority communities. Since 1966, I have done a number of studies of language in the African American community, beginning with work in South Harlem for the Office of Education that was aimed at the question, "Are the language differences between black and white children responsible for reading failure in the inner city schools?"

<u>Research in New York, Philadelphia, Washington, Florida, Chicago, Texas, Los Angeles, and San Francisco shows a remarkably uniform grammar spoken by African Americans who live and work primarily with other African Americans. Repeated studies by teams of black and white researchers show that about 60% of the African American residents of the inner city speak this dialect in its purist form at home and with intimate friends.</u> Passive exposure to standard

English -- through the mass media or in school -- has little effect upon the home language of children from highly segregated inner city areas. However, those African Americans who have had extensive face-to-face dealings with speakers of other dialects show a marked modification of their grammar..

However, research in the years that followed found that in many of its important features, African American Vernacular English was becoming not less, but more different from other dialects. Research on the language of ex-slaves showed that some of the most prominent features of the modern dialect were not present in the 19th century. It appears that the present-day form of African American English is not the inheritance of the period of slavery, but the creation of the second half of the 20th century.

Research on reading shows that an essential step in learning to read is the mastery of the relation of sound to spelling. As linguists, we know that for most inner city African American children, this relation is different, and more complicated, than for speakers of other dialects. We have not yet been able to apply this knowledge to large-scale programs for the teaching of reading, but we hope that with the interest aroused by the Oakland School Board resolution, this will become possible in the near future....

Therefore, and with a view to the plain words of Dawson v. Hinshaw, it is become evident that rap music or hip hop music is driven by Ebonics, and designed to cater to this audience who is highly proficient in this dialect of English. *(But see also: Concrete Machinery Co. v. Classic Lawn Ornaments, Baxter v. MCA, Inc., Whelan Assoc., Inc. v. Jaslow Dental Laboratory, Walker v. Time Life Films, Inc., Litchfield v. Spielberg, Original Appalachian Artworks, Inc. v. Toy Loft, Inc., Atari, Inc. v. North American Consumer Elec., Perini Corp. v. Perini Constr., Computer Associates Int'l v. Altai, Wildlife Express Corp. v. Carol Wright Sales, Inc., Sturdza v. United Arab Emirates & Kohus v. Mariol).*

Furthermore, plaintiff hereby requests this Court to make specific findings concerning the intended audience for this music, utilizing actual members from such an audience as well as affidavits supplied by the plaintiff from members of this specialized and intended audience. It is plaintiff's firm position that members of this audience possess a special expertise that is relevant to their purchasing decisions, which the lay public lacks.

Respectfully Submitted,

Robert R. Prunté'

## CERTIFICATE OF SERVICE

I HEREBY DECLARE, UNDER PENALTY OF PERJURY, THAT THE FOREGOING IS A TRUE AND CORRECT ACCOUNT OF THE HEREIN ALLEGED MATTERS AND EVENTS, AND THAT THE FOLLOWING ENTITIES REPRESENT THE INDIVIDUAL DEFENDANT PERSONS NAMED IN THE CAPTION AS INTERESTED PERSONS, AND WERE MAILED A TRUE AND CORRECT COPY OF THIS MOTION ON OR ABOUT ~~~~~~ JUNE ~~~~ 2008.  Thurs.
12th

,

**JENNER & BLOCK, LLP**, C/O MICHAEL DESANCTIS, SEAN HARTIGAN AND STEVEN FABRIZIO; 1099 NEW YORK AVENUE, N.W. SUITE 900, WASHINGTON, D.C. 20001; **LEVINE, SULLIVAN, KOCH & SCHULTZ, LLP.**, C/O MICHAEL D. SULLIVAN OR JOHN B. O'KEEFE 1050 SEVENTEENTH STREET, N.W. SUITE 800, WASHINGTON, D.C. 20036-5514 & **THE UNITED STATES COURTHOUSE** OF THE DISTRICT OF COLUMBIA, F. BARRETT PRETTYMAN BUILDING, 333 CONSTITUTION AVENUE, N.W. WASHINGTON, D.C. 20001, C/O, CLERK'S OFFICE.

BY: /s/ Robert R. Prunte'

ROBERT R. PRUNTE'
614 WYANOKE AVENUE
BALTIMORE, MARYLAND 21217
443.615.1745 OR 443.682.7292