_____ )
                                                )

| | | |
|---|---|---|
| ROBERT R. PRUNTÉ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-0480 (PLF) |
| | ) | |
| UNIVERSAL MUSIC GROUP, INC., *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

_____ )

OPINION

       Plaintiff Robert R. Prunté alleges that approximately 45 named defendants have infringed his copyright in numerous songs that he wrote and produced. He seeks to recover damages pursuant to the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, for direct and contributory copyright violations. Of the many defendants currently named in this case, only two — UMG Recordings, Inc. ("UMG" or "Universal"), and Warner Music Group Corp. ("Warner") (collectively "the defendants"), have responded to the complaint. These defendants have filed a motion for summary judgment, and Mr. Prunté has filed a cross-motion. Mr. Prunté has also submitted two plainly frivolous motions in which he (1) alleges that the defendants are in contempt of court, and (2) requests that the Court "take judicial notice of certain adjudicative facts and facts of law." Docket No. 94 at 1. The defendants have moved to strike various papers

filed by Mr. Prunté, including his motion alleging contempt of court and his motion for summary judgment.[1]

Upon consideration of the entire record in this case, the parties' arguments, and the relevant law, the Court concludes that the defendants' works are not substantially similar to those of the plaintiff and that the defendants therefore are entitled to summary judgment on all claims. Having already ruled that expert reports would not be accepted at this stage of the litigation, see Prunté v. Universal Music Group, Civil Action No. 06-0480, Memorandum Opinion and Order at 5-6 (D.D.C. Mar. 25, 2009), the Court will also grant the defendants' motion to strike the plaintiff's expert report. Each of the remaining outstanding motions will be denied as either meritless or moot.

## I. BACKGROUND

According to his various complaints, plaintiff Robert Prunté is a composer of hip-hop songs and the president of YoWorld Music ("YoWorld"), a company whose street teams sell and give away Mr. Prunté's music in various urban areas. See Compl. ¶ 65; id., Exs. F, H, M; First Am. Compl. ¶¶ 73, 75.[2] As President of YoWorld, Mr. Prunté took part in a service

---

[1]     The papers submitted by the parties and reviewed by the Court include: plaintiff's original complaint ("Compl."); defendants' motion to dismiss ("Defs.' MTD"); plaintiff's first amended complaint ("First Am. Compl."); plaintiff's second amended complaint ("Second Am. Compl."); plaintiff's motion for summary judgment ("Pl.'s MSJ"); Pl.'s MSJ, Ex. A ("Music CD"); Pl.'s MSJ, Ex. B ("Lyrics"); plaintiff's motion for judicial notice ("Pl.'s MJN"); plaintiff's supplemental report of music expert, Ex. A ("Mikeal Report"); plaintiff's motion alleging contempt of court by defendants ("Pl.'s Cont. Mot."); defendants' motion for summary judgment ("Defs.' MSJ"); defendants' opposition and motion to strike plaintiff's motion for contempt, motion for summary judgment and expert report ("Defs.' Opp."); plaintiff's opposition to defendants' motion for summary judgment ("Pl.'s Opp."); and defendants' reply to plaintiff's opposition to defendants' motion for summary judgment ("Defs.' Reply").

[2]     Mr. Prunté, a *pro se* litigant, appears to incorporate by reference into each successive complaint all allegations and arguments made in previous complaints. The Court therefore has referenced all three complaints in summarizing the plaintiff's contentions.

provided by Inside Sessions, a division of defendant Universal, which involved his purchasing an educational CD-ROM on how to succeed in the music industry and submitting samples of his musical work for professional industry feedback. Compl. ¶ 65; id., Ex. D; First Am. Compl. at 8; id. ¶ 89. Mr. Prunté submitted 38 songs to Inside Sessions in 2001 and received written critiques from Inside Sessions in 2002. See Compl. ¶ 65; id., Exs. B-C.

On March 25, 2006, Mr. Prunte commenced this action by filing a complaint on his own behalf and that of YoWorld against approximately 45 corporate and individual recording industry defendants, including large production companies such as Universal, Warner, and Viacom and well-known artists such as Eminem, Kanye West, and Lil Wayne.[3] Mr. Prunté asserted a total of twelve claims against all defendants collectively. Two of those claims asserted copyright infringement, while the remaining ten alleged breach of fiduciary duty, violations of the Lanham Act, civil RICO claims, criminal extortion, and bank fraud. See First Am. Compl. ¶¶ 131-312. Although his complaint named numerous defendants, Mr. Prunté obtained summonses for just three of them — Universal, Warner, and Viacom — and served process only upon Universal and Warner. See Prunté v. Universal Music Group, 484 F. Supp 2d 32, 36 (D.D.C. 2007).

On March 30, 2007, ruling on a motion to dismiss filed by Universal and Warner, the Court dismissed all of the pending claims except those alleging copyright infringement.

---

[3]     The following are the defendants, other than Universal and Warner, named in Mr. Prunté's most recent complaint: the board of directors of Universal, Zach Horowitz, Nick Henry, Shawn (Jay-Z) Carter, L.A. Reid, Cash Money Records, Inside Sessions, Dino Delvaille, Damon Dash, Def Jam Music Group, Interscope Records, Geoff Seigel, Brian Wittmer, Kanye West, Brandy Norwood, G-Unit Records, 50 Cent, Juvenile, Lil Wayne, Roy Jones, Jr., Eminem, DMX, T.I., Ying Yang Twins, Fat Joe, Ludacris, Shawnna, Akon, T-Pain, Yo Gotti (Young Gotti), the Game, John Legend, Ted Turner, the board of directors of Warner, Ahmet Ertegun, Adam Fischell, Black Rob, Rich Christina, Sum[n]er Redstone, BET, MTV, VH1, Paramount Pictures, Rolf Schmidt-Holtz, and Tim Bowen. Second Am. Compl. at 1.

Prunté v. Universal Music Group, 484 F. Supp 2d at 44.  The Court also dismissed all claims

brought by YoWorld on the ground that Mr. Prunté, proceeding *pro se*, could not represent an

artificial entity.  Id. at 37-38.  On March 11, 2008, the Court dismissed all pending claims

against Viacom, finding that Mr. Prunté had never effected proper service upon that defendant.

Prunté v. Universal Music Group, 248 F.R.D. 335, 339 (D.D.C. 2008).  As a result of those

rulings, Mr. Prunté's complaint now consists only of claims alleging direct and contributory

copyright infringement against Universal, Warner, and a host of individuals and companies for

whom summonses have not been issued and who have never appeared in this litigation.  Mr.

Prunté alleges that the various defendants conspired to imitate protectible elements of fourteen

songs in which he holds the copyrights and to feed the resulting sixteen infringing songs to

"already hot artist[s] on the [defendant production companies'] roster[s]." First Am. Compl. ¶ 5;

see also Pl.'s MSJ at 6.

On June 2, 2008, the Court ruled that the defendants would be permitted to file a

motion for summary judgment prior to the commencement of discovery on the issue of whether

the defendants' allegedly infringing songs are substantially similar to Mr. Prunté's music.

Prunté v. Universal Music Group, 563 F. Supp. 2d 41, 43-45 (D.D.C. 2008).  The Court reasoned

that, in all likelihood, the only evidence necessary to a decision on substantial similarity would

be (1) recordings of all the songs at issue, and (2) transcriptions of the songs' lyrics.  Id. at 44.

The parties could easily exchange that evidence among themselves and provide it to the Court,

thus avoiding the expense of formal discovery at least temporarily.  Id.  In the event that Mr.

Prunté determined that he would need further evidence in order to answer the defendants'

motion, he would be permitted to move for limited discovery pursuant to Rule 56(f) of the

Federal Rules of Civil Procedure.  Id. at 45.

During the several months following the issuance of the Court's June 2, 2008 Order, the parties were unable to complete the exchange of evidence contemplated by the Court and failed to agree on a briefing schedule for the defendants' motion for summary judgment. See Prunté v. Universal Music Group, Civil Action No. 06-0480, Memorandum Opinion and Order at 1-2 (D.D.C. Mar. 25, 2009). In that period, Mr. Prunté filed six "baseless" motions, prompting the Court to warn him that he could be barred from filing further papers without leave if he continued to "clog[] [the Court's] docket . . . with meritless motions." Id. at 3 (internal quotation marks omitted). To facilitate the briefing and resolution of the anticipated motion for summary judgment, the Court stated that it required five pieces of evidence: (1) a list of the allegedly infringed songs; (2) a list of the allegedly infringing songs; (3) a document "explaining which portions of Mr. Prunté's works were, in his view, infringed by [the defendants'] works" and "clearly identify[ing] the allegedly infringed portions of Mr. Prunté's works and the allegedly infringing portions of [the defendants'] works"; (4) a compact disc containing recordings of the allegedly infringed songs; and (5) a separate compact disc containing recordings of the allegedly infringing songs. Id. at 5. The Court warned that "[n]o other evidence will be permitted except by leave of Court" and ordered Mr. Prunté to submit the five requested pieces of evidence. Id. at 5-6. Finally, the Court instructed Mr. Prunté to file the requested evidence on or before May 1, 2009, and ordered the defendants to file their motion for summary judgment on or before June 15, 2009. Id. at 6.

Instead of following the Court's explicit instructions by submitting only the five pieces of evidence requested and permitted, Mr. Prunté responded to the Court's March 25, 2009 Order by filing three motions and the report of a purported music expert. See Pl.'s MSJ; Mikeal Report; Pl.'s MJN; Pl.'s Cont. Mot. The first motion alleges that the defendants should be held

5

in contempt of Court because they failed to file their motion for summary judgment by April 20, 2009. <u>See</u> Pl.'s Cont. Mot at 2. The second requests the entry of summary judgment in Mr. Prunté's favor. <u>See</u> Pl.'s MSJ. That motion is accompanied by some but not all of the evidence requested by the Court. <u>See</u> Music CD; Lyrics. The third motion, in which Mr. Prunté requests "judicial notice of certain adjudicative facts and facts of law," merely reiterates the facts alleged in plaintiff's complaints and his motion for summary judgment.

The defendants moved to strike several of Mr. Prunté's filings as frivolous and/or not permitted by the terms of the Court's March 25, 2009 Order. <u>See</u> Defs.'Opp. at 1-2. They then timely filed their motion for summary judgment on the issue of substantial similarly on June 15, 2009. That motion is now ripe and appropriate for resolution.

## II. LEGAL FRAMEWORK

### *A. Standard of Review*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P 56(c). Material facts are those "that might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Id</u>. at 255; <u>see</u> <u>also</u> <u>Wash. Post Co. v. U.S. Dep't. of Health and Human Servs.</u>, 865 F.2d 320, 325 (D.C. Cir. 1989).

*Pro se* complaints filed without the assistance of counsel are held "to less stringent standards than formal pleadings drafted by lawyers," <u>Chandler v. W.E. Welch &</u>

Assocs., 553 F. Supp. 2d 94, 102 (D.D.C. 2008) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972)) (internal quotation marks omitted), and, when necessary, the Court may examine other pleadings "to understand the nature and basis of [a plaintiff's] *pro se* claims." Gray v. Poole, 275 F.3d 1113, 1115 (D.C. Cir. 2002). A *pro se* plaintiff's inferences "need not be accepted 'if such inferences are unsupported by the facts set out in the complaint.'" Caldwell v. District of Columbia, 901 F. Supp. 7, 10 (D.D.C. 1995) (quoting Henthorn v. Dep't. of Navy, 29 F.3d 682, 684 (D.C. Cir. 1994)). Furthermore, a *pro se* plaintiff's opposition to a motion for summary judgment, like any other, must consist of more than mere unsupported allegations and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in his favor. Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50.

*B. Copyright Infringement*

To establish copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361 (1991); see also Stenograph L.L.C. v. Bossard Assocs., Inc., 144 F.3d 96, 99 (D.C. Cir. 1998). The second requirement — that is, the copying of original "constituent elements" — is composed of two sub-parts. Specifically, "[t]he plaintiff must show not only that the defendant actually copied the plaintiff's work, but also that the defendant's work is 'substantially similar' to protectible elements of the plaintiff's work." Sturdza v. United Arab Emirates, 281 F.3d 1287, 1295 (D.C.

Cir. 2002). The first sub-element is generally referred to as "actual" or "factual" copying and the second is generally referred to as "improper" or "actionable" copying. See Johnson v. Gordon, 409 F.3d 12, 18 (1st Cir. 2005); see also 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.01[B] at 13-8 (2008) (hereinafter "NIMMER").

Even if actual copying is established, a plaintiff must establish actionable copying to prevail. In other words, "[c]opying as a factual matter is insufficient, if [actionable copying] is lacking." NIMMER § 13.01[B] at 13-9; see also id. at 13-14 (actionable copying "remains an indispensible [component] of plaintiff's proof, even in cases . . . in which defendant does not contest factual copying"). Courts employ a two-step analysis to determine whether defendants have engaged in actionable copying:

> The first [step] requires identifying which aspects of the artist's work, if any, are protectible by copyright. No author may copyright facts or ideas. The copyright is limited to those aspects of the work — termed "expression" — that display the stamp of the author's originality. . . .
>
> Once unprotectible elements such as ideas and *scènes à faire* are excluded, the [second] step of the inquiry involves determining whether the allegedly infringing work is "substantially similar" to protectible elements of the [complaining] artist's work. "Substantial similarity" exists where the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value.

Sturdza v. United Arab Emirates, 281 F.3d at 1295-96 (internal quotation marks and citations omitted).

### 1. Unprotectible Elements

The first step in the substantial similarity inquiry "requires identifying which aspects of the artist's work, if any, are protectible by copyright" — that is, which aspects display

the author's "stamp of originality."  Sturdza v. United Arab Emirates, 281 F.3d at 1295.  The mere fact that a book, play, or piece of music is copyrighted does not mean that every part of it is protected.  See Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. at 348; Stenograph L.L.C. v. Bossard Assocs., Inc., 144 F.3d at 99 (copyright protection does not extend to every element of a copyrighted work, merely those components of the work that are original to the creator).  For example, because "the *sine qua non* of copyright is originality," "no author may copyright ideas or the facts he narrates."  Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. at 345 (quoting Harper Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 556 (1985)).  Ideas and facts contained in copyrighted works therefore are not protected even though the creative expression of those ideas or facts may be.  See Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. at 348; Nelson v. Grisham, 942 F. Supp. 649, 652 (D.D.C. 1996), *aff'd*, 132 F.3d 1481 (D.C. Cir. 1997), *cert. denied*, 522 U.S. 1148 (1998).  As Judge Boudin has explained for the First Circuit, "the underlying idea (*e.g.*, the travails of two star-crossed lovers), even if original, cannot be removed from the public realm; but its expression in the form of a play script (such as William Shakespeare's Romeo and Juliet) can be protected.  Needless to say, the line is a blurry one."  Matthews v. Freedman, 157 F.3d 25, 27 (1st Cir. 1998).

Similarly, sequences of events that "necessarily result from the choice of setting or situations," known as *scènes à faire,* and stock themes or settings that often arise in works of a particular genre also are not protected.  Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996); see also Sturdza v. United Arab Emirates, 281 F.3d at 1295-96.  For instance, the use of a police car chase in an action movie is not copyrightable, although the way a particular car chase is depicted may be copyrightable.  As the Ninth Circuit has explained: "[D]epictions of the small miseries of domestic life, romantic frolics at the beach, and conflicts between ambitious young

people on one hand, and conservative or evil bureaucracies on the other [are] unprotectible. These familiar scenes and themes are among the very staples of modern American literature and film.  The common use of such stock . . . merely reminds us that . . . there is only rarely anything new under the sun."  Berkic v. Crichton, 761 F.2d 1289, 1294 (9th Cir.), *cert. denied*, 474 U.S. 826 (1985); see also Whitehead v. Paramount Pictures, Inc., 53 F. Supp. 2d 38, 46-47 (D.D.C. 1999).

Like *scènes à faire*,  individual words and short phrases are generally not protected because they lack the requisite originality.  See 37 C.F.R. § 202.1 (a) ("Words and short phrases such as names, titles, and slogans" are not subject to copyright.); Acuff-Rose Music, Inc. v. Jostens, 155 F.3d 140, 144 (2d Cir. 1998) (phrases that "enjoy[] a robust existence in the public domain" are not protectible); Narrell v. Freeman, 872 F.2d 907, 911 (9th Cir. 1989) ("Ordinary phrases are not entitled to copyright protection."); Whitehead v. Paramount Pictures Corp., 53 F. Supp. 2d at 47 n.5 ("[T]he isolated use of a word or phrase such as 'kind of cute' is not copyrightable.").

### 2.  Assessing Substantial Similarity

"Once unprotectible elements such as ideas and *scènes à faire* are excluded, the next step of the [substantial similarity inquiry] involves determining whether the allegedly infringing work is substantially similar to protectible elements of the [plaintiff's] work."  Sturdza v. United Arab Emirates, 281 F.3d at 1296 (internal quotation marks omitted).  One work is substantially similar to another if "an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value."  Id. (internal quotation marks and citation omitted).   In assessing substantial similarity, a court or factfinder must consider "the works as a whole" as well as

"individual elements [of the works] in isolation," because "protectible expression may arise through the ways in which artists combine even unprotectible elements." Id. (internal quotation marks and citations omitted).

## III. DISCUSSION

### A. Permissible Evidence

Before analyzing the substance of Mr. Prunté's claims, the Court must determine what material is properly included in the record. In its June 2, 2008 Memorandum Opinion and Order, the Court determined that it would resolve any motion for summary judgment regarding the issue of substantial similarity without relying upon expert affidavits or reports submitted by the parties. Prunté v. Universal Music Group, 563 F. Supp. 2d at 42-43. Accordingly, the Court instructed Mr. Prunté to submit as evidence *only* (1) transcriptions of the lyrics at issue, and (2) sound recordings of the allegedly infringed and infringing works. Prunté v. Universal Music Group, Civil Action No. 06-0480, Memorandum Opinion and Order at 5 (D.D.C. Mar. 25, 2009). The parties were warned that "[n]o other evidence will be permitted except by leave of the Court." Id.

Mr. Prunté flagrantly disobeyed that Order by submitting without leave an "expert report" that was prepared by one David Mikeal and purports to analyze the similarities and differences between four sets of allegedly infringing/infringed songs. See Mikeal Report. As evidence of Mr. Mikeal's expertise, Mr. Prunté has submitted only a printout of the welcome page from Mr. Mikeal's website, which states that "David is a well known singer, songwriter, producer[,] engineer and multi-instrumentalist." Plaintiff's Supplemental Report of Music Expert, Ex. B. Because Mr. Prunté has improperly submitted Mr. Mikeal's report, and because the Court has already determined that expert reports should not be used to prove substantial

similarity in this matter, the Court will grant the defendants' motion to strike Mr. Mikeal's report and will not consider it in deciding the defendants' motion for summary judgment.[4]

## B. Analysis

Having determined which materials it will consider, the Court now must analyze the substance of Mr. Prunté's claims of substantial similarity. Those claims fail to demonstrate that any genuine issue of material fact exists as to the question of substantial similarity in this case. The plaintiff's assertions follow a pattern. With respect to each pair of allegedly infringed or infringing songs, Mr. Prunté identifies one or two common, unprotectible elements — a word or common phrase, an idea, a *scène à faire* — in the defendants' song that is also present in his own song, often in the title or chorus. He then points out that the songs share a theme or subject — another unprotectible element. Finally, he asserts that in combination, the unprotectible elements shared by the two songs constitute his own protected expression. See, e.g., Pl.'s Opp. at 49-50.

As the defendants point out, see Defs.' Reply at 6, Mr. Prunté seems draw this line of argument from Sturdza v. United Arab Emirates, 281 F.3d 1287 (D.C. Cir. 2002), in which the court of appeals ruled that two architectural works may be substantially similar, in

---

[4]     The Court notes that the report would be of no help to Mr. Prunté in any case. With regard to each of the four sets of songs upon which Mr. Mikeal opines, he finds that the music of Mr. Prunté's song *differs* substantially from that of the defendants. The music of defendants' "The Heat," for example, "isn't very similar" to that of Mr. Prunté's "Wish a Muthafugga Would." Mikeal Report at 1. "The musical parts and structure" of defendants' "Talk About Our Love" and plaintiff's "Everybody's Talkin Bout Us" "are quite different." Id. at 2. "The keys, musical parts and feel (groove)" of defendants' "Fire in Da Hole" and plaintiff's "Fire in the Hole" "are quite different." Id. Aside from a trivial similarity in the flute accompaniment to plaintiff's song "Kings in the City" and defendants' "Kings in a King," "the musical parts and arrangement of both songs are different." Id. at 1. Mr. Mikeal's report thus validates the defendants' contention that no reasonable person would consider the music of their songs substantially similar to that of Mr. Prunté's songs.

spite of numerous small differences between them, if their "overall look and feel" is very similar. Id. at 1297; see Pl.'s Opp. at 14. That line of reasoning simply cannot be applied in Mr. Prunté's case, however. In Sturdza, the court of appeals found that the two architectural works in question might have a similar "overall look and feel" because they shared numerous design elements and conveyed a similar visual "effect." See id. at 1297-99. In contrast, Mr. Prunté typically asserts that each allegedly infringing song has in common with one of his songs (1) use of a stock phrase, such as "that's what's up," and (2) a very broad theme or subject, such as sex and drugs. The use of a cliché short phrase in a hip-hop song treating a very common subject cannot be said to create a distinctive musical effect, and so Mr. Prunté cannot rely upon Sturdza to transform his combination of a few unprotectible elements into protected expression.

Having explained the gist of Mr. Prunté's arguments, the Court may now assess his allegations with regard to particular songs. While weighing Mr. Prunté's arguments, the Court painstakingly and repeatedly listened to the audio recordings of the allegedly infringed and infringing songs submitted by the plaintiff. It also carefully reviewed the transcriptions of the songs' lyrics provided by Mr. Prunté. Based on this thorough analysis of the songs' music and lyrics, the Court concludes that no trier of fact could find the works substantially similar.

Since Mr. Prunté's arguments follow a pattern, as explained above, so too will the Court's analysis: it will first identify the elements of each allegedly infringed song that Mr. Prunté believes to be present in an allegedly infringing song, and then explain why those elements are not protectible and so cannot be a source of substantial similarity. In cases where Mr. Prunté has identified a string of trivial similarities, the Court explains how the differences between the two works in question far outweigh any minor similarities.

### 1. Plaintiff's "Fire in the Hole"
### Defendants' "Fire in Da Hole"

Mr. Prunté contends that defendants' song "Fire in Da Hole" by Black Rob infringes his work "Fire in the Hole" because the songs have "the same theme concerning rowdy young people acting out their desires to do harm to their enemies." Pl.'s MSJ at 20. He also relies on the fact that the songs have the same title and contain the phrase "fire in the hole" in their chorus lines. Id. Of course, titles are not protectible, and neither are short, common phrases such as "fire in the hole." See 37 C.F.R. § 202.1 (a); Narrell v. Freeman, 872 F.2d at 911. The theme of vengeful young people is an idea and so is unprotectible. These unprotectible elements cannot serve as a basis for a finding of substantial similarity.

### 2. Plaintiff's "God, Pick Up the Phone"
### Defendants' "Lord, Give Me a Sign"

As an initial matter, the Court notes that Mr. Prunté, contrary to the Court's instructions, has failed to submit an audio recording of these songs and has provided a transcription only of the two songs' chorus lines. The Court therefore addresses only Mr. Prunté's arguments regarding the lyrics of the chorus lines.

Mr. Prunté alleges that defendants' "Lord, Give Me a Sign" by DMX infringes his song "God, Pick Up the Phone" because "both works . . . ask[] God to do something for the speaker" using a phrase five syllables long. See Second Am. Compl. at 35-36. It is nearly impossible to think of a theme more transcendent of culture and history than that of a person reaching out and asking for help or counsel from a god. Such an idea is precisely the type of broad, general concept not safeguarded by copyright. See Berkic v. Crichton, 761 F. 2d 1289, 1293 (9th Cir. 1985) ("General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind."). The fact that Mr. Prunté invokes the

concept of divine intervention in five syllables does not render that concept protectible.  See NIMMER § 13.03[A] at 13-36 ("[S]light or trivial similarities are not substantial and are not therefore infringing.").

### 3.  Plaintiff's "I'm So High"
### Defendants' "So High"

According to Mr. Prunté, the Defendants' song "So High" by John Legend is substantially similar to his song "I'm So High" because the songs' titles are "virtually identical," and both songs use contact with the sky as a metaphor for being high.  Pl.'s MSJ at 20-21. Neither titles nor short phrases such as "so high," however, are protectible.  See 37 C.F.R. § 202.1 (a); Narrell v. Freeman, 872 F.2d at 911.  Furthermore, lyrics using clichéd language — such as the equation of being high to touching the sky — "are too trite to warrant copyright protection."  Johnson v. Gordon, 409 F.3d at 24.  Any similarity based on those elements therefore cannot give rise to a finding of actionable copyright infringement.

### 4.  Plaintiff's "Smoke, Drink, Cuss, Fight"
### Defendants' "I Smoke, I Drank" and "By Myself"

Mr. Prunté has not provided an audio recording of defendants' songs "I Smoke, I Drank" by Roy Jones, Jr., and "By Myself" by the Ying Yang Twins, nor has he submitted a transcription of the songs' lyrics.  His arguments regarding these songs are based entirely on the lyrics of their chorus lines, which he quotes in his second amended complaint.  See Second Am. Compl. at 40.  Even if the Court assumes that the lyrics of the songs are exactly as the plaintiff describes them in his complaint, his infringement claim fails.  Mr. Prunté's claim of similarity appears to be based entirely on the fact that the defendants' two songs use the words "smoke"

and "drink" in their choruses.  See id.  Needless to say, the mere use of those two words, whether together or separately, is not protectible expression.

### 5. Plaintiff's "Kings in the City" Defendants' "I'm a King"

The similarities alleged to exist between the defendants' "I'm a King" by T.I. and the plaintiff's "Kings in the City" consist of the following: Both songs use the word "king" in their title and chorus; both  mention a car and an item of clothing in the chorus; and both feature a narrator who is "immensely popular" and "speak[s] of destroying enemies." Pl.'s MSJ at 21-22; Pl.'s Opp. at 30.  Mr. Prunté also argues that both narrators "speak of moving through cities or cross-country," Pl.'s Opp. at 30, but in fact, defendants' song does *not* speak of moving; it says only that the narrator is "connected nationwide."  Lyrics at 6.

The concept of a narrator who is popular and vengeful toward his enemies is an unprotectible idea.  The word "king" is itself unprotectible.  As a whole, the similar elements listed by Mr. Prunté amount to nothing more than a "random" assortment of "similarities scattered throughout the works," which "does not support a finding of substantial similarity where [the] works as a whole are not substantially similar."  Whitehead v. Paramount Pictures Corp., 53 F. Supp. 2d at 50 (internal quotation marks and citation omitted); see also Bridgeport Music, Inc. v. UMG Recordings, Inc., 585 F.3d 267, 275 (6th Cir. 2009) ("[R]andom similarities . . . are not a proper basis for a finding of substantial similarity.").  Furthermore, aside from the repeated use of the word "king," the lyrics of the two songs are entirely different.  For example, the fact that both songs mention an article of clothing in their chorus is hardly significant, since the meaning and nature of the clothing mentioned is different for each song.  "Kings in the City" compares the hooded sweatshirts worn by the song's narrators to "crowns," while "I'm a King"

alludes to the wealth of the narrator by claiming that he has "[b]ank rolls in the pockets of my jeans." Lyrics at 6. Mr. Prunté cannot claim substantial similarity based on the idea of an article of clothing — or being a king, or being popular — when his expression of those ideas is so different from the expressions contained in the defendants' song. See <u>Nelson v. PRN Prods.</u>, 873 F.2d 1141, 1143 (9th Cir. 1989) ("There must be substantial similarity not only of the general ideas but of the expression of those ideas as well.") (internal quotation marks omitted).

### 6. Plaintiff's "We Got It Poppin'" Defendants' "Get It Poppin'"

Mr. Prunte alleges that the defendants infringed his copyright in the song "We Got It Poppin'" by using the phrase "get it poppin'" to refer to "the sex act" in "Get It Poppin" by Fat Joe. Pl.'s MSJ at 60. Furthermore, he asserts that the songs are similar because both are set in a dance club and involve "girls getting promiscuous after hours." <u>Id.</u> at 33. Mr. Prunté does not claim that the phrase "get it poppin'" originated with him, but instead contends that "there is only (1) one hip hop song with this title and expression, and it belongs to this plaintiff." Pl.'s Opp. at 34. Once again, however, the Court must point out that titles and common phrases such as "get it poppin'" are not protectible by copyright, and neither is the idea of "girls getting promiscuous after hours" in a club. See <u>Scott-Blanton v. Universal City Studios Prods.</u>, 539 F. Supp. 2d 191, 201 (D.D.C. 2008) ("[T]he public domain would have scant selection if stock settings such as . . . a club were subject to copyright protection").

### 7. Plaintiff's "Wish a Muthafugga Would" Defendants' "The Heat"

Mr. Prunté alleges that the defendants' "The Heat" by Lil Wayne infringes his song "Wish a Muthafugga Would" because defendants' chorus contains the phrase, "I wish a

motherfucker would trip this year," while the chorus Mr. Prunté's song repeatedly uses the phrase, "We wish them muther fuckers would." Pl.'s MSJ at 22. According to Mr. Prunté, both songs use the phrase to warn listeners that if they "do anything the speaker doesn't like," the speaker "will retaliate with gunplay if forced." See Second Am. Comp. at 48. The combination of a speaker's wish plus a common swear word, however, is a simple short phrase and thus not protectible. See Narrell v. Freeman, 872 F.2d at 911 (lyrics combining an ordinary phrase and other unprotectible elements will not be infringing unless the defendants copied an entire "sequence of creative expression," such as a "unique line or stanza") Furthermore, the manner in which that phrase is used in each song is distinct. The plaintiff's song uses the phrase to list various actions that enemies should not take unless they wished to be killed by the narrators (e.g., "try to set up shop on this block," "come to this table runnin the stable," "try to fuck with our skrilla," "try to state their case in our face"). See Lyrics at 10. In contrast, "The Heat" uses the phrase once in each repetition of its chorus to express a wish that "a motherfucker would trip this year"; it is not clear which meaning of the word "trip" is intended. Id. There is no indication that the speaker is warning the audience away from a specific act. Mr. Prunté thus can establish no more than that both songs use the word "wish" and the word "motherfucker" in the same phrase. Such a trivial point of commonality cannot establish substantial similarity. See Stratchborneo v. Arc Music Corp., 357 F. Supp. 1393, 1404 (S.D.N.Y. 1973) ("[S]ubstantial similarity cannot be established . . . simply by showing that both . . . songs focus on [a particular] idea; [the plaintiff] to prevail must establish that the [defendants], in a material way, tracked his . . . treatment of that idea.").

### 8. Plaintiff's "Stripper Girl"
### Defendants' "I'm N Luv (Wit a Stripper)"

According to Mr. Prunté, defendants' song "I'm N Luv (Wit a Stripper)" by T-Pain is substantially similar to his song "Stripper Girl" because both mention a stripper in their title and chorus, and both express the narrator's "deep love and admiration for the 'Stripper Girl' or the 'Girl Who Strips.'" Pl.'s MSJ at 22. Furthermore, both songs feature a stripper using a pole to dance. Id. These claims are light-years away from establishing substantial similarity. Mr. Prunté has no protectible interest in the word "stripper" or the idea of a narrator being in love with a stripper. Similarities between the songs relate solely to setting (strip club), stock themes (men enjoying watching strippers), and sequences of events (strippers dancing on poles) "that necessarily result from the choice of . . . situation"; they are thus all part of a *scène à faire* that does not enjoy copyright protection. Whitehead v. Paramount Pictures Corp., 53 F. Supp. 2d at 46 (internal quotation marks and citation omitted).

### 9. Plaintiff's "Slow Neck"
### Defendants' "Slow Motion"

Mr. Prunté claims his song "Slow Neck" was infringed by defendants' song "Slow Motion" by Juvenile because defendants' song "expresses scandalous sexual situations in the same candid manner as plaintiff'[']s [song]," with both singers emphasizing their preference that sexual acts be "slow." See Second Am. Compl. at 52-53. Such a broad theme is merely a concept that cannot be protected by copyright. See Johnson v. Gordon, 409 F.3d at 19 ("[C]opyright law protects original expressions of ideas but it does not safeguard either the ideas themselves or banal expressions of them." (quoting Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. at 345-51) (internal quotation marks omitted)); Whitehead v. Paramount

<u>Pictures Corp.</u>, 53 F. Supp. 2d at 49 (noting that "general concept[s]," such as the idea "of an interracial relationship" or "two star-crossed lovers," are "not copyrightable").

10.  Plaintiff's "Everybody's Talkin' 'Bout Us"
Defendants' "Talk About Our Love"

Mr. Prunté lists the following similarities between his song "Everybody's Talkin' 'Bout Us" and defendants' song "Talk About Our Love" by Brandy Norwood and Kanye West: Both songs are "about two lovers who notice that people are discussing or talking about their love affair, [but] . . . then decide[] to let [people] think whatever they want"; both "talk about family members" who gossip about the lovers; both "are moderately paced"; both include the phrase "just running their mouths"; and both "are considered upbeat and urban contemporary." Pl.'s Opp. at 43-44.  Again, ideas — such as the idea of two lovers deciding to ignore gossip about them — are not protectible, nor are short, common phrases such as "just running their mouths."  Furthermore, "random similarities," such as references to family members who gossip, "moderate[]" pacing, and an "upbeat" tone, "do[] not support a finding of substantial similarity where [the] works as a whole are not substantially similar."  <u>Whitehead v. Paramount Pictures Corp.</u>, 53 F. Supp. 2d at 50 (internal quotation marks and citation omitted).  Aside from their use of the common phrase "just running their mouths," the songs feature completely different lyrics, and the music of the two works is entirely different, with distinctly different melodies, accompaniment, tempos, and rhythms.  As a result, no reasonable factfinder could conclude that the songs are substantially similar.

11.  Plaintiff's "Shoot to Kill"
Defendants' "Welcome to the South" and "Battle Song"

Mr. Prunté contends that defendants' song "Welcome to the South" by Youngbuck is substantially similar to his song "Shoot to Kill" because both songs (1) include the phrase "shoot to kill" in their chorus, (2) rhyme words ending in an "-ill" sound in their chorus (*e.g.*, kill, pill), (3) "talk about cars" and "taking lives" "in the chorus lines," and (4) "speak about 'wheels.'" Pl.'s Opp. at 46. This list of supposed similarities is not accurate. The chorus of Mr. Prunté's song does not "talk about cars"; it says that the narrator will leave enemies "slumped behind the [steering] wheel." Lyrics at 22. The defendants' song, on the other hand, mentions "coupe Devilles." Id. Nor do the songs "speak about 'wheels'" — or at least, not the same kind of wheel, for Mr. Prunté's song refers to a steering wheel, while "Welcome to the South" mentions "22's" — slang for tire rims.

Of the supposed similarities listed by Mr. Prunté, only three have some basis in reality. Both songs do use the phrase "shoot to kill" in their choruses and, having used that phrase, necessarily refer to taking lives. The chorus of the defendants' song does rhyme two words ending in an "–ill" sound, "pills" and "kill." Plaintiff's song, in contrast, rhymes "kill," "will," "hill," and "bills." Neither the common phrase "shoot to kill," nor the idea of taking lives, nor a rhyme scheme using words ending in the commonplace "–ill" sound is protectible. See Steele v. Turner Broadcasting System, Inc., 646 F. Supp. 2d. 185, 192 (D. Mass. 2009) ("A common rhyme scheme . . . does not qualify as original expression protectable under federal copyright law.").

The plaintiff's claims regarding Eminem's "Battle Song" are similarly without merit.[5]  Mr. Prunté contends that "Battle Song" infringes "Shoot to Kill" because both songs use the phrase "shoot to kill" in their choruses and "express the same thematic purposes."  Pl.'s MSJ at 24.  In fact, "Battle Song" does *not* use the phrase "shoot to kill."  Rather, the singer states, "If I can't shoot you, I'm 'a halfta [*sic*] kill you by spittin.'" Second Am. Compl. at 58.  Even if "Battle Song" did include the phrase "shoot to kill," however, it would not infringe the plaintiff's song.  Again, a common phrase such as "shoot to kill" is unprotectible, as is the theme of killing with gunfire.

### 12.  Plaintiff's "I'm a Maniac"
### Defendants' "Break Bread"

Mr. Prunté contends that the chorus line in defendants' song "Break Bread" by Ludacris infringes his song "I'm a Maniac" by using the phrase "I'm a maniac" repeatedly and "employ[ing]" "the same thematic purpose."  Pl.'s MSJ at 24.[6]  But short phrases such as "I'm a maniac" are not entitled to copyright protection.  See Narrell v. Freeman, 872 F.2d at 911. Furthermore, as the Court has already noted several times, themes are ideas and hence not protectible.

---

[5]  Contrary to the Court's instructions, Mr. Prunté has failed to submit an audio recording of "Battle Song" and has provided a transcription only of the song's chorus.  The Court therefore addresses only Mr. Prunté's arguments regarding the lyrics of the chorus.

[6]  Mr. Prunté has failed to submit an audio recording of "Break Bread" and has provided a transcription only of the song's chorus.  The Court therefore addresses only Mr. Prunté's arguments regarding the lyrics of the chorus.

### 13. Plaintiff's "First Blood"
### Defendants' "It's Okay (One Blood)"

Mr. Prunté's claims regarding the defendants' song "It's Okay (One Blood)" by The Game consist entirely of the observation that the word "blood" is repeated several times in the chorus line of that song, just as it is in his song "First Blood." Pl.'s MSJ at 23. Being a single word, however, "blood" is not copyrightable, no matter how many times it is repeated. See, e.g., 37 C.F.R. 202.1(a) (individual words are not copyrightable).

### 14. Plaintiff's "That's What's Up"
### Defendants' "That What's Up"

According to Mr. Prunté, defendants' song "That's What's Up" by Yo Gotti is substantially similar to his song "That's What's Up" because they (1) have "completely identical titles," (2) have the same "thematic expression," and (3) feature "a 'call and answer' sequence that is answered by the phrase 'That's What's Up.'" Pl.'s MSJ at 24. These claims lack merit. First, "that's what's up" is a common, short phrase and so is not protectible. Second, themes are unprotectible ideas. Finally, Mr. Prunté is utterly incorrect in asserting that defendants' chorus has a call-and-answer section involving the phrase "that's what's up." An ordinary listener can discern that the same vocalist who says "that's what's up" in the chorus of defendants' song also says the preceding words; the section lacks the alternation between musicians or vocalists that is characteristic of call-and-response. Because Mr. Prunté has not identified any elements in defendants' song that are similar to protectible elements of his song, he cannot demonstrate substantial similarity.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant the defendants' motion to strike Mr. Mikeal's report, but deny the remainder of that motion.  It will deny as frivolous both Mr. Prunté's motion for judicial notice and his motion alleging contempt of court.  Finally, it will grant defendants' motion for summary judgment and deny Mr. Prunté's cross-motion.  Because this Opinion disposes of all of Mr. Prunté's claims on the merits, the Court will enter judgment for all defendants, including those who have not appeared.  An Order consistent with this Opinion shall issue this same day.

SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:   March 29, 2010